## No. 26-2124

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee

v.

STATE OF NEBRASKA,
Defendant-Appellee

v.

OREL ALLIANCE and MATTERS ON TOMORROW, TRUE POTENTIAL
SCHOLARSHIP,
Intervenor Defendants - Appellants

On Appeal from the United States District Court for the District of
Nebraska, No. 8:26-cv-0172
The Hon. Brian C. Buescher, U.S. District Judge

## INTERVENOR DEFENDANTS-APPELLANTS' OPPOSED MOTION FOR
## PARTIAL STAY PENDING APPEAL

Nicholas K. Grandgenett
Robert E. McEwen
James A. Goddard
947 O. St, Ste, 401
Lincoln, NE 68508
Phone: (402) 438-8853
ngrandgenett@neappleseed.org

Orlando C. Economos
Joshua M. Salzman
Paul R.Q. Wolfson
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
jsalzman@democracyforward.org

*Counsel for Orel Alliance and
True Potential Scholarship*

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

BACKGROUND.................................................................................................3

   I.   Statutory Background .................................................................................3

   II.  The United States and Nebraska Coordinate a Lawsuit ............................4

   III. Intervenors True Potential and Orel Alliance .........................................5

ARGUMENT .....................................................................................................8

   I.   Intervenors Are Likely to Prevail on the Merits. .....................................9

        A.    Intervenors are likely to succeed on their challenge to denial of intervention. ................................................................................9

             1.   Intervenors have standing. ....................................................9

             2.   Intervenors satisfy Rule 24 .................................................14

        B.    Intervenors are likely to prevail on their challenge to the Consent Judgment. ..................................................................................16

             1.   Intervenors are, at minimum, likely to prevail in challenging the district court's injunction to the extent it applies to currently enrolled students.................................................16

             2.   The Consent Judgment was also entered without jurisdiction and is wrong on the merits.................................................18

   II.  Absent a Stay, Intervenors Will Likely Suffer Irreparable Harm................21

   III. The Balance of Equities and Public Interest Favor a Partial Stay ..............22

CONCLUSION ................................................................................................22

ADDENDUM.........................................................................................Add.000

   1.  Filing 21, Index of Evidence in Support of Motion to Intervene ......Add.001

   2.  Filing 43, Order Denying Motion to Intervene ................................Add.052

   3.  Filing 49, Memorandum and Order Denying Motion to Intervene and Motion for Stay, Granting Joint Motion for Consent Judgment.Add.053

   4.  Filing 50, Consent Order and Final Judgment...................................Add.107

Appellate Case: 26-2124    Page: 2    Date Filed: 06/12/2026 Entry ID: 5650825

## INTRODUCTION

For more than twenty years, Nebraska law has authorized certain Nebraska high school graduates to pay in-state tuition at the State's public colleges and universities, regardless of their immigration status. Reasonably relying on these laws, numerous currently enrolled students invested thousands of dollars and years of their lives in pursuing educations based on the expectation that they would be able to afford to complete their degrees. Yet after decades of inaction, the United States brought suit asserting that Nebraska's law governing tuition at its own public educational institutions is preempted by a 30-year-old federal statute. The Nebraska Attorney General immediately capitulated and joined in a request by the United States for entry of a Consent Judgment barring enforcement of the challenged law.

With no one else defending Nebraska's law, two organizations that provide services to immigrant students, and that would be adversely affected by the Consent Judgment (Intervenors), moved to intervene. Intervenors explained that the district court lacked jurisdiction to hear the underlying suit, which arose from what the Parties termed a "partnership between Nebraska state leaders and the Department of Justice"—not an Article III case or controversy. And Intervenors argued that Nebraska law is not preempted, as illustrated by a recent District of Minnesota decision upholding an analogous law. *See United States v. Walz*, No. 25-cv-2668, 2026 WL 851231 (D. Minn. Mar. 27, 2026), *appeal pending*, No. 26-1886 (8th Cir.).

Despite showings by the Intervenors of both clear financial harm and impediment to their core business activities, the district court denied intervention, concluding that Intervenors failed to show a concrete injury. The court then entered the Parties' proposed Consent Judgment. In doing so, the court failed to explain why it would be equitable for the Consent Judgment to take immediate effect after decades of federal inaction. The court further failed to consider the interests of currently enrolled students.

Intervenors have appealed. Full merits briefing will establish that the district court erred in denying intervention and that the Consent Judgment should be vacated in its entirety. But currently enrolled students, who invested time and money in reliance on Nebraska's longstanding statutes and now face potentially life-altering consequences from interrupted educations, need immediate relief. Accordingly, this Court should enter a partial stay of the Consent Judgment to protect currently enrolled students.[1]

---

[1] Intervenors asked the district court for a stay pending appeal, which was denied. Add.082; *see also* Fed. R. App. P. 8(a)(1). In district court, the Intervenors sought a complete, rather than partial, stay. But the district court's resolution of that request makes clear that any further or differently framed stay request would likewise have been rejected.

Appellate Case: 26-2124    Page: 4    Date Filed: 06/12/2026 Entry ID: 5650825

# BACKGROUND

## I.   Statutory Background

Nebraska's public post-secondary schools charge substantially higher tuition to students lacking any connection to Nebraska. At University of Nebraska Omaha, out-of-state students are charged nearly three times the tuition rate paid by in-state students. Add.022–24.

In 2006, the Nebraska Legislature enacted L.B. 239, which created additional pathways to eligibility for in-state tuition. Non-citizens qualify if they have an immigration "petition pending … to attain lawful status," have lived in Nebraska for at least 180 days, are habitually present in the state, and intend to remain. Neb. Rev. Stat. § 85-502(5). Alternatively, any student, regardless of lawful presence, who lives in Nebraska for three years and graduates from a Nebraska high school while living with a parent or guardian qualifies for in-state tuition if they aver that they will apply for "permanent residen[ce]" at the "earliest opportunity." *Id.* § 85-502(9)(iv). For two decades, L.B. 239 has ensured post-secondary education remains affordable for many Nebraska high school graduates.

Subsection (9) applies regardless of immigration status. For instance, it covers an undocumented child who grows up in Nebraska and attends and later graduates from a local high school. It also applies to a U.S. citizen who lives in Nebraska for three years, graduates from a Nebraska high school, moves out of state and

3

completes online courses at a public Nebraska college. Students have reasonably relied on these statutory promises over the past two decades to access affordable education in Nebraska.

## II.     The United States and Nebraska Coordinate a Lawsuit

In April 2026, the United States sued Nebraska alleging that the portions of Section 85-502, and three related statutes (collectively the "Nebraska Laws"), are preempted by 8 U.S.C. § 1623(a). R. Doc. 1 (Compl.). Under Section 1623(a), "an alien . . . not lawfully present" cannot "be eligible on the basis of residence within a State" for "any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit . . . without regard to whether the citizen or national is such a resident." According to the United States, even a facially neutral provision making all of a State's high school graduates eligible for in-state tuition is preempted unless it affirmatively excludes non-citizens who are not lawfully present.

Before a summons was even issued, Nebraska and the United States jointly moved for a Consent Judgment invalidating and enjoining the challenged statutes. Despite his duty to "defend actions and claims against the state," Neb. Rev. Stat. § 84-205 (2025), and a recent decision from the District of Minnesota upholding nearly identical Minnesota statutes, *United States v. Walz*, No. 25cv2668, 2026 WL 851231 (Mar. 27, 2026), the Attorney General immediately capitulated, waived

4

Appellate Case: 26-2124     Page: 6     Date Filed: 06/12/2026 Entry ID: 5650825

service of process, consented to the Court's jurisdiction, and made no effort to defend the constitutionality of its own laws. R. Docs. 2, 3.

Later that same day, the Parties celebrated this collaboration as advancing shared policy. U.S. Attorney Lesley Woods for the District of Nebraska explained:

> This proposed consent decree demonstrates the quality of partnership between Nebraska state leaders and the Department of Justice for the shared purpose of ensuring that federal tax dollars are not used to discriminate against Nebraska's lawful citizens.

U.S. Dep't of Justice Press Release, *The Department of Justice Reaches a Proposed Consent Decree with Nebraska to Enjoin the State from Enforcing its Unconstitutional In-State Tuition and Scholarship for Illegal Aliens* (April 21, 2026), Add.044–47. Governor Pillen explained the suit resulted from "the combined efforts of President Trump's Department of Justice and Attorney General Hilgers . . . [and] is the latest example of [their] tremendous partnership." Add. 045.

### III. Intervenors True Potential and Orel Alliance

When the Attorney General capitulated, two organizations that assist non-citizens in pursuing higher education sought to intervene. True Potential Scholarship, a program within Nebraska non-profit Matters on Tomorrow, funds 100% of the tuition costs for students ineligible for federal financial aid, who live in Nebraska or Iowa, completed high school in the United States, and plan to attend a community or state college in Nebraska or Iowa. Add.005–06. True Potential enters administrative agreements with donors to ensure sufficient funding for these annual

Appellate Case: 26-2124    Page: 7    Date Filed: 06/12/2026 Entry ID: 5650825

scholarships. Add.006. The organization has provided upwards of 300 scholarships to Nebraskans that are undocumented or have Deferred Action for Childhood Arrivals ("DACA") or Temporary Protected Status ("TPS"). *Id*.[2] This upcoming academic year, True Potential has committed to financing 27 scholarships to students attending a public Nebraska or Iowa college or university.[3] Add.007. True Potential's ability to fulfill these commitments is contingent on students' retaining eligibility for in-state tuition. *Id.* Under the approved Consent Judgment, True Potential, with its current administrative and funding structure, will not have sufficient funds to finance these 27 scholarships during the 2026-2027 academic year and will either need to renege on these commitments, raise additional funds, or renegotiate administrative agreements. Add.007–08.

Orel Alliance is an Omaha-based nonprofit offering holistic access to education and immigration-related services for Ukrainian immigrants. Many of the immigrants Orel serves entered the United States with parole; Orel frequently covers the $2,300 parole filing fee and has done so for 98 Ukrainian families. Add.010–19. In Orel's experience, Nebraska views people with parole as lawfully present.

---

[2] Nebraska has taken the position that undocumented people, as well as non-citizens authorized to work or live in the United States through deferred action, DACA, TPS, and pending applications for TPS, re-parole, and asylum, are not lawfully present. Add.007–08, 013–14.

[3] Twenty-six of these students will attend a public college or university in Nebraska. Add.007.

Appellate Case: 26-2124    Page: 8    Date Filed: 06/12/2026 Entry ID: 5650825

Add.007, Add.014. However, delays in parole adjudications have prompted many Ukrainians to apply for TPS, asylum, or re-parole; and in some cases, Ukrainians simply have no approved immigration status. *Id.* at Add.013-15.

Orel also coordinates English as a second language ("ESL") classes and offers educational referral services. Add.015-16. Additionally, Orel provides tuition assistance to Ukrainian students and anticipates doing so in the future if Ukrainian students remain eligible for in-state tuition. *Id.* For the 2026-2027 school year, Orel will refer 38 Ukrainians to UNO or a public community college for either credit-based ESL classes or general course work. Add.015. Twenty-three of these students have TPS, a pending TPS application, pending applications for asylum, TPS, or re-parole, or no approved immigration status. Add.016. If these students are ineligible for in-state tuition, Orel anticipates needing to cover their parole filing fees to maintain their eligibility for in-state tuition, which unnecessarily creates duplicative immigration statuses. Add.017, 019.

While True Potential and Orel highlighted these ways in which the Consent Judgment threatened to adversely affect them, the district court nonetheless denied their motion to intervene and approved the Consent Judgment. In doing so, the court concluded that it had jurisdiction over this "friendly" lawsuit, Add.088–90; that enforcement of Section 1623 against the State raises no federalism concerns, Add.097; and that the challenged statutes are preempted to the extent they allow

7

students not lawfully present to access in-state tuition, Add.102. True Potential and Orel Alliance promptly appealed and moved to stay the Consent Judgment.

## ARGUMENT

On a motion to stay judgment pending appeal, the Court considers: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009). Ultimately, the Court "must consider the relative strength of the four factors, balancing them all." *Brady v. NFL*, 640 F.3d 785, 789 (8th Cir. 2011). Because the factors are considered collectively, a movant's showing of "a substantial question" (rather than an outright likelihood of success) may be sufficient basis on which to grant relief when "the equities are otherwise strongly in his favor." *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 113 (8th Cir. 1981). *See also Nebraska v. Biden*, 52 F.4th 1044, 1046 (8th Cir. 2022). Here, all four factors support staying the Consent Judgment as to currently enrolled students. Substantial questions related to standing, intervention, and Nebraska's in-state tuition laws are, moreover, before the court.

Appellate Case: 26-2124    Page: 10    Date Filed: 06/12/2026 Entry ID: 5650825

**I.      Intervenors Are Likely to Prevail on the Merits.**

Intervenors have appealed from the denial of their intervention motion and the Consent Judgment.[4] They are likely to prevail on both appeals.

**A. Intervenors are likely to succeed on their challenge to denial of intervention.**

Intervenors sought to participate in these proceedings because the Consent Judgment would "perceptibly impair[]" their "ability to provide [their] services" to students who would be stripped of their statutory rights to qualify for in-state tuition. *Granville House, Inc. v. Dep't of Health & Hum. Servs.*, 715 F.2d 1292, 1298 (8th Cir. 1983). Though the court acknowledged that the Consent Judgment would "increas[e] [Intervenors'] costs of providing services," Add.067, the court nonetheless concluded Intervenors lacked standing and failed to satisfy the requirements for intervention under Fed. R. Civ. P. 24(a). In reaching these conclusions, the court failed to "accept as true all material allegations in the motion to intervene and construe the motion in favor of the prospective intervenor." *Nat'l Parks Conservation Ass'n v. EPA*, 759 F.3d 969, 973 (8th Cir. 2014).

*1. Intervenors have standing.*

Representatives from both True Potential and Orel submitted sworn declarations identifying how the Consent Judgment will specifically harm the

---

[4] Intervenors properly appealed from the Consent Judgment, notwithstanding the denial of intervention. *See Mausolf v. Babbitt*, 125 F.3d 661, 666 (8th Cir. 1997).

Appellate Case: 26-2124      Page: 11      Date Filed: 06/12/2026 Entry ID: 5650825

organizations financially and impede their ability to perform their core missions. Add.005–19. The district court nonetheless concluded that Intervenors failed to establish either a cognizable injury or the traceability required to establish standing. Add.063. These conclusions rest on an overly narrow conception of the legal principles governing standing and on an unduly restrictive reading of the Intervenors' declarations.

**a.** As to injury, the district court found that Intervenors could establish standing only if they could show that the judgment would "reclassify" Intervenors' business activities or "impose[] requirements for the conduct of business." Add.067. But these requirements are not found in this Court's caselaw or that of the Supreme Court. As this Court recently reaffirmed, "[a]n organizational plaintiff satisfies the injury-in-fact requirement if a defendant's actions directly affected and interfered with the organization's core business activities." *Get Loud Arkansas v. Jester*, 171 F.4th 1058, 1064 (8th Cir. 2026). Both Intervenors readily satisfy that standard.

True Potential "funds 100% of the tuition costs" for students ineligible for federal financial aid, including students "who are undocumented" or enrolled in programs like deferred action, DACA, or TPS. Add.005–06. Under the Consent Judgment, the tuition of the 26 Nebraska students it has committed to funding in the 2026-2027 academic year will increase substantially. Add.107. This monetary cost is a paradigmatic injury in fact. *See, e.g.*, *Wallace v. ConAgra Foods, Inc.*, 747 F.3d

10

1025, 1029 (8th Cir. 2014). Moreover, because True Potential's ability to finance those students "is contingent on … retaining eligibility for in-state tuition," Add.007, the Consent Judgment places True Potential in the untenable position of needing to renege on its commitment to these students unless additional funds can be raised or existing agreements renegotiated. Add.008. This constitutes clear interference with the organization's core business activities.

Orel faces similar injuries to its education referral services for Ukrainian immigrants. Add.012. For example, Orel alleged that its ability to refer 13 Ukrainians with TPS, a pending TPS application, or a pending asylum application to UNO for the upcoming school year depends on the students' continued eligibility for in-state tuition. Add.016. Orel's ability to provide tuition assistance to students depends on their eligibility for in-state tuition. *Id*. Orel also faces a number of increased financial costs from the Consent Judgment, including a need to pay expensive parole filings fees for otherwise unnecessary, duplicative immigration applications for impacted students. Add.014, 017–18. Moreover, Orel alleged that the Consent Judgment would make post-secondary education financially unattainable for many Ukrainians. As such, it would dramatically shift Orel's organizational mission away from educational referral services and towards charitable services—a shift that would require them to hire additional staff. Add.018–19.

Appellate Case: 26-2124    Page: 13    Date Filed: 06/12/2026 Entry ID: 5650825

The district court dismissed these concrete injuries on the mistaken view that these harms would only be cognizable if the organizations were under "a legal obligation to provide" assistance to students. Add.067. But an organization (or business) will almost always have the option of ceasing operations if the regulatory environment becomes unfriendly. In *Get Loud*, this Court did not ask whether the plaintiff organization was legally obligated to conduct voter registration activities before concluding that the organization could challenge a regulation that made those activities "substantially less effective." 171 F.4th at 1064.

The district court also faulted Intervenors for not "identif[ying] any specific recipients" of their services who are "aliens unlawfully present." Add.067. But True Potential expressly alleged that its ability to finance the tuition of the its scholarship recipients was "contingent on those students eligibility for in-state tuition without regard to immigration status." Add.007. Both organizations also described the immigration statuses of the students they serve. Add.006, 013–14, 016. This was more than sufficient to establish injury, especially since all reasonable inferences must be drawn in favor of Intervenors. *See Nat'l Parks Conservation Ass'n*, 759 F.3d at 973. And that is particularly true here because the district court refused to even engage the question of which immigration statuses would be considered "unlawfully present." *See* Add. 105 (refusing to add "clarity" to the consent judgment by specifying which of "multiple immigration statuses" would be deemed unlawfully

Appellate Case: 26-2124    Page: 14    Date Filed: 06/12/2026 Entry ID: 5650825

present). Any ambiguity on this score should thus be resolved in favor of Intervenors.

**b.** Intervenors have also shown traceability. The district court thought Intervenors' injuries too attenuated because tuition is assessed to students, not charged to the Intervenors directly. Add.068. But the link between the increased costs inflicted on affected students by the Consent Judgment and the increased costs and other harms on Intervenors is direct and substantial.

As the Supreme Court recently explained, a party that is not regulated directly can establish traceability when it can show its injuries from the challenged policy are "predictable" rather than "speculative." *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025). Here, the effects of the Consent Judgment on Intervenors—whose charitable purpose directs them to bear these costs on behalf of regulated students—is entirely non-speculative.

The district dismissed *Diamond* on the ground that it involved "business" instead of "philanthropy." Add.070. But Article III does not privilege for-profit organizations over philanthropic ones. In either case, an entity prevented from conducting its core business activities has a cognizable injury. And nothing in *Diamond* limits its application to the for-profit sector. No less than in the business context, "commonsense economic principles" dictate the requisite link between the Consent Judgment and Intervenors' injuries. 606 U.S. at 116.

13

## 2. *Intervenors satisfy Rule 24*

Once standing is established, intervention as of right is available under Federal Rule of Civil Procedure 24(a)(2) if (1) a prospective intervenor has a recognized interest in the subject matter of the litigation; (2) that might be impaired by the disposition of the litigation; and (3) which is not adequately protected by the existing parties. *Mille Lacs Band of Chippewa Indians v. Minn.*, 989 F.2d 994, 997 (8th Cir. 1993). The district court mistakenly found Intervenors' showing inadequate as to the first and third requirements.

As to the first requirement, for much the same reasons that Intervenors have standing, they also have a cognizable interest in the litigation. Intervenors' missions are substantially frustrated, and their coffers drained, by the Consent Judgment. That cost is not "tangential or collateral"—it is at the very heart of this case, "contingent upon the outcome of the litigation." *United States v. Union Elec. Co.*, 64 F.3d 1152, 1161–62 (8th Cir. 1995). Moreover, other federal circuits have explicitly recognized that education and educational opportunities are a significant, legally protectable interest, separate and apart from the financial injury of tripling tuition costs. *See, e.g., Brumfield v. Dodd*, 749 F.3d 339, 343 (5th Cir. 2014) (permitting intervention of right by students' parents where a proposed Consent Judgment could have eliminated educational opportunities stemming from educational vouchers and scholarships); *Grutter v. Bollinger*, 188 F.3d 394, 398 (6th Cir. 1999) (allowing

14

intervention by, among others, a nonprofit organization whose stated mission is to preserve opportunities in higher education for African–American and Latino/a students in Michigan based on a substantial legal interest in the preservation of educational opportunities for Black and Latino students).

The district court also believed that Intervenors are adequately represented by the Attorney General. Add.076–77. But a party seeking intervention bears only the "minimal" burden of demonstrating representation of their interests by the existing parties "may be inadequate." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972). And although government parties are typically presumed to represent the interests of its citizens as *parens patriae*, an intervenor may "rebut the presumption that the government is adequately representing its interests by showing that its interests actually differ from or conflict with the government's interests." *South Dakota ex rel. Barnett v. U.S. Dep't of Interior*, 317 F.3d 783, 785–86 (8th Cir. 2003).

Here, there could be no starker conflict. The Nebraska Attorney General is actively inviting the invalidation of the laws that Intervenors seek to protect. The inadequacy of representation is underscored by the clear indications of collaboration between the Parties that belies any adversarial process. Given the Attorney General's unwillingness to protect Intervenors' interests, they are entitled to represent themselves.

Appellate Case: 26-2124    Page: 17    Date Filed: 06/12/2026 Entry ID: 5650825

**B. Intervenors are likely to prevail on their challenge to the Consent Judgment.**

> *1. Intervenors are, at minimum, likely to prevail in challenging the district court's injunction to the extent it applies to currently enrolled students.*

As for the Consent Judgment, the Intervenors are (at minimum) likely to prevail in showing that the district court erred in enjoining application of the Nebraska Laws to currently enrolled students. The Intervenors, participating as amici, flagged for the district court that it could not enter injunctive relief without performing a full equitable analysis and that the equities strongly weighed against entering any injunction that applies to currently enrolled students. R. Doc. 44 at 31-32. Yet the portion of the district court's opinion approving the injunction makes no mention of the balance of equities or the public interest, let alone reflects any acknowledgment of the substantial reliance interests of currently enrolled students.[5] This apparent failure to consider the equities before entering an injunction is, standing alone, reversible error. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 394 (2006) (holding "the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity").

---

[5] The district court briefly addressed the public interest in the context of concluding that Intervenors had not satisfied the requirements for a stay pending appeal. Add.082. But that analysis nowhere suggests that the court considered the separate question of whether the underlying injunction is itself equitable.

Appellate Case: 26-2124     Page: 18     Date Filed: 06/12/2026 Entry ID: 5650825

Had the district court performed the required equitable analysis, it would have been compelled to conclude that the balance of equities and public interest weigh heavily against any injunctive relief that is applicable to currently enrolled students, who have relied heavily on Nebraska's longstanding tuition laws in planning their futures and structuring their lives. The average graduating college student in Nebraska takes on $32,206 of debt. Melanie Hanson, *Student Loan Debt by State: Nebraska*, EducationData.org (June 26, 2025), https://perma.cc/YG8V-NLPH. They reasonably assume that incurring debt in reliance on the expectation that educational attainment will enable them to secure better employment prospects. But the injunction makes no effort to consider the reliance interests of students who have already invested time and money in educations they cannot afford to complete under the proposed injunction.

These substantial and legitimate reliance interests dwarf any countervailing interest in an injunction that takes immediate effect. Plaintiff United States alleges only an abstract sovereign interest and waited 20 years to raise any objection to the challenged statutes. After decades of inaction, which induced students to reasonably rely on the challenged laws, the United States cannot plausibly claim that there is any exigency that requires immediate preemption of the challenged laws even as applied to enrolled students. *Cf. Benisek v. Lamone*, 585 U.S. 155, 160 (2018)

17

(weighing "years-long" delay in seeking injunctive relief in the balance of the equities).

Nebraska, the nominal defendant, likewise cannot identify any prejudice from a more narrowly tailored injunction that preserves some applications of the challenged laws. While Nebraska's current Governor and Attorney General have made clear their disapproval of those statutes, those laws were passed by a democratically elected state legislature. The State's interest is in having those laws remain in force to the greatest extent possible.

Intervenors are thus likely to show that the district court erred to the extent that it overlooked these substantial inequities.

> ### 2. The Consent Judgment was also entered without jurisdiction and is wrong on the merits.

On the present motion, which seeks only a partial stay, the Court need not consider whether Intervenors are likely to prevail in showing that the Consent Judgment should be vacated in its entirety. But the Consent Judgment suffers from three independent defects, each of which is grounds for complete reversal.

*First*, the district court lacked jurisdiction because the was no "case or controversy" to supply the court with Article III jurisdiction. A true case or controversy requires parties with adverse legal interests who pursue "an honest and actual antagonistic assertion of rights" against each other. *Muskrat v. United States*, 219 U.S. 346, 359 (1911); *Chicago & Grand Trunk Ry. Co. v. Wellman*, 143 U.S.

18

339, 345 (1892). When "both litigants desire precisely the same result," there is no case or controversy. *Moore v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 47, 48 (1971). Without strict application of this jurisdictional limitation, a "friendly suit" could allow "a party beaten in the legislature" to "transfer to the courts an inquiry as to the constitutionality of the legislative act." *Wellman,* 143 U.S. at 345.

Here, the timetable on which the litigation unfolded, and the Parties' own statements, confirm that the Nebraska Attorney General actively collaborated with the United States to secure the invalidation of a Nebraska statute that the legislature has repeatedly chosen to maintain. The district court nonetheless believed, Add.088, that this case falls within the narrow exception to adversity principles recognized in *United States v. Windsor*, 570 U.S. 744 (2013). But here, there is no evidence that Nebraska "refus[ed] to give [] effect" to its agreement with the other side's legal position, as evidenced by a concrete adverse action against the opposing party in the litigation. *Id.* at 756. Moreover, the *Windsor* Court was clear that "Article III requirements . . . must be satisfied by the parties before judicial consideration is appropriate." *Id. at* 760. Here, unlike *Windsor,* the parties were not adverse at the time of filing.

*Second*, the district court's merits holding rests on misreadings of both Section 1623 and of Section 85-502. Space considerations do not allow for a full textual exegesis here. But it is notable that courts have upheld California and Minnesota

Appellate Case: 26-2124     Page: 21     Date Filed: 06/12/2026 Entry ID: 5650825

analogues to the challenged portions of Section 85-502. *See United States v. Walz*, 2026 WL 851231 (D. Minn. Mar. 27, 2026); *Martinez v. Regents of Univ. of Cal.*, 241 P.3d 855, 863 (Cal. 2010). Full merits briefing will show that Nebraska's similar in-state tuition law is likewise consistent with Section 1623. *Cf.* L.B. 239 *Hearing before the Education Committee*, 99th Leg. 1st Sess. 3 (Neb. 2005) (showing that the Nebraska legislature was aware of Section 1623 and specifically designed the challenged laws to be neutral between citizens and immigrants to comply with federal law).

*Third*, the district court's preemption holding raises grave federalism concerns. The Consent Judgment impinges on Nebraska's authority to administer its educational system—a domain in which states have always been sovereign. *See United States v. Lopez*, 514 U.S. 549, 564 (1995). The district court deemed the Tenth Amendment to be no impediment to the Consent Judgment because of Congress's authority "over aliens and immigration policy." Add.097. But the United States has not brought suit against "aliens" for the unlawful receipt of benefits, but rather, has sued a sovereign State on the theory that its tuition laws are invalid unless they affirmatively exclude certain graduates of Nebraska high schools from in-state tuition. Even when legislating pursuant to an enumerated power, such as the power to regulate immigration, Congress lacks "the power to issue direct orders to the governments of the States." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453,

20

471 (2018). Accordingly, "every form of preemption is based on a federal law that regulates the conduct of private actors, not the States." *Id.* at 479. Here, however, the Consent Judgment is predicated on the supposition that Section 1623(a) regulates States directly, dictating to them the necessary content of their laws and the tuition policies they must adopt and enforce. That is constitutionally impermissible.

## II. Absent a Stay, Intervenors Will Likely Suffer Irreparable Harm

Intervenors will also suffer irreparable harm in the absence of at least partial stay. For much the same reasons that Intervenors can establish standing, *see supra* Part I.A.1, they will also be injured in the absence of a partial stay. Intervenors have committed to providing tuition payments and other assistance to students enrolled in Nebraska public universities for the 2026-2027 year and who would be covered by the partial stay. Add.006–07, Add.016–17. As explained, Intervenors' ability to serve those students and honor their commitments depend on the continued availability of in-state tuition. *See League of Women Voters of the U. S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (recognizing "obstacles which make it more difficult [for an organization] to accomplish their primary mission" as a form of irreparable harm). Likewise, if True Potential pays higher tuition on behalf of any of the students it has committed to help, it is unclear whether it would be able to recover those amounts even if the Consent Judgment is ultimately vacated. *See Iowa Utilities Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996) ("The threat of unrecoverable economic

21

loss, however, does qualify as irreparable harm."). True Potential would also need to "renegotiate its administrative agreements" absent a stay, in ways that would be irreversible. Add.008.

### III. The Balance of Equities and Public Interest Favor a Partial Stay

The remaining equitable factors also support a partial stay of the Consent Judgment. As explained above, the district court's injunction was inequitable and contrary to the public interest because it failed to consider the reasonable reliance interests of currently enrolled students. *See supra* Part I.B.1. For much the same reasons, a partial stay of that judgment would serve the public interest. Given that the United States has waited two decades to seek relief, a stay of a few additional months while this appeal proceeds does not constitute any meaningful imposition on its interests. And the Nebraska Attorney General could not claim any harm from a partial delay in an injunction against Nebraska's own democratically enacted statutes.

### CONCLUSION

Intervenors respectfully request this Court grant a partial stay of the district court's Order and Final Judgment as to students currently enrolled as of the date of that order, pending disposition of this appeal.

Dated: June 12, 2026                    Respectfully submitted,

*/s/ Nicholas Grandgenett*
Nicholas K. Grandgenett
Robert E. McEwen
James A. Goddard
947 O. St, Ste, 401
Lincoln, NE 68508
Phone: (402) 438-8853
Fax: (402) 438-0263


ngrandgennett@neappleseed.org
rmcewen@neappleseed.org
jgoddard@neappleseed.org

*/s/    Orlando Economos*
Orlando Economos
Joshua M. Salzman
Paul R.Q. Wolfson
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 921-4875


oeconomos@democracyforward.org
jsalzman@democracyforward.org
pwolfson@democracyforward.org


*Counsel for Intervenors*

Appellate Case: 26-2124     Page: 25     Date Filed: 06/12/2026 Entry ID: 5650825

# CERTIFICATE OF COMPLIANCE

This motion complies with the typeface and type-volume limitations in Federal Rule of Appellate Procedure 27(d)(1)(E) and 27(d)(2)(A) because it contains 5,019 words according to the count generated by Microsoft Word, and has been prepared in a proportionally spaced typeface using 14-point Times New Roman font.

Dated: June 12, 2026

*/s/  Orlando Economos*
Orlando Economos

# ADDENDUM

## United States District Court
## District of Nebraska

| | | |
|---|---|---|
| United States of America, | | |
| Plaintiffs, | | Civil Action No: 8:26-cc-172 |
| v. | | |
| State of Nebraska | | |
| Defendants. | | |

---

### Proposed Intervenors Evidence Index In Support of their Motion to Intervene and Accompanying Brief

---

Proposed Intervenors, Orel Alliance and True Potential, file this Evidence Index in support of their above referenced motion.

| Ex. | Description | App. Pages |
|---|---|---|
| 1 | Declaration of Ross Pesek | 1-6 |
| 2 | Declaration of Amanda Hall | 7-16 |
| 3 | University of Nebraska at Omaha Online Advertised Tuition Rates | 17-26 |
| 4 | L.B. 239 Slip Law (2006) | 27-29 |
| 5 | L.B. 870, as it was introduced, (2026). | 30-34 |
| 6 | L.B. 1061, as it was introduced, (2026). | 35-39 |
| 7 | U.S. Dep't of Justice Press Release, *The Department of Justice Reaches a Proposed Consent Decree with Nebraska to Enjoin the State from Enforcing its Unconstitutional In-State Tuition and Scholarship Programs for Illegal Aliens,* (April 21, 2026). | 40-44 |
| 8 | U.S. Dep't of Justice Press Release, *The Justice Department, Texas Reach* | 45-48 |

1

Appellate Case: 26-2124    Page: 28    Date Filed: 06/12/2026 Entry ID: 5650825

| | *Agreement to End In-State Tuition for Illegal Aliens* | |
|---|---|---|

May 7, 2026

*/s/ Nicholas Grandgenett*
Nicholas K. Grandgenett
  (NE Bar 27323)
Robert E. McEwen
  (NE Bar 24817)
James A. Goddard
  (NE Bar 24150)
947 O. St, Ste, 401
Lincoln, NE 68508
Phone: (402) 438-8853
Fax: (402) 438-0263

ngrandgennett@neappleseed.org
rmcewen@neappleseed.org
jgoddard@neappleseed.org

Respectfully submitted,

*/s/ Orlando Economos*
Orlando Economos*
  (DC Bar 90013791)
Joshua M. Salzman*
  (DC Bar 982239)
Paul R.Q. Wolfson*
  (DC Bar 414759)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 921-4875
oeconomos@democracyforward.org
jsalzman@democracyforward.org
pwolfson@democracyforward.org

*Counsel for Proposed Intervenors*

* Motions to appear pro hac vice
  forthcoming

2

## CERTIFICATE OF SERVICE

I hereby certify that on May 7, 2026, a true and correct copy of the foregoing document was electronically filed via the Court's CM/ECF system which sends notice of electronic filing to all counsel of record.

/s/ Nicholas Grandgenett
Nicholas K. Grandgenett

3

App.-1

# EXHIBIT 1

Appellate Case: 26-2124    Page: 31    Date Filed: 06/12/2026 Entry ID: 5650825

## United States District Court
## District of Nebraska

United States of America,

                    Plaintiffs,        Civil Action No: 8:26-cc-00172

        v.
                                       Declaration of Ross Pesek

State of Nebraska


                    Defendants.


I, Ross Pesek, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I make this declaration based on my personal knowledge and upon review of the relevant documents. If called as a witness, I could and would testify competently and truthfully to what is contained in this declaration.

2.      I am an attorney in South Omaha and co-founder of True Potential. True Potential operates as a subprogram within Matters on Tomorrow, a Nebraska-based non-profit. I am responsible for the general management of True Potential and am familiar with its application processes, fundraising, fiscal management, and the population it serves.

### True Potential's Business Activities

3.      True Potential's core business activity is to operate as a scholarship program that funds 100% of the tuition costs, and fees, for students who are

ineligible for federal financial aid, live in Nebraska or Iowa, completed their senior year of high school in the United States, and plan to attend a community or state college in Nebraska or Iowa.

4.      Our organizational mission is to cover tuition expenses for as many students as possible. All of our grant recipients attend public, Nebraska and Iowa post-secondary schools.

5.      True Potential has a staff of five volunteers, including me and four other people.

6.      Our fundraising strategy requires us to enter administrative agreements with various donors to ensure we have sufficient funding to grant students full tuition scholarships on an annual basis.

7.      True Potential does not require any specific immigration status to qualify for a scholarship. As such, True Potential provides scholarship funds to students who are undocumented or are authorized to live in Nebraska through deferred action, Deferred Action for Childhood Arrivals ("DACA"), or Temporary Protected Status ("TPS").

8.      Since True Potential was founded in 2013, it has provided more than 300 scholarships to students who are undocumented or living in Nebraska through deferred action, TPS, or DACA or other immigration statuses.

2

App.-3

**Immigration Status and True Potential**

9.      For the 2026-2027 school year, True Potential has determined it will finance the tuition costs of 27 students attending a public, Nebraska or Iowa post-secondary college. Our ability to finance the full tuition of those 27 students is contingent on these students retaining eligibility for in-state tuition without regard to immigration status.

10.      For the 2026-2027 school year, 26 of the 27 students will attend Nebraska post-secondary college.

11.      Many of True Potential's scholarship recipients are eligible for in-state tuition because they graduated from a Nebraska high school with three years of attendance and aver that they will apply for permanent residency when eligible or they have a pending application for lawful status.

12.      Of the 27 students that will receive scholarships for the 2026-2027 school year, at least 3 will take course work for the summer of 2026.

13.      It is my understanding that the proposed consent judgment would make people without "lawful presence" ineligible for in-state tuition in Nebraska.

14.      In my experience, Nebraska takes the position that undocumented people, as well as those who are authorized to live and work in the United States through deferred action, DACA, and TPS, are not "lawfully present."

3

15.    It is my understanding that the state, for example, uses that interpretation of lawful presence to prevent people with deferred action, DACA, and TPS from accessing unemployment benefits in Nebraska if they lose their job through no fault of their own.

**Harm to True Potential**

16.    If the proposed consent judgment is approved by this Court, then True Potential, with its current administrative structure, will not have sufficient funds to pay the full tuition of the 27 students attending public community and state colleges in Nebraska during the 2026-2027 school year.

17.    For example, if students become ineligible for in-state tuition during the summer and fall of 2026, then True Potential will not be able to fulfill its commitments in the spring of 2027, and possibly the fall of 2026, with its current funding and fundraising structure.

18.    If the proposed consent decree requires students to demonstrate lawful presence, True Potential will need to renegotiate its administrative agreements and increase fundraising efforts.

19.    As such, True Potential will have to renege on its commitment to the 27 students unless it can successfully raise additional funds (which itself would require the expenditure of additional resources).

4

20.    Additionally, True Potential will need to update student application materials and revise the eligibility criteria reflected on its website and other public facing resources.

21.    If the proposed consent judgment is approved by the court, then it will frustrate the core business activities of True Potential.

_____

Ross Pesek
Co-Founder
True Potential

Executed this 7th day of May 2026, in Omaha, Nebraska.

5

App.-6

App.-7

# EXHIBIT 2

**United States District Court**
**District of Nebraska**

United States of America,

                        Plaintiffs,

        v.

State of Nebraska

                        Defendants.

Civil Action No: 8:26-cc-00172

Declaration of Amanda Hall

I, Amanda Hall, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I make this declaration based on my personal knowledge and upon review of the relevant documents. If called as a witness, I could and would testify competently and truthfully to what is contained in this declaration.

2.      I am the Executive Director and co-founder of Orel Alliance, an Omaha-based nonprofit founded in April 2024 to ensure Ukrainian families can access the assistance necessary to rebuild and thrive in Nebraska. The organization works to provide security, independence, and a pathway to integration for Ukrainian immigrants.

3.      I have a bachelor's degree in psychology from the University of Kansas and a master's degree in counseling psychology from the University of Missouri-Kansas City. Prior to my current position at Orel Alliance, I gained

significant experience as a case manager and community manager while working for the Journey Mental Health Center and the Crohn's & Colitis Foundation. I have also served as a volunteer for the Center for Immigrant and Refugee Advancement ("CIRA").

4.     Through my education and professional experiences, I am familiar with the immigration statuses, and their limitations, common amongst Ukrainian immigrant populations.

5.     In 2022, Russia pursued an unprovoked invasion of Ukraine. The subsequent, ongoing war has killed civilian and military personnel alike, rendered cities unlivable, and displaced thousands, if not millions, of families seeking safety. Ukrainian families have been resettled throughout the world, including here in Nebraska. Orel Alliance was founded against this backdrop of war, resettlement, and immigration.

6.     Specifically, Orel Alliance's core business activity is to provide guidance and referral services related to employment assistance, resettlement, housing, and education to Ukrainian immigrants.

7.     Orel Alliance offers services to approximately 2,500 Ukrainian immigrants living in Nebraska and Western Iowa. Approximately 500 of these individuals are receiving education related services.

Add.013

8.      Since its founding, Orel Alliance has provided approximately $1.5 million in direct financial support to Ukrainian immigrants. Orel devotes approximately $120,000 annually for education guidance and referral services. These funds are used for staffing and other costs,

9.      In support of our operations, we opened a new Ukrainian community center in Omaha on or about April 16th, 2026 in a rented facility.

**Immigration Statuses**

10.     Most of the Ukrainian immigrants Orel Alliance serves were paroled by the federal government into the United States through the Uniting for Ukraine ("U4U") program. As such, in many cases, their initial immigration status was a form of humanitarian parole. A few Ukrainian families were also paroled into the country at the southern border.

11.     Recently, the federal government has slowed and delayed U4U-based parole. This has had a significant impact on many Ukrainian immigrants served by Orel Alliance. In response, Orel Alliance has referred these Ukrainians to private and non-profit attorneys to ensure they have access to legal advice and representation.

12.     Most commonly, these attorneys have helped these Ukrainian immigrants apply for Temporary Protected Status ("TPS"), asylum, and re-

parole. As such, many Ukrainians served by Orel Alliance in Nebraska are authorized to remain in the country by virtue of TPS, or pending asylum applications, or are waiting for a new parole application to be adjudicated (i.e. re-parole).

13.     Some Ukrainians, through no fault of their own, have seen their immigration status lapse due to slow processing times and thus currently have no approved immigration status or are locked into a conditionally approved status. This prohibits them from obtaining an Employment Authorization Document ("EAD") from USCIS. Many immigrants, if ineligible for an EAD, will prioritize post-secondary education to ensure they have marketable skills when eligible for an EAD.

14.     Applying for parole and a parole-based EAD costs approximately $2,350. This includes a $1,330 fee at the time of filing and another $1,020 fee if conditionally approved. Orel Alliance has paid these filing fees for approximately 98 Ukrainian individuals and referred them to CIRA, or private attorneys, for legal representation.

15.     In my experience, Nebraska takes the position that people with no current immigration status as well as those with TPS and pending applications for re-parole or asylum are not lawfully present. This is true even for Ukrainian immigrants authorized to live and work in Nebraska by virtue

App.-11

of TPS or a pending asylum application. Nebraska does, however, take the position that parole, once granted, is a form of lawful presence.

16. It is my understanding that, for example, Nebraska uses this interpretation of "lawful presence" to prevent people with TPS, deferred action, and pending asylum applications from receiving unemployment benefits in Nebraska, which are unavailable to immigrants without "lawful presence." For similar reasons, Nebraska denies driver's licenses to those with only a pending parole application, but not a granted parole application.

**Education Services**

17. Orel Alliance provides its guidance and referral services, including its education services, to Ukrainians immigrants without regard to immigration status. Our education services include, for example, coordinating English as a second language ("ESL") classes, after-school tutoring, and homework assistance. We provide these services to better ensure Ukrainians can access and utilize Nebraska's post-secondary educational opportunities.

18. For example, we refer Ukrainian immigrants to Metropolitan Community College ("MCC") and Southeast Community College ("SCC") where they can take ESL classes. At MCC and SCC, they are eligible for in-state tuition rates when they take ESL courses for credit. Most of the

Ukrainian immigrants we refer have pending re-parole and asylum applications, have been granted TPS, or are experiencing a gap in immigration status. For the 2026-2027 academic year, we expect to refer approximately 15 Ukrainian immigrants to credit based-ESL classes. Our ability to do this is conditioned on their eligibility for in-state tuition.

19.    Orel Alliance also works to ensure Ukrainian immigrants attending Nebraska high schools can access post-secondary education at Nebraska's public universities, colleges, and community colleges. Many of these students have pending re-parole and asylum applications or have been granted TPS. For the 2026-2027 academic school year, Orel Alliance anticipates referring 23 Ukrainian immigrants to UNO or a public community college. Of these 23 immigrants, 13 have TPS, a pending TPS application, or a pending asylum application. Our ability to refer 23 students to UNO, or a public community college, is conditioned on their eligibility for in-state tuition.

20.    Orel Alliance has also provided tuition assistance to Ukrainian students in the past and anticipates doing so in the future if Ukrainian students are eligible for instate tuition.

21.    In light of Nebraska's policies for administering unemployment benefits and drivers licenses discussed above (¶ 16), I am concerned that the proposed consent judgement will prohibit many of the Ukrainian immigrants

App.-13

Orel Alliance serves from being able to access in-state tuition rates in Nebraska by virtue of their graduation from a Nebraska high school or a pending application for lawful status.

**Injuries to Orel Alliance**

22.    If Ukrainian immigrants served by Orel Alliance are deemed ineligible for in-state tuition and Nebraska's public universities, colleges, and community colleges, then post-secondary education will become cost-prohibitive for many Ukrainians in Nebraska and they will discontinue their education.

23.    Orel Alliance's referral and guidance services are predicated on the promise of in-state tuition for eligible students without regard to lawful presence. If only "lawfully present" students are eligible for in-state tuition, then that will significantly impact Orel Alliance's operations.

24.    First, Orel Alliance will need to spend more money covering the filing fees for Ukrainian immigrants to apply for parole—a status that would make in-state tuition available—even for immigrants who already have TPS or a pending asylum application. This will also unnecessarily create duplicative immigration statues for individual immigrants. Additionally, USCIS backdates parole to the most recent period of parole, not the most

App.-14

Add.018

recent period of an approved status like TPS; this further compounds costs associated with parole filings Orel Alliance pays.

25. Additionally, if these students become ineligible for in-state tuition by virtue of their immigration status, these same Ukrainian immigrants will turn to Orel Alliance for referrals to charitable financial services instead of education services. Reliance on referrals to charitable financial services undermines Orel Alliance's goal of supporting an independent and self-reliant Ukrainian immigrant population in Nebraska.

26. As education referrals and guidance would remain a core business activity of Orel Alliance, we would need to retrain our staff on the private educational opportunities that exist in Nebraska or engage in additional fundraising campaigns and solicitations to ensure Ukrainian immigrants can access affordable educational opportunities. This would require us to develop new organizational resources for private schools and charitable resources. Furthermore, we expect that we will have to hire a full-time employee with a salary of $55,000 to make these changes.

27. As many Ukrainian immigrants would elect not to pursue education altogether if in-state tuition is unavailable, Orel Alliance would need to recruit more staff and volunteers to find career opportunities for a

Appellate Case: 26-2124    Page: 45    Date Filed: 06/12/2026 Entry ID: 5650825

App.-15

Ukrainian immigrant population with less education and less access to postsecondary education.

28.    Covering duplicative immigration filing fees, retraining staff, and developing new guidance and referral materials also makes it less likely that we will be able to purchase property, as opposed to renting property, for our community center, which is a goal outlined in our strategic plan.

29.    The proposed order will frustrate Orel Alliance's core business activities.

Amanda Hall
Executive Director
Orel Alliance

Executed this 6th day of May 2026, in Omaha, Nebraska.

Add.020

# EXHIBIT 3

App.-17

Appellate Case: 26-2124     Page: 47     Date Filed: 06/12/2026 Entry ID: 5650825

5/5/26, 3 18 PM: 9:26-cv-00172-BCB-RCC Estimated Cost of Attendance (Tuition and Fees) / Undergraduate Admissions University of Nebraska Omaha Page 21 of 51 Page ID #137

Add.021



# Undergraduate Admissions

# Estimated Cost of Attendance (Tuition and Fees)

UNO / Undergraduate Admissions / Tuition & Aid / Estimated Cost of Attendance (Tuition and Fees)

The University of Nebraska Omaha (UNO) is proud to offer some of the most competitive tuition rates in the region.

Below is an estimated cost for Nebraska Residents, Out-of-State Residents, and the Omaha Urban Rate (OUR) Tuition OUR tuition is reduced tuition for residents of some of Nebraska's surrounding states.

**Undergraduate Students**    **Graduate Students**

## Estimated Cost for Undergraduate Students

### (Fall 2026, Spring 2027 Semesters)

This information is based on full-time enrollment of 27 credit hours or more for the nine-month academic year.

All total costs of attendance include: tuition and fees, housing and food, books and supplies, estimated personal expenses, and transportation.

- Students are not required to live on campus.
- Housing and food costs are an estimate. Meal plans are not required to live on campus, except for Scott Hall.
- Personal expenses include items such as clothing, personal hygiene, recreation, and loan fees.

**TUITION RATES**

**Cost of Attendance**

The cost of attendance is the estimated full and reasonable cost of completing an academic year as a full-time student and includes:

- tuition and fees
- housing and food
- books and supplies
- personal expenses

These estimates are conservative by design, and in no way attempt to reflect differences in actual costs incurred by students with

App.-18

Appellate Case: 26-2124    Page: 48    Date Filed: 06/12/2026 Entry ID: 5650825

Add.022

- Transportation includes the cost to commute to and from the UNO campus.

differing lifestyle choices.

## Student Data Questionnaire

**The questionnaire is assigned as a To-Do List item in MavLINK.**

Students must complete a Student Data Questionnaire in order to:

- Receive an increase to their Cost of Attendance for the purchase of a computer, the cost of childcare, or the cost of licensure.
- Be awarded Federal Work-Study.
- Receive an adjustment to their Cost of Attendance if their housing status is different than the housing status at the time of awarding.

**Related Resources**

Omaha Urban Rate (OUR) Tuition

Nebraska Residency Requirements

## Living On-Campus

|  | Nebraska Resident | OUR | Out-of-State Residents |
|---|---|---|---|
| **ESTIMATED COLLEGE COSTS** | | | |
| Tuition and Fees | $9,768 | $14,332 | $26,092 |
| Housing and Food | $13,288 | $13,288 | $13,288 |
| Books and Supplies | $1,264 | $1,264 | $1,264 |
| Subtotal | **$24,320** | **$28,884** | **$40,644** |
| **ESTIMATED MISCELLANEOUS COSTS** | | | |
| Personal Expenses | $2,540 | $2,540 | $2,540 |
| Transportation | $1,700 | $1,700 | $1,700 |

App.-19

Appellate Case: 26-2124    Page: 49    Date Filed: 06/12/2026 Entry ID: 5650825

5/5/26, 3 18 PM

Estimated Cost of Attendance (Tuition and Fees) | Undergraduate Admissions. University of Nebraska Omaha

8:26-cv-00172-BCB-RCC   Doc # 21   Filed: 05/07/26   Page 23 of 51 - Page ID #: 139

Add.023

|  | Nebraska Resident | OUR | Out-of-State Residents |
|---|---|---|---|
| Total | **$28,560** | **$33,124** | **$44,884** |

## Living Off-Campus

|  | Nebraska Resident | OUR | Out-of-State Residents |
|---|---|---|---|
| **ESTIMATED COLLEGE COSTS** | | | |
| Tuition and Fees | $9,768 | $14,332 | $26,092 |
| Housing and Food | $14,342 | $14,342 | $14,342 |
| Books and Supplies | $1,264 | $1,264 | $1,264 |
| Subtotal | **$25,374** | **$29,938** | **$41,698** |
| **ESTIMATED MISCELLANEOUS COSTS** | | | |
| Personal Expenses | $2,540 | $2,540 | $2,540 |
| Transportation | $1,700 | $1,700 | $1,700 |
| Total | **$29,614** | **$34,178** | **$45,938** |

## Living at Home (with parent/relative)

|  | Nebraska Resident | OUR | Out-of-State Residents |
|---|---|---|---|
| **Estimated College Costs** | | | |
| Tuition and Fees | $9,768 | $14,332 | )92 |

App.-20

5/5/26, 3 18 PM
8:26-cv-00172-BCB-RCG    Doc # 21    Filed 05/07/26    Page 24 of 51 - Page ID # 140
Estimated Cost of Attendance (Tuition and Fees) | Undergraduate Admissions | University of Nebraska Omaha

Add.024

| | Nebraska Resident | OUR | Out-of-State Residents |
|---|---|---|---|
| Housing and Food | $3,904 | $3,904 | $3,904 |
| Books and Supplies | $1,264 | $1,264 | $1,264 |
| Subtotal | $14,936 | $19,500 | $31,260 |
| **Estimated Miscellaneous Costs** | | | |
| Personal Expenses | $2,540 | $2,540 | $2,540 |
| Transportation | $1,700 | $1,700 | $1,700 |
| Total | $19,176 | $23,740 | $35,500 |

# Online Tuition and Other Fees

Online tuition, full tuition rates, and fees can be found at
Cashiering and Student Accounts

**2024-2025 and 2025-2026**

Undergraduate Student Online Rates

Graduate Student Online Rates

## Estimated Cost for Graduate Students

### (Fall 2026, Spring 2027 Semesters)

**The information below is based on full-time enrollment of 18 credit hours or more for the nine-month academic year.**

All total costs of attendance include: tuition and fees, housing and food, books and supplies, estimated personal expenses, and transportation.

5/5/26, 3 18 PM
9:26-cv-00172-BCB-RCC   Doc # 21   Filed 05/07/26   Page 25 of 51 - Page ID # 141
Estimated Cost of Attendance (Tuition and Fees) / Undergraduate Admissions University of Nebraska Omaha

Add.025

- Students are not required to live on campus.
- Housing and food costs are an estimate. Meal plans are not required to live on campus, except for Scott Hall.
- Personal expenses include items such as clothing, personal hygiene, recreation, and loan fees.
- Transportation includes the cost to commute to and from the UNO campus.

## Student Data Questionnaire:

**The questionnaire is assigned as a To-Do List item in MavLINK.**

Students must complete a Student Data Questionnaire in order to:

- Receive an increase to their Cost of Attendance for the purchase of a computer, the cost of childcare, or the cost of licensure.
- Be awarded Federal Work-Study.
- Receive an adjustment to their Cost of Attendance if their housing status is different than the housing status at the time of awarding.

## Living On-Campus

| | Nebraska Resident | OUR | Out-of-State Residents |
|---|---|---|---|
| **ESTIMATED COLLEGE COSTS** | | | |
| Tuition and Fees | $8,982 | $13,248 | $18,990 |
| Housing and Food | $13,288 | $13,288 | $13,288 |
| Books and Supplies | $1,264 | $1,264 | $1,264 |
| Subtotal | **$23,534** | **$27,800** | **$33,542** |
| **ESTIMATED MISCELLANEOUS COSTS** | | | |

App.-22

9:26-cv-00172-BCB-BCG    Doc # 21    Filed 05/07/26    Page 26 of 51 - Page ID #: 142
Add.026

| | Nebraska Resident | OUR | Out-of-State Residents |
|---|---|---|---|
| Personal Expenses | $2,540 | $2,540 | $2,540 |
| Transportation | $1,700 | $1,700 | $1,700 |
| Total | **$27,774** | **$32,040** | **$37,782** |

## Living Off-Campus

| | Nebraska Resident | OUR | Out-of-State Residents |
|---|---|---|---|
| **ESTIMATED COLLEGE COSTS** | | | |
| Tuition and Fees | $8,982 | $13,248 | $18,990 |
| Housing and Food | $16,674 | $16,674 | $16,674 |
| Books and Supplies | $1,264 | $1,264 | $1,264 |
| Subtotal | **$26,920** | **$31,186** | **$36,928** |
| **ESTIMATED MISCELLANEOUS COSTS** | | | |
| Personal Expenses | $2,540 | $2,540 | $2,540 |
| Transportation | $1,700 | $1,700 | $1,700 |
| Total | **$31,160** | **$35,426** | **$41,168** |

## Living at Home (with parent/relative)

Appellate Case: 26 2124    Page: 53    Date Filed: 06/12/2026 Entry ID: 5650825

9:26-cv-00172-BCB-RCG   Doc # 21   Filed 05/07/26   Page 27 of 51   Page ID # 143

Add.027

|  | Nebraska Resident | OUR | Out-of-State Residents |
|---|---|---|---|
| **ESTIMATED COLLEGE COSTS** | | | |
| Tuition and Fees | $8,982 | $13,248 | $18,990 |
| Housing and Food | $3,904 | $3,904 | $3,904 |
| Books and Supplies | $1,264 | $1,264 | $1,264 |
| Subtotal | **$14,150** | **$18,416** | **$24,158** |
| **ESTIMATED MISCELLANEOUS COSTS** | | | |
| Personal Expenses | $2,540 | $2,540 | $2,540 |
| Transportation | $1,700 | $1,700 | $1,700 |
| Total | **$18,390** | **$22,656** | **$28,398** |

## Undergraduate Admissions

111 Eppley Administration Building

6001 Dodge Street

Omaha, NE 68182

402.554.2393

unoadmissions@unomaha.edu

SERVICES AND RESOURCES                    RELATED LINKS

App. 24

9:26-cv-00172-BCB-RCC   Doc # 21   Filed 05/07/26   Page 28 of 51 - Page ID # 144

Add.028

Academic Calendar

Course Catalogs

MavCARD Services

MavLINK

my.unomaha.edu

UNO Brand Guide

A-Z List

Employment

University of Nebraska System

## CAMPUS LINKS

Accessibility

Billing Office

Buildings and Maps

Campus Directory

Campus Safety

Events

Human Resources

Library

Military-Connected Resource Center

News

Registrar

Samuel Bak Museum: The Learning Center

## POLICIES AND REPORTING

Emergency Information Alert

MavsReport

Notice of Nondiscrimination

NU Foundation

Privacy Statement

University Policies

PRIVACY STATEMENT    ACCESSIBILITY

402.554.2800

University of Nebraska at Omaha, 6001 Dodge Street, Omaha, NE, 68182

© 2026

App.-25



# Our Campus. Otherwise Known as Omaha.

The University of Nebraska does not discriminate based on race, color, ethnicity, national origin, sex, pregnancy, sexual orientation, gender identity, religion, disability, age, genetic information, veteran status, marital status, and/or political affiliation in its education programs or activities, including admissions and employment. The University prohibits any form of retaliation taken against anyone for reporting discrimination, harassment, or retaliation for otherwise engaging in protected activityRead the full statement

App.-26

Appellate Case: 26-2124    Page: 56    Date Filed: 06/12/2026 Entry ID: 5650825

# **EXHIBIT 4**

App.-27

Appellate Case: 26-2124     Page: 57     Date Filed: 06/12/2026 Entry ID: 5650825

LB 239                                                              LB 239

LEGISLATIVE  BILL  239

Passed  over  the  Governor's  veto  April  13,  2006.

Introduced by Schimek, 27; Aguilar, 35; Combs, 32; Kruse, 13; Preister, 5;
          Synowiecki, 7; Dw. Pedersen, 39

AN ACT relating to postsecondary educational institutions; to amend section
          85-502, Reissue Revised Statutes of Nebraska; to change provisions
          relating to determination of residency; to harmonize provisions; and
          to repeal the original section.
Be it enacted by the people of the State of Nebraska,

          Section 1. Section 85-502, Reissue Revised Statutes of Nebraska, is
amended to read:
          85-502 Rules and regulations established by the governing board of
each state postsecondary educational institution shall require as a minimum
that a person shall not be is not deemed to have established a residence in
this state, for the purpose purposes of sections 85-501 to 85-504, unless:
          (1) Such person is of legal age or is an emancipated minor and shall
have has established a home in Nebraska where he or she is habitually present
for a minimum period of one hundred eighty days, with the bona fide intention
of making this state his or her permanent residence, supported by documentary
proof;
          (2) The parents, parent, or guardian having custody of a minor
registering in the educational institution shall have established a home in
Nebraska where such parents, parent, or guardian are or is habitually present
with the bona fide intention of such parents, parent, or guardian to make
this state their, his, or her permanent residence, supported by documentary
proof. If a student ; PROVIDED, that if a person has matriculated in any
state postsecondary educational institution while his or her parents, parent,
or guardian had an established home in this state, and the parents, parent, or
guardian leave ceases to reside in the state, such person student shall not
thereby lose his or her resident status by reason of such parents, parent,
or guardian having ceased to reside in this state if such person student has
the bona fide intention to make this state his or her permanent residence,
supported by documentary proof;
          (3) Such person student is of legal age and is a dependent for
federal income tax purposes of a parent or former guardian, who shall have
has established a home in Nebraska where he or she is habitually present with
the bona fide intention of making this state his or her permanent residence,
supported by documentary proof;
          (4) Such person student is a nonresident of this state prior to
marriage, and marries a person who has established a home in Nebraska where he
or she is habitually present with the bona fide intention of making this state
his or her permanent residence, supported by documentary proof;
          (5) Such person Except as provided in subdivision (8) of this
section, such student, if an alien, shall have has applied to or has a
petition pending with the United States Immigration and Naturalization Service
to attain lawful status under federal immigration law and has established a
home in Nebraska for a period of at least one hundred eighty days where he or
she is habitually present with the bona fide intention to become a permanent
resident alien of the United States and make this state his or her permanent
residence, supported by documentary proof;
          (6) Such person student is a staff member or a dependent of a staff
member of the University of Nebraska, one of the Nebraska state colleges, or
one of the community college areas who joins the staff immediately prior to
the beginning of a term from an out-of-state location;
          (7) Such person student is on active duty with the armed services of
the United States and has been assigned a permanent duty station in Nebraska,
or is a legal dependent of a person on active duty with the armed services of
the United States assigned a permanent duty station in Nebraska; or
          (8) Such person is a graduate of a high school of this state or has
been previously registered in a state educational institution at a time when
he or she was a resident of this state.
          (8)(a) Such student resided with his or her parent, guardian, or
conservator while attending a public or private high school in this state and:
          (i) Graduated from a public or private high school in this state or
received the equivalent of a high school diploma in this state;
          (ii) Resided in this state for at least three years before the date
the student graduated from the high school or received the equivalent of a
high school diploma;

-1-

LB 239                                                                    LB 239

(iii) Registered as an entering student in a state postsecondary educational institution not earlier than the 2006 fall semester; and

(iv) Provided to the state postsecondary educational institution an affidavit stating that he or she will file an application to become a permanent resident at the earliest opportunity he or she is eligible to do so.

(b) If the parent, guardian, or conservator with whom the student resided ceases to reside in the state, such student shall not lose his or her resident status under this subdivision if the student has the bona fide intention to make this state his or her permanent residence, supported by documentary proof.

Sec. 2. Original section 85-502, Reissue Revised Statutes of Nebraska, is repealed.

-2-

# EXHIBIT 5

Appellate Case: 26-2124     Page: 60     Date Filed: 06/12/2026 Entry ID: 5650825

LEGISLATURE OF NEBRASKA

ONE HUNDRED NINTH LEGISLATURE

SECOND SESSION

# LEGISLATIVE BILL 870

Introduced by Andersen, 49; Kauth, 31.

Read first time January 08, 2026

Committee: Education

A BILL FOR AN ACT relating to postsecondary education; to amend section 85-502, Reissue Revised Statutes of Nebraska; to change residence requirements relating to tuition and fees at state postsecondary educational institutions; and to repeal the original section.

Be it enacted by the people of the State of Nebraska,

Appellate Case: 26-2124    Page: 61    Date Filed: 06/12/2026 Entry ID: 5650825

**Section 1.** Section 85-502, Reissue Revised Statutes of Nebraska, is amended to read:

85-502 Rules and regulations established by the governing board of each state postsecondary educational institution shall require as a minimum that a person is not deemed to have established a residence in this state, for purposes of sections 85-501 to 85-504, unless:

(1) Such person is of legal age or is an emancipated minor and has established a home in Nebraska where he or she is habitually present for a minimum period of one hundred eighty days, with the bona fide intention of making this state his or her permanent residence, supported by documentary proof;

(2) The parents, parent, or guardian having custody of a minor registering in the educational institution have established a home in Nebraska where such parents, parent, or guardian are or is habitually present with the bona fide intention to make this state their, his, or her permanent residence, supported by documentary proof. If a student has matriculated in any state postsecondary educational institution while his or her parents, parent, or guardian had an established home in this state, and the parents, parent, or guardian ceases to reside in the state, such student shall not thereby lose his or her resident status if such student has the bona fide intention to make this state his or her permanent residence, supported by documentary proof;

(3) Such student is of legal age and is a dependent for federal income tax purposes of a parent or former guardian who has established a home in Nebraska where he or she is habitually present with the bona fide intention of making this state his or her permanent residence, supported by documentary proof;

(4) Such student is a nonresident of this state prior to marriage and marries a person who has established a home in Nebraska where he or she is habitually present with the bona fide intention of making this state his or her permanent residence, supported by documentary proof;

(5) Except as provided in subdivision (9) of this section, such student, if an alien, has applied to or has a petition pending with the United States Immigration and Naturalization Service to attain lawful status under federal immigration law and has established a home in Nebraska for a period of at least one hundred eighty days where he or she is habitually present with the bona fide intention to make this state his or her permanent residence, supported by documentary proof;

(5) (6) Such student is a staff member or a dependent of a staff member of the University of Nebraska, one of the Nebraska state colleges, or one of the community college areas who joins the staff immediately prior to the beginning of a term from an out-of-state location;

(6)(a) (7)(a) Such student is on active duty with the armed services of the United States and has been assigned a permanent duty station in Nebraska; or

(b) Such student is a spouse or legal dependent of a person who was on active duty with the armed services of the United States assigned to a permanent duty station in Nebraska at the time such student was accepted for admission to the state postsecondary educational institution and such student remains continually enrolled at such state postsecondary educational institution;

(7) (8) Such student is currently serving in the Nebraska National Guard; or

(9)(a) Such student resided with his or her parent, guardian, or conservator while attending a public, private, denominational, or parochial high school in this state or a school in this state which elects pursuant to section 79 1601 not to meet accreditation or approval requirements and:

(i) Graduated from a public, private, denominational, or parochial high school in this state, completed the program of instruction offered by a school in this state which elects pursuant to section 79 1601 not to meet accreditation or approval requirements, or received a diploma of

Appellate Case: 26-2124    Page: 63    Date Filed: 06/12/2026 Entry ID: 5650825

LB870
2026

LB870
2026

high school equivalency issued pursuant to section 79 730;

(ii) Resided in this state for at least three years before the date the student graduated from the high school, completed the program of instruction, or received the diploma of high school equivalency;

(iii) Registered as an entering student in a state postsecondary educational institution not earlier than the 2006 fall semester; and

(iv) Provided to the state postsecondary educational institution an affidavit stating that he or she will file an application to become a permanent resident at the earliest opportunity he or she is eligible to do so.

(b) If the parent, guardian, or conservator with whom the student resided ceases to reside in the state, such student shall not lose his or her resident status under this subdivision if the student has the bona fide intention to make this state his or her permanent residence, supported by documentary proof; or

(8) (10) Such student is qualified for a national service educational award or summer of service educational award from the National Service Trust pursuant to 42 U.S.C. 12602, as such section existed on January 1, 2021.

**Sec. 2.**   Original section 85-502, Reissue Revised Statutes of Nebraska, is repealed.

-4-

App.-34

Add.038

# EXHIBIT 6

App.-35

Appellate Case: 26-2124    Page: 65    Date Filed: 06/12/2026 Entry ID: 5650825

8:26-cv-00172-BCB-RCC   Doc # 21   Filed: 05/07/26   Page 39 of 51 - Page ID # 155

LB1061
2026

Add.039

LB1061
2026

LEGISLATURE OF NEBRASKA

ONE HUNDRED NINTH LEGISLATURE

SECOND SESSION

# LEGISLATIVE BILL 1061

Introduced by Murman, 38; Clements, 2; Lonowski, 33; Meyer, G., 17;
Sanders, 45; Sorrentino, 39; Storm, 23.

Read first time January 14, 2026

Committee: Education

A BILL FOR AN ACT relating to postsecondary education; to amend section 85-502, Reissue Revised Statutes of Nebraska; to change residence requirements relating to tuition and fees at state postsecondary educational institutions; and to repeal the original section.

Be it enacted by the people of the State of Nebraska,

Appellate Case: 26-2124   Page: 66   Date Filed: 06/12/2026 Entry ID: 5650825

**Section 1.** Section 85-502, Reissue Revised Statutes of Nebraska, is amended to read:

85-502 Rules and regulations established by the governing board of each state postsecondary educational institution shall require as a minimum that a person is not deemed to have established a residence in this state, for purposes of sections 85-501 to 85-504, unless:

(1) Such person is of legal age or is an emancipated minor and has established a home in Nebraska where he or she is habitually present for a minimum period of one hundred eighty days, with the bona fide intention of making this state his or her permanent residence, supported by documentary proof;

(2) The parents, parent, or guardian having custody of a minor registering in the educational institution have established a home in Nebraska where such parents, parent, or guardian are or is habitually present with the bona fide intention to make this state their, his, or her permanent residence, supported by documentary proof. If a student has matriculated in any state postsecondary educational institution while his or her parents, parent, or guardian had an established home in this state, and the parents, parent, or guardian ceases to reside in the state, such student shall not thereby lose his or her resident status if such student has the bona fide intention to make this state his or her permanent residence, supported by documentary proof;

(3) Such student is of legal age and is a dependent for federal income tax purposes of a parent or former guardian who has established a home in Nebraska where he or she is habitually present with the bona fide intention of making this state his or her permanent residence, supported by documentary proof;

(4) Such student is a nonresident of this state prior to marriage and marries a person who has established a home in Nebraska where he or she is habitually present with the bona fide intention of making this state his or her permanent residence, supported by documentary proof;

Appellate Case: 26-2124   Page: 67   Date Filed: 06/12/2026 Entry ID: 5650825

(5) Such Except as provided in subdivision (9) of this section, such student, if an alien, has applied to or has a petition pending with the United States Immigration and Naturalization Service to attain lawful status under federal immigration law and has established a home in Nebraska for a period of at least one hundred eighty days where he or she is habitually present with the bona fide intention to become a lawful permanent resident of the United States and make this state his or her permanent residence, supported by documentary proof;

(6) Such student is a staff member or a dependent of a staff member of the University of Nebraska, one of the Nebraska state colleges, or one of the community college areas who joins the staff immediately prior to the beginning of a term from an out-of-state location;

(7)(a) Such student is on active duty with the armed services of the United States and has been assigned a permanent duty station in Nebraska; or

(b) Such student is a spouse or legal dependent of a person who was on active duty with the armed services of the United States assigned to a permanent duty station in Nebraska at the time such student was accepted for admission to the state postsecondary educational institution and such student remains continually enrolled at such state postsecondary educational institution;

(8) Such student is currently serving in the Nebraska National Guard; or

(9)(a) Such student resided with his or her parent, guardian, or conservator while attending a public, private, denominational, or parochial high school in this state or a school in this state which elects pursuant to section 79 1601 not to meet accreditation or approval requirements and:

(i) Graduated from a public, private, denominational, or parochial high school in this state, completed the program of instruction offered by a school in this state which elects pursuant to section 79 1601 not to

meet accreditation or approval requirements, or received a diploma of high school equivalency issued pursuant to section 79 730;

(ii) Resided in this state for at least three years before the date the student graduated from the high school, completed the program of instruction, or received the diploma of high school equivalency;

(iii) Registered as an entering student in a state postsecondary educational institution not earlier than the 2006 fall semester; and

(iv) Provided to the state postsecondary educational institution an affidavit stating that he or she will file an application to become a permanent resident at the earliest opportunity he or she is eligible to do so.

(b) If the parent, guardian, or conservator with whom the student resided ceases to reside in the state, such student shall not lose his or her resident status under this subdivision if the student has the bona fide intention to make this state his or her permanent residence, supported by documentary proof; or

(9) (10) Such student is qualified for a national service educational award or summer of service educational award from the National Service Trust pursuant to 42 U.S.C. 12602, as such section existed on January 1, 2021.

**Sec. 2.** Original section 85-502, Reissue Revised Statutes of Nebraska, is repealed.

Appellate Case: 26-2124   Page: 69   Date Filed: 06/12/2026 Entry ID: 5650825

# EXHIBIT 7

Appellate Case: 26-2124    Page: 70    Date Filed: 06/12/2026 Entry ID: 5650825

4/25/26, 2 49 PM 9:26-CV-00172-BCB-RCC Office of Public Affairs | The Department of Justice Reaches a Proposed Consent Decree with Nebraska to Enjoin the State from Enforcing its Un

Add.044



**PRESS RELEASE**

# The Department of Justice Reaches a Proposed Consent Decree with Nebraska to Enjoin the State from Enforcing its Unconstitutional In-State Tuition and Scholarship Programs for Illegal Aliens

Tuesday, April 21, 2026

**For Immediate Release**

Office of Public Affairs

Today, the United States filed a complaint against Nebraska and joined with the State in filing a proposed consent decree to permanently enjoin Nebraska laws that provide in state tuition and financial assistance for illegal aliens

The proposed consent decree, which must still be approved by the court, would resolve the Department's claims that Nebraska's laws unconstitutionally discriminate against American citizens in favor of illegal aliens Specifically, Nebraska's challenged laws grant reduced tuition to illegal aliens over U S citizens, which not only violates federal law but also incentivizes illegal immigration and rewards illegal immigrants with scholarship benefits that U S citizens are not eligible for

Appellate Case: 26-2124   Page: 71   Date Filed: 06/12/2026 Entry ID: 5650825

4/25/26, 2 49 PM — Office of Public Affairs | The Department of Justice Reaches a Proposed Consent Decree with Nebraska to Enjoin the State from Enforcing its Un

8 26-cv-00172-BCB-RCC    Doc # 21    Filed 05/07/26    Page 45 of 51 - Page ID # 161

Add.045

"For two decades, the Nebraska legislature gave preferential treatment to illegal aliens over American citizens," said Associate Attorney General Stanley Woodward  "We encourage all States to follow the commonsense correction of Attorney General Hilgers, ceasing any policy that rewards illegal entry into our nation with educational opportunities not available to U S citizens "

"Nebraska's unconstitutional and un American laws should never have been passed in the first place and are prohibited by federal law," said Assistant Attorney General Brett A  Shumate of the Justice Department's Civil Division  "The Department of Justice has won on this exact issue in Texas, Oklahoma, and Kentucky, and we will take this fight to any states that fail to put American citizens first "

"This proposed consent decree demonstrates the quality of partnership between Nebraska state leaders and the Department of Justice for the shared purpose of ensuring that federal tax dollars are not used to discriminate against Nebraska's lawful citizens," said U S  Attorney Lesley Woods for the District of Nebraska

"Nebraskans expect that illegal aliens won't get the benefit of in state tuition and financial aid, and federal law forbids it," said Nebraska Governor Jim Pillen  "Outdated Nebraska laws to the contrary are deeply misguided and unconstitutional, and I am grateful for the combined efforts of President Trump's Department of Justice and Attorney General Hilgers to deliver this long overdue correction  This is the latest example of the tremendous partnership between the State of Nebraska and the Trump Administration "

"This Nebraska law is unconstitutional as it unlawfully extended benefits to illegal immigrants which were not available to American citizens," said Nebraska Attorney General Mike Hilgers  "We filed the joint motion with the Department of Justice in order to ensure that this unconstitutional law was permanently enjoined "

The motion came just hours after the Justice Department filed a complaint in the District of Nebraska, Omaha Division, against the state of Nebraska seeking to enjoin the state from enforcing laws that require colleges and universities to provide in state tuition rates to all aliens who maintain Nebraska residency, regardless of whether those aliens are lawfully present in the United States  Additionally, the complaint seeks to enjoin Nebraska from enforcing state laws that afford financial assistance and scholarships to illegal aliens

This is the 8th lawsuit in a series of actions the department has filed to fulfill President Trump's commitment to ensure that illegal aliens are not obtaining taxpayer benefits or preferential treatment  These efforts have already delivered wins for the American people, as three similar lawsuits in Texas, Kentucky, and Oklahoma have resulted favorable orders permanently enjoining and declaring unconstitutional analogous laws that gave reduced tuition to illegal

Appellate Case: 26-2124    Page: 72    Date Filed: 06/12/2026 Entry ID: 5650825

aliens  Lawsuits against other states that similarly put illegal aliens ahead of U S  citizens are pending across the country in <u>Illinois</u>, <u>Minnesota</u>, <u>Virginia</u>, and <u>California</u>

Updated April 21, 2026

## Topic

**IMMIGRATION**

## Components

<u>Civil Division</u>    |    <u>Office of the Associate Attorney General</u>    |    <u>USAO - Nebraska</u>

Press Release Number: 26-385

# Related Content

**PRESS RELEASE**

## Federal Judge Revokes Naturalization of Violent Extortionist

Today the Justice Department announced that the U S  District Court for the Southern District of New York revoked the naturalized U.S. citizenship of Michael Pizzuti, a native of Italy, after...

April 10, 2026

**PRESS RELEASE**

## Justice Department Secures the Denaturalization of Convicted Gun Trafficker and Health Care Fraudster, and Files Complaint Against

App.-43

Appellate Case: 26-2124    Page: 73    Date Filed: 06/12/2026 Entry ID: 5650825

Add.047

## Marriage Scammer

The Department of Justice announced that it has secured the denaturalization of two individuals who obtained U.S. citizenship through fraud and sued to revoke the citizenship of a third person...

**March 26, 2026**

---

|PRESS RELEASE

## District Court Revokes U.S. Citizenship of Convicted Drug Dealer

Following a two-day trial in September 2025, the U.S. District Court for the Northern District of Florida today revoked the naturalization of Melchor Munoz, also known as Melchor Munoz-Correa, a

**March 19, 2026**

---

✉ **Office of Public Affairs**

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington DC 20530

📞 Office of Public Affairs Direct Line

202 514 2007

Department of Justice Main Switchboard

202-514-2000

App.-44

Appellate Case: 26-2124    Page: 74    Date Filed: 06/12/2026 Entry ID: 5650825

# EXHIBIT 8

Appellate Case: 26-2124    Page: 75    Date Filed: 06/12/2026 Entry ID: 5650825



**PRESS RELEASE**

# The Justice Department, Texas Reach Agreement to End In-State Tuition for Illegal Aliens

Thursday, June 5, 2025

**For Immediate Release**

Office of Public Affairs

## Agreement comes hours after Justice Department filed complaint challenging two decades-old laws

U.S. Attorney General Pamela Bondi and Texas Attorney General Ken Paxton released the following statements after a federal judge formally enjoined Texas from providing in-state tuition for illegal aliens.

"The Justice Department commends Texas leadership and AG Ken Paxton for swiftly working with us to halt a program that was treating Americans like second-class citizens in their own country," said Attorney General Pamela Bondi. "Other states should take note that we will continue filing affirmative litigation to remedy unconstitutional state laws that discriminate against American citizens."

"I'm proud to stand with Attorney General Bondi and the Trump Administration to stop an unconstitutional and un-American law that gave in-state tuition to illegal aliens," said Texas Attorney General Ken Paxton. "This law was an insult to our nation's citizens and has now been rightly stopped from being enforced. I will continue to fight for the American people and work swiftly to defeat any policy that puts illegal aliens ahead of our own citizens."

App.-46

2:26-CV-00172-BCB-RGC    Doc # 21    Filed: 05/07/26    Page 50 of 51    Page ID # 166
Add 050

The motion came just hours after the Department filed a complaint in the Northern District of Texas seeking to enjoin enforcement of Texas laws that required colleges and universities to provide in state tuition rates for all aliens who maintain Texas residency, regardless of their legal status  Federal law prohibits institutions of higher education from providing benefits to aliens that are not offered to U S  citizens  The Texas laws were in direct conflict of federal law and the Supremacy Clause of the U S  Constitution

*Updated July 9, 2025*

**Topic**

**IMMIGRATION**

**Component**

[Office of the Attorney General](#)

Press Release Number: 25-582

# Related Content

**PRESS RELEASE**

## Justice Department Secures the Denaturalization of Convicted Gun Trafficker and Health Care Fraudster, and Files Complaint Against Marriage Scammer

The Department of Justice announced that it has secured the denaturalization of two individuals who obtained U.S. citizenship through fraud and sued to revoke the citizenship of a third person

App.-47

Appellate Case: 26-2124    Page: 77    Date Filed: 06/12/2026 Entry ID: 5650825

**March 26, 2026**

> | PRESS RELEASE
>
> ## Antifa Cell Members Convicted in Prairieland ICE Detention Center Shooting
>
> Nine North Texas Antifa Cell operatives were convicted by a federal jury in Fort Worth, Texas for their roles in rioting, using weapons and explosives, providing material support to terrorists...

**March 13, 2026**

> | PRESS RELEASE
>
> ## Justice Department Files Lawsuit Against New Jersey for Interfering with Federal Immigration Laws
>
> Yesterday, the Department of Justice [filed a lawsuit](#) against the State of New Jersey and New Jersey Governor Mikie Sherrill over New Jersey's new Executive Order No. 12 that interferes...

**February 24, 2026**

---

✉ **Office of Public Affairs**

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington DC 20530

📞 Office of Public Affairs Direct Line

202-514-2007

Department of Justice Main Switchboard

202 514 2000


Appellate Case: 26-2124   Page: 78   Date Filed: 06/12/2026 Entry ID: 5650825

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

UNITED STATES OF AMERICA,

Plaintiff,

vs.

STATE OF NEBRASKA,

Defendant.

8:26CV172

**ORDER DENYING PROPOSED INTERVENOR'S MOTION TO INTERVENE**

This case is before the Court on Proposed Intervenors' Motion to Intervene. Filing 18. For the reasons set forth in a Memorandum and Order to follow, Proposed Intervenors' Motion to Intervene is denied. The Court stated in a prior Order that if the Court denied Proposed Intervenors' Motion to Intervene, Proposed Intervenors would have to and including Friday, May 22, 2026, to file a brief on the Joint Motion for Entry of Consent Judgment as *Amicus Curiae*, if they so choose, and the Court will then determine whether or not to consider such brief of *Amicus Curiae*. Accordingly,

IT IS ORDERED that Proposed Intervenors' Motion to Intervene, Filing 18, is denied. Proposed Intervenors therefore have to and including today, Friday, May 22, 2026, to file a brief on the Joint Motion for Entry of Consent Judgment as *Amicus Curiae*, if they so choose. The Court will then determine whether or not to consider such brief of *Amicus Curiae*.

Dated this 22nd Day of May, 2026.

BY THE COURT:

Brian C. Buescher
United States District Judge

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | **8:26CV172** |
| Plaintiff, | |
| vs. | **MEMORANDUM AND ORDER DENYING MOTION TO INTERVENE AND MOTION FOR STAY PENDING APPEAL AND GRANTING JOINT MOTION FOR ENTRY OF CONSENT JUDGMENT** |
| STATE OF NEBRASKA, | |
| Defendant. | |

This action by the United States challenges portions of four provisions in the Nebraska Revised Statues that extend eligibility for in-state tuition benefits at Nebraska post-secondary education institutions to aliens resident in the state who are not lawfully present in the United States while denying such benefits to United States citizens from other states. Filing 1 at 1–2. The provisions in question are Neb. Rev. Stat. §§ 85-502, 85-1907(3), 85-3202(6), and 85-2102(6). Filing 1 at 1–2. The United States contends that the four Nebraska statutes are preempted by a provision of federal immigration law codified at 8 U.S.C. § 1623(a), so that the state statutes must yield to federal law under the Supremacy Clause of the United States Constitution. Filing 1 at 2.

This case is before the Court on the parties' Joint Motion for Entry of Consent Judgment. Filing 2. The Joint Motion reflects the Nebraska Attorney General's agreement with the United States that the Nebraska statutes at issue are preempted by the federal statute to the extent that the state statutes extend eligibility for in-state tuition benefits to aliens who are not lawfully present in the United States. Filing 2 at 2 (¶ 7). The agreement between the United States and the Nebraska Attorney General promptly garnered opposition in the form of an *amicus curiae* brief from a sitting state senator. *See* Filing 14 (motion for leave to file *amicus* brief); Filing 16 (*amicus* brief). The

1

agreement also garnered a Motion to Intervene by two organizations seeking party status to oppose the proposed Consent Judgment because the two organizations fund and assist immigrants pursuing higher education in Nebraska. Filing 18. After the Court entered an Order, Filing 43, denying Proposed Intervenors' Motion to Intervene for the reasons set forth in this anticipated Memorandum and Order, Proposed Intervenors filed a Motion for Stay of Proceedings Pending Appeal. Filing 45.

For the reasons stated below, both Proposed Intervenors' Motion to Intervene and their Motion for Stay of Proceedings Pending Appeal are denied. However, the Court has considered Proposed Intervenors' brief on the merits as a brief of *amici curiae* to the extent the Court finds appropriate. After considering the briefs of the parties and *amici curiae*, the Court grants the Joint Motion for Entry of Consent Judgment, albeit with some editorial amendments to the proposed Consent Judgment.

## I.   INTRODUCTION

### A.  Background to the Litigation

In 2006, the Nebraska legislature passed a statute that allows aliens unlawfully present in the United States who meet certain Nebraska residence requirements to pay in-state tuition rather than out-of-state tuition at state post-secondary educational institutions, even though United States citizens who reside in other states are not entitled to in-state tuition. Neb. Rev. Stat. §§ 85-501, 85-502(5), (9). Three other Nebraska statutes, Neb. Rev. Stat. §§ 85-1907(3), 85-3202(6), and 85-2102(6) relating to state educational grant or scholarship programs incorporate the requirements of § 85-502 to establish residence for purposes of in-state tuition.

This litigation has arisen because a provision of the federal Immigration and Naturalization Act provides that "an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State . . . for any postsecondary education benefit unless a citizen

2

or national of the United States is eligible for such a benefit . . . without regard to whether the citizen or national is such a resident." 8 U.S.C. § 1623(a).

The law is clear. The Nebraska statutes establishing residence requirements for illegal aliens to obtain in-state tuition, while leaving United States citizens from other states to pay full out-of-state tuition, blatantly violate the federal law set out in 8 U.S.C. § 1623. Both the United States Department of Justice and the Nebraska Attorney General's office point this out and agree on the result.

The fact that the Nebraska Attorney General, who in most circumstances is charged with defending laws validly passed by the Nebraska Legislature, has chosen not to defend the statutes at issue places this case in a unique category. This case implicates the "case or controversy" clause of the United States Constitution, which limits the jurisdiction of the federal courts to "controversies" between certain parties. *See Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 110 (2025) ("Article III of the Constitution confines the jurisdiction of federal courts to 'Cases' and 'Controversies.'" (citing U.S. Const., Art. III, § 2, cl. 1)).

In order to hear opposing views of this matter, the Court allowed three persons or entities to present *Amicus* briefs presenting opposing views. A primary contention of the *Amici* is that given both litigants in this case agree on the result, this case is not a proper "controversy" under the United States Constitution, and the Court should not be able to rule on this.

This Court rejects *Amici's* contention. Although the case or controversies clause of the United States Constitution limits this Court's jurisdiction, it does not do so in this case. As outlined in this opinion, history and United States Supreme Court precedent are replete with examples of situations where a court retained jurisdiction to declare that a statute violates the United States Constitution or federal law where all parties to a lawsuit are in agreement as to the result. Indeed,

Appellate Case: 26-2124   Page: 82   Date Filed: 06/12/2026 Entry ID: 5650825

it would be absurd if the Federal Courts were always precluded from declaring an obviously unconstitutional or preempted law to be invalid where there was no party to the lawsuit willing to try to defend the invalid law. Under the present circumstances, if this Court would not have jurisdiction in this case, it is possible no Court would.

It is emphatically the role of this Court to say what the law is. The Court has done so here.

### B. History of the Litigation

*1.      The Complaint and Joint Motion for Entry of Consent Judgment*

On April 21, 2026, plaintiff United States brought this civil action for declaratory and injunctive relief. Filing 1. In its Complaint, the United States asserts four claims, each alleging that one of the Nebraska statutes at issue violates the Supremacy Clause of the United States Constitution. *See* Filing 1 at 14–15 (¶ 69–71) (Count I: "Violation of the Supremacy Clause (Preemption of Neb. Rev. Stat. § 85-502)"); 15 (¶¶ 72–74 (Count II: "Violation of the Supremacy Clause (Preemption of Neb. Rev. Stat. § 85-1907(3))"); 15 (Count III: "Violation of the Supremacy Clause (Preemption of Neb. Rev. Stat. § 85-3202(6))"); 16 (Count IV: "Violation of the Supremacy Clause (Preemption of Neb. Rev. Stat. § 85-2102(6))").

The Complaint prays for the following relief:

> 1.      That this Court enter a judgment declaring the portions of Neb. Rev. Stat. §§ 85-502, 85-1907(3), 85-3202(6), and 85-2102(6), to the extent they extend eligibility for in-state tuition benefits to illegal aliens, violate the Supremacy Clause and are therefore unconstitutional and invalid;
>
> 2.      That this Court issue a permanent injunction that prohibits Defendant as well as their [sic] successors, agents, and employees, from enforcing the portions of Neb. Rev. Stat. §§ 85-502, 85-1907(3), 85-3202(6), and 85-2102(6), to the extent they extend eligibility for in-state tuition benefits to illegal aliens;
>
> 3.      That this Court award the United States its costs and fees in this action; and
>
> 4.      That this Court award any other relief it deems just and proper.

4

Filing 1 at 16 (Prayer for Relief).

The same day that the United States filed its Complaint, the United States and defendant State of Nebraska (jointly, the Parties) filed the Joint Motion for Entry of Consent Judgment now before the Court. Filing 2. In their Joint Motion, the Parties agreed *inter alia* that "those portions of Neb. Rev. Stat. §§ 85-502, 85-1907(3), 85-3202(6), and 85-2102(6), are preempted by 8 U.S.C. § 1623(a), to the extent they extend eligibility for in-state tuition benefits to aliens who are not lawfully present in the United States." Filing 2 at 2 (¶ 7). Thus, the Parties request a final declaratory judgment to that effect and a permanent injunction prohibiting Nebraska from enforcing portions of the Nebraska statutes at issue to the extent that the statutes extend eligibility for in-state tuition benefits to aliens who are not lawfully present in the United States. Filing 2 at 2 (¶¶ 8–9).

The Court observed that the Parties filed no brief in support of their Joint Motion, but the Court concluded that NECivR 7.1(a)(1)(A) required briefing because the Joint Motion raises a substantial issue of law. Filing 15 at 1. Consequently, in an Order filed April 24, 2026, the Court ordered that not later than May 8, 2026, the Parties were required to file jointly or separately briefs addressing the legal basis for the entry of the proposed Consent Judgment and the Court's subject-matter jurisdiction to do so as further outlined in that Order. Filing 15 at 2.

   2.   *Amicus and Proposed Intervenors*

On April 23, 2026, just two days after the United States filed its Complaint and the Parties filed the Joint Motion for Entry of Consent Judgment, State Senator Dunixi Guereca, who represents Legislative District 7 in southeast Omaha in the Nebraska Legislature, filed a Motion for Leave to Submit Brief of *Amicus Curiae*. Filing 14 at 2 (¶ 4). Senator Guereca asserts in his *Amicus* Brief that this lawsuit threatens his constituents with diminished access to post-secondary education and direct financial harm in the form of higher tuition. Filing 16 at 1. He contends *inter*

Appellate Case: 26-2124   Page: 84   Date Filed: 06/12/2026 Entry ID: 5650825

*alia* that there is no "case or controversy" in this "friendly" lawsuit, which is an attempt by the Parties to use the courts to invalidate laws passed by the legislature, so that this Court lacks jurisdiction to enter the Consent Judgment. Filing 16 at 3–7. The Court granted the Motion for Leave to Submit Brief of *Amicus Curiae* on April 24, 2026, Filing 15, and Senator Guereca filed his *Amicus* Brief that same day, Filing 16.

On May 7, 2026, before the deadline for the Parties' briefing on the merits of the Joint Motion set by the Court, Proposed Intervenors filed the Motion to Intervene also now before the Court. Filing 18. Proposed Intervenors identify themselves as follows:

> Proposed Intervenors are two organizations that fund and assist immigrants pursuing higher education in Nebraska. True Potential Scholarship is a scholarship program of Matters on Tomorrow, a non-profit organization, that funds 100% of the tuition costs and fees for students who are ineligible for federal financial aid, live in Nebraska or Iowa, completed their senior year of high school in the United States, and plan to attend a community or state college in Nebraska or Iowa. Orel Alliance is a non-profit organization dedicated to ensuring Ukrainian families can secure the resources, including educational opportunities, necessary to rebuild and thrive in Nebraska.

Filing 18 at 1–2; *see also* Filing 32 at 1. The reason Proposed Intervenors state for their intervention is the following:

> If the challenged statutes are invalidated, it will be much more difficult for Proposed Intervenors to fulfill their missions of assisting students with pursuing postsecondary education in Nebraska.

Filing 18 at 2. By Order filed May 8, 2026, Filing 25, the Court granted Proposed Intervenor's Motion for Leave to File Corrected Brief, Filing 24, and Proposed Intervenors filed their Corrected Brief on May 11, 2026, Filing 32.

### 3.    *Expedited Briefing*

In the same Order filed May 8, 2026, the Court established an expedited briefing schedule on pending matters. Filing 25. Specifically, the Court gave the Parties to and including May 12, 2026, to file responses to Proposed Intervenors' Motion to Intervene and gave Proposed

Intervenors to and including May 15, 2026, to file a brief on the merits of the Joint Motion for Entry of Consent Judgment, if the Court granted their Motion to Intervene. Filing 25 at 1–2. The Court stated further that if it denied Proposed Intervenors' Motion to Intervene, Proposed Intervenors would have to and including May 15, 2026, to file a brief on the Joint Motion for Entry of Consent Judgment as *amici curiae*, if they chose to do so, and the Court would then determine whether to consider such brief of *amici curiae*. Filing 25 at 2.

On May 8, 2026, Proposed Intervenors filed a Motion to Extend the Court's Order for Briefing on Motion to Intervene and Existing Parties' Joint Motion for Entry of Consent Judgment. Filing 28. The Motion stated that Proposed Intervenors and the Parties had conferred and had agreed to extensions of the briefing deadlines. Filing 28 at 1. The Court found the proposed extensions acceptable. Filing 29 at 1. Consequently, the Court gave the Parties to and including May 19, 2026, to file responses to Proposed Intervenors' Motion to Intervene; gave Proposed Intervenors to and including May 22, 2026, to file a brief on the merits of the Joint Motion for Entry of Consent Judgment if the Court granted their Motion to Intervene; and gave Proposed Intervenors to and including May 22, 2026, to file a brief on the merits of the proposed Consent Judgment as *amici curiae* if the Court denied their Motion to Intervene. Filing 29 at 1.

On May 19, 2026, the Parties filed a Joint Brief in Opposition to Intervention. Filing 41. On May 20, 2026, Proposed Intervenors filed a Reply Brief in Support of Motion to Intervene. Filing 42. Thus, briefing on the Motion to Intervene was completed on May 20, 2026. On May 22, 2026, the Court filed an Order Denying Proposed Intervenors' Motion to Intervene "[f]or the reasons set forth in a Memorandum and Order to follow," *i.e.*, in this Memorandum and Order. Filing 43. The Court reiterated that Proposed Intervenors would have to and including May 22, 2026, to file a brief on the Joint Motion for Entry of Consent Judgment as *amici curiae*, if they

Appellate Case: 26-2124   Page: 86   Date Filed: 06/12/2026 Entry ID: 5650825

chose to do so, and that the Court would then determine whether to consider such brief of *amici curiae*. Filing 43 at 1.

Back on May 8, 2026, the Parties filed a Joint Brief in Support of Joint Motion for Entry of Consent Judgment, Filing 27, as the Court had directed. On May 22, 2026, True Potential Scholarship and Orel Alliance filed their Brief of *Amici Curiae* in Opposition to Joint Motion for Consent Decree. Filing 44. Their *Amici Curiae* Brief completed the briefing on the merits of the Parties' Joint Motion for Entry of Consent Judgment.

> 4.      *The Motion for Stay of Proceedings Pending Appeal*

On May 27, 2026, Proposed Intervenors filed their Motion for Stay of Proceedings Pending Appeal. Filing 45. The Proposed Intervenors seek a stay of consideration of the Parties' Joint Motion for Entry of Consent Judgment "pending disposition of the Movants' forthcoming appeal of this Court's order denying Movant[s'] motion for intervention." Filing 45. More specifically, Proposed Intervenors stated that they "intend to appeal the denial of intervention once the Court issues the memorandum supporting the order denying intervention referenced in [the Order at Filing 43]. Filing 46 at 2. On May 29, 2026, the Parties filed a Joint Brief in Opposition to Proposed Intervenors' Motion to Stay Proceedings Pending Appeal. Filing 47.

The Court begins its consideration of the matters now before it with Proposed Intervenors' Motion to Intervene. Once the Court resolves whether Proposed Intervenors are properly parties to this litigation or may be heard only as *amici curiae,* the Court will turn to the question of whether to stay proceedings pending appeal or proceed to the merits of the Joint Motion for Entry of Consent Judgment.

## II.  THE MOTION TO INTERVENE

In support of their Motion to Intervene, Proposed Intervenors argue that because Nebraska is declining to defend its own statutes, Proposed Intervenors are entitled to participate in this action

to protect their cognizable interests in the challenged statutes and to provide the opposition to the invalidation of those statutes that no existing party will supply. Filing 32 at 7. They argue that intervention is appropriate because federal and state officials have collaborated to achieve a jointly desired outcome without regard to the democratic process. Filing 32 at 8. They also argue that the Court should not invalidate a statute enacted by elected representatives without the participation of anyone willing to defend the interests of the Nebraska residents who would be harmed by the proposed Consent Judgment. Filing 32 at 8. The Parties oppose intervention on the ground that Proposed Intervenors do not have standing to intervene here. Filing 41 at 2. The Parties argue further that the Consent Judgment will not injure the Proposed Intervenors in any cognizable way. Filing 41 at 2. Moreover, the Parties argue that the factors for intervention weigh against the Proposed Intervenors. Filing 41 at 2.

Intervention is governed by Federal Rule of Civil Procedure 24. *Chase v. Andeavor Logistics, L.P.*, 165 F.4th 1102, 1122 (8th Cir. 2026). However, before considering the requirements for intervention under Rule 24, the Court must consider preliminary issues concerning the real party in interest, the capacity to sue, and standing raised by the Parties in their opposition to the Motion to Intervene. Although parties often conflate the issues of real party in interest, capacity to sue, and standing, "they are distinct elements and must be considered separately." *See, e.g., White Oak Glob. Advisors, LLC v. Pistol Drilling, LLC*, No. CIV-13-280-C, 2014 WL 12132230, at *2 (W.D. Okla. Aug. 11, 2014); *Whittiker v. Deutsche Bank Nat. Tr. Co.*, 605 F. Supp. 2d 914, 929 (N.D. Ohio 2009) ("The Court recognizes that standing, capacity to sue, and real-party-in-interest are different concepts that are frequently confused." (citing *Firestone v. Galbreath*, 976 F.2d 279, 283 (6th Cir. 1992)). Thus, the Court will consider these preliminary issues separately.

Appellate Case: 26-2124   Page: 88   Date Filed: 06/12/2026 Entry ID: 5650825

## A. Preliminary Issues

### 1. *True Potential's Status and Capacity to Sue*

In the Joint Brief in Opposition to Intervention, the Parties' first arguments are that True Potential is neither the real party in interest nor does True Potential have the capacity to sue where it is merely a trade name of its parent corporation, Matters on Tomorrow. Filing 41 at 3. Federal Rule of Civil Procedure 17 defines both "real party in interest" in subsection (a) and "capacity to sue or be sued" in subsection (b). Fed. R. Civ. P. 17(a), (b). However, the Court need not address in detail these issues in this case. Even if True Potential's parent Matters on Tomorrow has the capacity to sue as a corporation that True Potential lacks as a trade name and Matters on Tomorrow were substituted as the real party in interest as permitted by Rule 17(a)(2), the result as to intervention would be the same. That is because Matters on Tomorrow has no more interest in the subject matter of this litigation than True Potential does, any injury to that supposed interest is not fairly traceable to the Consent Judgment, and that supposed interest is just as adequately protected by existing parties as True Potential's.https://www.westlaw.com/Document/N22939DB0B96311D8983DF34406B5929B/View/FullText.html?transitionType=Default&contextData=(sc.Default)&VR=3.0&RS=da3.0https://www.westlaw.com/Document/N22939DB0B96311D8983DF34406B5929B/View/FullText.html?transitionType=Default&contextData=(sc.Default)&VR=3.0&RS=da3.0

Thus, neither True Potential nor Matters on Tomorrow is a proper intervenor in this action.

### 2. *The Proposed Intervenors' Standing to Intervene in this Action*

The Court turns to another preliminary matter, that of Article III standing, which is separate and distinct from "real party in interest" and "capacity to sue." *See, e.g., White Oak Glob. Advisors, LLC*, 2014 WL 12132230, at *2; *Whittiker*, 605 F. Supp. 2d at 929. This separate preliminary issue matters here, because an intervenor under Federal Rule of Civil Procedure 24 must not only satisfy

10

the requirements of Rule 24 but establish Article III standing. *See United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 833 (8th Cir. 2009) ("In our circuit, a party seeking to intervene must establish Article III standing in addition to the requirements of Rule 24.").

    a.  "Standing" Requirements

The Eighth Circuit Court of Appeals has explained the requirements for Article III standing of an intervenor as follows:

> "An Article III case or controversy is one where all parties have standing, and a would-be intervenor, because he seeks to participate as a party, must have standing as well." *Mausolf v. Babbitt*, 85 F.3d 1295, 1300 (8th Cir. 1996); *see Town of Chester v. Laroe Estates, Inc.*, —— U.S. ——, 137 S.Ct. 1645, 1651, 198 L.Ed.2d 64 (2017). A prospective intervenor, then, must satisfy the familiar requirements of Article III standing. The intervenor must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, —— U.S. ——, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016).

*Liddell v. Special Admin. Bd. of Transitional Sch. Dist. of City of St. Louis*, 894 F.3d 959, 964 (8th Cir. 2018); *accord United States v. Reilly Tar & Chem. Corp.*, 43 F.4th 849, 855 (8th Cir. 2022). "It is well established that the 'manner and degree of evidence' required for a [proposed party] to establish standing depends on the stage the litigation has reached." *Id.* at 965 (quoting *Lujan*, 504 U.S. at 561). Thus, "[o]n a motion to intervene, the putative intervenors may establish the elements of Article III standing based on well-pleaded allegations alone." *Id.*

The Court finds that—even at this preliminary stage of the litigation—Proposed Intervenors cannot establish either the "injury in fact" requirement or the "fairly traceable"/causation requirement to establish standing. *Id.* at 964; *Reilly Tar*, 43 F.4th at 855.

    b.  Proposed Intervenors Cannot Establish "Injury in Fact"

        i.  *The Pertinent Arguments*

Both Proposed Intervenors and the Parties focus on the "injury in fact" requirement. Proposed Intervenors argue that they have Article III standing because the outcome of the case

directly affects their ability to carry out their organizational missions and interferes with their "core business activities." Filing 32 at 16. They contend further that the direct services that they provide to their constituents and community members would be "perceptibly impaired" if the people they serve are no longer eligible for in-state tuition at Nebraska's higher education institutions. Filing 32 at 17.

The Parties argue that True Potential cannot establish standing because its alleged injury is that the Consent Judgment would result in insufficient funds for True Potential to pay 100% of the tuition of the 27 students attending public community and state colleges in Nebraska during the 2026–2027 school year that True Potential has "committed" to pay. Filing 41 at 5; *see* Filing 32 at 13. The Parties argue that such an injury is not cognizable for standing purposes for two reasons. First, the Parties argue that the injury is too speculative, where True Potential never alleges that a single student purportedly receiving one of True Potential's 27 scholarships is unlawfully present in the United States so no risk of needing more money under the Consent Judgment can be shown. Filing 41 at 5. Second, the Parties argue that True Potential has not identified any legal obligations that the Consent Judgment would affect, where True Potential has not demonstrated a legal obligation to provide those scholarships. Filing 41 at 6. The Parties contend that an allegation that True Potential will have to "break a promise" is not the kind of concrete and particularized invasion of a legal right that establishes injury in fact. Filing 41 at 6. Similarly, the Parties argue that Orel Alliance does not identify a single Ukrainian immigrant that would be affected by the Consent Judgment. Filing 41 at 6–7. The Parties assert that the alleged undermining of a nongovernmental organization's goals is too "ephemeral" to be a concrete injury, or every organization would obtain standing to challenge almost every federal policy that the organization dislikes. Filing 41 at 7.

12

In reply, Proposed Intervenors argue that they have described the specific immigration statuses "typical" of the students they assist and that they have alleged credible fears that Nebraska will construe the Consent Judgment to apply to individuals with these same immigration statuses or who are undocumented. Filing 42 at 3.

### ii.   "Injury in Fact" Requirements

The Eighth Circuit has explained the "injury in fact" requirement as follows:

> An "injury in fact" has been construed by the Supreme Court as meaning "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Schumacher v. SC Data Ctr., Inc.*, 33 F.4th 504, 509 (8th Cir. 2022) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016)) (internal quotation marks omitted).

*Reilly Tar & Chem. Corp.*, 43 F.4th at 855 (8th Cir. 2022); *Liddell*, 894 F.3d at 964–65 (also quoting *Spokeo*, 578 U.S. at 339, in turn quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). More specifically still, "[f]or an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). An injury is "concrete" if it "actually exist[s]"—*i.e.*, is "real" and not "abstract"—but it does not have to be "tangible," because it can be a violation of a legally protected right. *Id*. 339–41. Also, "a litigant may bring a pre-enforcement suit seeking prospective relief against government officials so long as it faces 'a credible threat of enforcement.'" *First Choice Women's Res. Centers, Inc. v. Davenport*, 608 U.S. ___, 146 S. Ct. 1114, 1122 (2026) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161, 164–167 (2014)).

Here, Proposed Intervenors are organizations asserting standing. "An organizational plaintiff satisfies the injury-in-fact requirement if a defendant's actions directly affected and interfered with the organization's core business activities." *Get Loud Arkansas v. Jester*, 171 F.4th 1058, 1064 (8th Cir. 2026) (citing *FDA v. Alliance for Hippocratic Medicine,* 602 U.S. 367, 395 (2024); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). At first blush, it is not clear

13

how interfering with an organization's "core business activities" constitutes "invasion of a legally protected interest" as required to establish the requisite injury in fact. *See Reilly* Tar, 43 F.4th at 855 (citations omitted). However, that concern is resolved by clarifying that the question is whether the opponent's regulations at issue in the case "require or forbid some action by plaintiff," not simply whether the regulations have some effect—however indirect—on the organization's business. *See Get Loud Arkansas*, 171 F.4th at 1064 (the challenged regulation forbade the organization from using its online registration tool, which was an important element of its core business activities).

An organization has also suffered an injury in fact if an opponent's regulations have "perceptibly impaired" the organization's ability to provide its services to its intended recipients. *Granville House, Inc. v. Dep't of Health & Hum. Servs.*, 715 F.2d 1292, 1298 (8th Cir. 1983) (citing *Havens Realty*, 455 U.S. at 379). Again, it is not clear how impairment of an organization's ability to provide services constitutes "invasion of a legally protected interest" as required to establish the requisite injury in fact. *See Reilly* Tar, 43 F.4th at 855 (citations omitted). However, that concern is resolved by clarifying that the question is whether the opponent's regulations reclassify the organization's business or impose requirements for the conduct of its business, not simply whether the regulations had some effect—however indirect—on the organization's ability to provide services. *See Granville House*, 715 F.2d at 1298 (the regulation classified chemical dependency as a mental disease, which required the organization to meet requirements for providing mental health services).

### iii. Proposed Intervenors Lack a Cognizable "Injury in Fact"

The Court will assume for the sake of argument that Proposed Intervenors properly seek pre-enforcement intervention to seek prospective relief against a credible threat of enforcement by

14

the Parties' Consent Judgment. *See First Choice Women's Res. Ctrs., Inc.*, 146 S. Ct. at 1122. That assumption is not sufficient to establish the required "injury in fact," however.

The Court concludes that Proposed Intervenors' assertions that the Consent Judgment will cause them injury in fact because it will interfere with their core business activities and impair their ability to provide services to community members do not involve invasion of a concrete and legally protected interest, and even if they theoretically do, they are conjectural, hypothetical, or speculative. *See Reilly Tar*, 43 F.4th at 855 (defining injury in fact as "invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical" (citations omitted)). Here, the Consent Judgment invalidating the Nebraska statutes at issue would not "require or forbid some action by" Proposed Intervenors, it would simply increase Proposed Intervenors' need for funding for that business and those services. *See Get Loud Arkansas*, 171 F.4th at 1064. Likewise, Proposed Intervenors do not cognizably allege that the Consent Judgment will "perceptibly impair" their ability to provide services in the sense of reclassifying Proposed Intervenors' business activities or imposing requirements for the conduct of their business, rather than simply increasing the costs of providing their services. *See Granville House*, 715 F.2d at 1298.

Even if the injuries Proposed Intervenors allege might be theoretically sufficient, those injuries are simply too speculative, conjectural, and hypothetical here. *See Reilly Tar*, 43 F.4th at 955. The Parties are correct that Proposed Intervenors have not identified any specific recipients of their assistance or services that are aliens unlawfully present in the United States or that Proposed Intervenors have a legal obligation to provide with any assistance or services. Proposed Intervenors identification of the specific immigration statuses "typical" of the students they assist, *see* Filing 42 at 3, does not make the existence of any specific recipient that Proposed Intervenors

15

are legally bound to assist any less speculative. Indeed, the hypothetical nature of some impact of the Consent Judgment on recipients of the assistance or services provided by Proposed Intervenors is not an injury to Proposed Intervenors but an injury to the hypothetical recipients.

Thus, Proposed Intervenors fail the first requirement for standing.

c. Proposed Intervenors Cannot Establish an Injury "Fairly Traceable" to the Parties' Conduct

The Court now turns to the second requirement of standing, which is that the injury in fact must be "fairly traceable to the challenged conduct of the defendant." *Reilly Tar*, 43 F.4th at 855; *Liddell*, 894 F.4th at 964. The Parties argue that the need to renegotiate True Potential's administrative agreements and increase its fundraising efforts is too far removed from the "ripple effects" of the Consent Judgment to be fairly traceable to that Consent Judgment. Filing 41 at 5. They argue that the Consent Judgment is not the direct cause of such attenuated consequences, even if those consequences were to come to pass. Filing 41 at 6. Proposed Intervenors reply that their assertion of standing is supported by "commonsense economic realities." Filing 42 at 3 (citing *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100 (2025)). Proposed Intervenors assert that there can be no credible dispute that the Consent Judgment would make it more costly for Proposed Intervenors to provide their existing services to students. Filing 42 at 4.

i. The "Fairly Traceable" Requirement

As to the "fairly traceable" requirement, "[a] plaintiff 'must show that his injury is fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Roberts v. Thompson*, No. 25-1475, ___ F.4th ___, 2026 WL 1409990, at *3 (8th Cir. May 20, 2026) (quoting *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 909–10 (8th Cir. 2016)). "The injury is considered 'fairly traceable' to the defendant's conduct if, for instance, 'the defendant will be compelled to cause the alleged injury to the intervenor if the

16

plaintiff prevails.'" *Reilly Tar*, 43 F.4th at 855 (quoting *Am. C.L. Union of Minn. v. Tarek ibn*

*Ziyad Acad.*, 643 F.3d 1088, 1093 (8th Cir. 2011)). More specifically,

> As this Court has explained, the "line of causation between the [challenged] conduct and injury"—the "links in the chain of causation," *Allen [v. Wright]*, 468 U.S. [737,] 752, 759, 104 S.Ct. 3315 [(1984)]—must not be too speculative or too attenuated, *Clapper [v. Amnesty Int'l USA]*, 568 U.S. [398,] 410–411, 133 S.Ct. 1138 [(2013)]. The causation requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs. *See Allen*, 468 U.S. at 757–759, 104 S.Ct. 3315; *Simon [v. Eastern Ky. Welfare Rights Org.]*, 426 U.S. [26,] 41–46, 96 S.Ct. 1917 [(1976)]. The causation requirement also rules out attenuated links— that is, where the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing. *See Allen*, 468 U.S. at 757–759, 104 S.Ct. 3315; *cf. Department of Commerce [v. New York]*, 588 U.S. [752,] 768, 139 S.Ct. 2551 [(2019)].

*Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024).

In *Diamond Alternative Energy, LLC v. Environmental Protection Agency*, 606 U.S. 100

(2025), on which Proposed Intervenors rely, the Supreme Court relied heavily on principles that it

had previously set out in *Alliance for Hippocratic Medicine*. The Supreme Court explained,

> This case presents what the Court has described as the "familiar" circumstance where government regulation of a business "may be likely" to cause injuries to other linked businesses. *Alliance for Hippocratic Medicine*, 602 U.S., at 384, 144 S.Ct. 1540. As the Court has explained, "when the government regulates (or under-regulates) a business, the regulation (or lack thereof) may cause downstream or upstream economic injuries to others in the chain, such as certain manufacturers, retailers, suppliers, competitors, or customers." *Ibid.*

> In cases of that kind, this Court's analysis of causation and redressability has recognized commonsense economic realities. When third party behavior is predictable, commonsense inferences may be drawn.

*Diamond Alternative Energy*, 606 U.S. at 116.

The Supreme Court then explained,

> In this case, those commonsense economic principles support the fuel producers' standing. The California regulations force automakers to manufacture more electric vehicles and fewer gasoline-powered vehicles. *See Bennett [v. Spear]*, 520 U.S. [154,] 169, 117 S.Ct. 1154 [(1997)]. The standards force automakers to produce a fleet of vehicles that, as a whole, uses significantly less gasoline and

17

other liquid fuels. California's regulation of automakers' vehicle fleets in turn will likely "cause downstream or upstream economic injuries to others in the chain," such as producers of gasoline and other liquid fuels. *Alliance for Hippocratic Medicine*, 602 U.S., at 384, 144 S.Ct. 1540.

*Diamond Alternative Energy*, 606 U.S. at 116–17 (footnote omitted).

### ii. Proposed Intervenors Lack a "Fairly Traceable" Injury

The Court concludes, first, that principles of "commonsense economic realities" have no application to the circumstances in this case. This is not a case in which the government regulation of a business is even at issue, so there is no question of whether the Consent Judgment "may be likely" to cause economic injuries to other linked businesses. *See Diamond Alternative Energy*, 606 U.S. at 116. Invalidation of the Nebraska statutes based on preemption only affects who may be eligible for in-state tuition. The Consent Decree does not regulate a business such as motor vehicle production that could "cause downstream or upstream economic injuries to others in the chain"; indeed, there is no chain of manufacturers, retailers, suppliers, competitors, or customers affected by regulation of eligibility for in-state tuition. *Id.* (quoting *Alliance for Hippocratic Medicine*, 602 U.S. at 384). Proposed Intervenors are not in the position of suppliers in a chain of commerce, even if they supply funding for students who might be eligible for in-state tuition, because their involvement is not a matter of business but of philanthropy with no expectation of business profit or economic injury from the regulation.

The Court concludes further that any "economic reality" of increased costs to Proposed Intervenors to provide their services to their target recipients has too attenuated a link to establish causation and standing. *See Alliance of Hippocratic Medicine*, 602 U.S. at 383. Rather, the Consent Judgment is so far removed from the distant ripple effects of increased costs to a donor of funds for secondary education that it does not establish that the purported injury is "fairly traceable" to the Consent Judgment, even if that ripple effect is predictable. *Id.*

Appellate Case: 26-2124   Page: 97   Date Filed: 06/12/2026 Entry ID: 5650825

Thus, Proposed Intervenors fail to establish requirements for standing, and their Motion to Intervene is denied on this ground before ever addressing the Rule 24 standards for intervention.

## B. Intervention Pursuant to Rule 24

Assuming for the sake of argument that Proposed Intervenors have standing to intervene, the Court will consider whether Proposed Intervenors satisfy the other requirements for intervention. Those requirements are set out in Federal Rule of Civil Procedure 24. *Chase v. Andeavor Logistics, L.P.*, 165 F.4th at 1122 ("Intervention is governed by Rule 24"). Rule 24 provides for both intervention of right and permissive intervention. Fed. R. Civ. P. 24(a), (b). The Court will consider each kind of intervention in turn.

### 1. Intervention of Right

#### a. The Pertinent Arguments

Proposed Intervenors argue that they have the required substantial interest at stake to intervene of right because they have "cognizable organizational and financial interests in defending the challenged statutes." Filing 32 at 21.[1] They argue that these costs are at the heart of the case because they are contingent on the outcome of the litigation. Filing 32 at 21. They also argue that other courts have recognized that education and educational opportunities are a significant, legally protectable interest. Filing 32 at 22. Proposed Intervenors argue that these interests are certain to be harmed by entry of the Consent Judgment. Filing 32 at 22. They assert that without intervention, they cannot participate in the proceedings or appeal any adverse judgment. Filing 32 at 23. Proposed Intervenors contend that they have an interest that no existing party will adequately protect where the United States seeks to dismantle Nebraska laws that make

---

[1] Proposed Intervenors also argue that their Motion to Intervene is timely, which the Parties do not appear to dispute. Filing 32 at 18–21; Filing 41 at 7 (acknowledging the timeliness requirement but not disputing that Proposed Intervenors' motion was timely).

19

education affordable for the people that Proposed Intervenors serve, and the Nebraska Attorney General has "abdicated" his responsibilities to defend the constitutionality of the challenged Nebraska statutes. Filing 32 at 24.

The Parties focus on their contention that Proposed Intervenors cannot show that their interest is unrepresented by existing parties. Filing 41 at 7. They argue this is so when the Court recognizes the "binary" question in this case: "Do the Nebraska laws violate federal law (and thus the Supremacy Clause)?" Filing 41 at 8. Although they acknowledge that the Nebraska Attorney General has a duty to defend actions and claims against the state, they argue that duty does not remove the Attorney General's discretion to determine that a state law was not duly adopted and is not constitutional, so that the Attorney General's agreement to the Consent Judgment was consistent with his duty. Filing 41 at 8–9. The Parties argue that Proposed Intervenors disagreement on the issue of the constitutionality of the state statutes does not mean that the Attorney General has a different interest from the Proposed Intervenors in protecting constitutional state statutes. Filing 41 at 9–10. Thus, they argue that Proposed Intervenors cannot overcome the strong presumption that the state represents their interests without a showing of misfeasance or nonfeasance in protecting the public, which the Parties assert that Proposed Intervenors cannot make here. Filing 41 at 9.

b. Standards for Intervention of Right

Rule 24 provides for intervention of right as follows:

**(a) Intervention of Right.** On timely motion, the court must permit anyone to intervene who:

> **(1)** is given an unconditional right to intervene by a federal statute; or

> **(2)** claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

20

Fed. R. Civ. P. 24(a); *Chase,* 165 F.4th at 1123 (quoting the rule).

Where the proposed intervenor does not have a statutory right to intervene, the issue is whether an existing party will adequately represent the proposed intervenor's interests—which is reviewed *de novo*. *Id.* Consequently,

> We apply a "tripartite test" to determine whether intervention as of right is appropriate: "1) the party must have a recognized interest in the subject matter of the litigation; 2) that interest must be one that might be impaired by the disposition of the litigation; and 3) the interest must not be adequately protected by the existing parties." *Mille Lacs Band of Chippewa Indians v. Minnesota,* 989 F.2d 994, 997 (8th Cir. 1993) (Mille Lacs).

*Chase,* 165 F.4th at 1123. "Absent . . . [a] clear dereliction of duty [by an existing party], . . . the proposed intervenor cannot rebut the presumption of representation by merely disagreeing with the litigation strategy or objectives of the party representing him." *Id.* at 1124 (quoting *Chiglo v. City of Preston,* 104 F.3d 185, 188 (8th Cir. 1997)).

c. Proposed Intervenors Do Not Satisfy the Requirements to Intervene of Right

Proposed Intervenors do not assert that any federal statute gives them an unconditional right to intervene in this case, nor could they. Fed. R. Civ. P. 24(a)(1). Proposed Intervenors "claim[ ] an interest relating to the property or transaction that is the subject of the action" and that they are "so situated that disposing of the action may as a practical matter impair or impede [their] ability to protect [their] interest." Fed. R. Civ. P. 24(a)(2); *Chase,* 165 F.4th at 1123. While the Court concludes that Proposed Intervenors are "interested" in this litigation, the Court concludes that they do not have a cognizable or recognized "interest relating to the property or transaction that is the subject of the action." Fed. R. Civ. P. 24(a)(2); *Chase,* 165 F.4th at 1123. This is true because Proposed Intervenors are not themselves eligible for in-state tuition, which is the subject matter of the litigation, even if they contend that they are interested in the question of whether or

Appellate Case: 26-2124   Page: 100   Date Filed: 06/12/2026 Entry ID: 5650825

not the state statutes making students not lawfully present in the United States eligible for in-state tuition are constitutional or are instead preempted by federal law.

This difference between the Proposed Intervenors' interest and the interest of students who are eligible for in-state tuition under the present Nebraska statutory scheme is apparent from the cases cited by Proposed Intervenors themselves. In *Brumfield v. Dodd*, 749 F.3d 339 (5th Cir. 2014), the Fifth Circuit held that parents of children who received school vouchers via Louisiana's Scholarship Program had the right to intervene in an action by the United States seeking to permanently enjoin Louisiana from awarding school vouchers to students attending school in districts operating under a federal desegregation order without authorization from the federal court overseeing the desegregation case. 749 F.3d at 340–41. The Fifth Circuit concluded,

> [A] *potential* decree . . . threatens a "prospective interference with" educational opportunities. Further, any decree might "adversely affect[ ] the interests of [the parents] in having equal access to ... opportunities ... without reference to race, color, or national origin." Finally, "existing" scholarships are "threatened by" a potential bar on certain kinds of vouchers.

*Brumfield v. Dodd*, 749 F.3d 339, 343 (5th Cir. 2014) (emphasis in the original). Thus, while *Brumfield* supports the conclusion that the students who are eligible for in-state tuition under the present Nebraska scheme—and their parents as their representatives—have an interest sufficient to warrant intervention, nothing in *Brumfield* suggests that entities like Proposed Intervenors that provide tuition and other support services to such students or their parents would have any such interest.

The other cases cited by Proposed Intervenors teach the same lesson. In *Smith v. Los Angeles Unified School District*, 830 F.3d 843 (9th Cir. 2016), the Ninth Circuit observed that the school district did not challenge the district court's finding that the intervenors—a sub-class of moderately to severely disabled children who moved to intervene in a class action brought on behalf of all disabled students in the Los Angeles Unified School District—had a protectable

interest in receiving a free appropriate public education in conformity with their Individualized Education Programs (IEPs). *Smith*, 830 F.3d at 846, 862. Thus, *Smith* is consistent with this Court's view of the interest of students in laws affecting their education.

In *Grutter v. Bollinger*, 188 F.3d 394 (6th Cir. 1999), the Sixth Circuit expressly held that prospective minority applicants for admission to the University of Michigan had sufficient interest "in gaining admission to the University" to intervene in an action challenging the use of race in determining admission. *Grutter*, 188 F.3d at 396–97, 399. Thus far, *Grutter* is entirely consistent with this Court's view of the interest of students in laws relating to their eligibility for educational benefits. However, that case also involved as an intervenor "the Citizens for Affirmative Action's Preservation (CAAP), a nonprofit organization whose stated mission is to preserve opportunities in higher education for African–American and Latino/a students in Michigan." *Id.* at 397. After mentioning this intervenor, there is no further or separate discussion of the basis on which the organization was allowed to intervene, as to either its substantial legal interest or impairment of that interest. *Id. passim*. Thus, the Court does not find *Grutter* persuasive on the question of whether the Proposed Intervenors here, as organizations supporting students, have a substantial legal interest that would warrant their intervention.

The Court concludes that Proposed Intervenors lack the required interest to intervene as of right. That determination makes it unnecessary for the Court to consider whether their interest might be impaired by the disposition of the litigation. *Chase,* 165 F.4th at 1123 (citations omitted) (stating this as the second part of the test). On the other hand, the Court will for the sake of completeness briefly consider whether whatever interests Proposed Intervenors have are adequately protected by the existing parties. *Id.* (citations omitted) (stating this as the third part of the test).

23

Although Proposed Intervenors clearly would prefer that the Nebraska Attorney General take a different position and pursue a different strategy in this case instead of jointly seeking the entry of the Consent Judgment with the United States, that does not establish that the Proposed Intervenors' proper interests are not adequately protected. First, as the Eighth Circuit has made clear, Proposed Intervenors "cannot rebut the presumption of representation by merely disagreeing with the litigation strategy or objectives of the party representing him." *Id.* at 1124 (quoting *Chiglo,* 104 F.3d at 188). Such disagreement is the centerpiece of Proposed Intervenors' position on this requirement, although Proposed Intervenors dress up the argument in the colors of failure of the Nebraska Attorney General to fulfill his duty.

As to the question of duty, the Nebraska Attorney General's duties include a duty "[t]o appear and defend actions and claims against the state." Neb. Rev. Stat. § 84-205(1). "[Nebraska] statutes may not precisely articulate the Attorney General's duty to defend the constitutionality of state statutes," but the Nebraska Supreme Court has recognized that "the common-law duties of the Attorney General" include "that he or she must defend duly adopted statutory enactments that are not unconstitutional." *State v. Denton*, 949 N.W.2d 344, 347 (Neb. 2020); *see also Lopez v. Cath. Charities of Archdiocese of Omaha*, 998 N.W.2d 31, 40 (Neb. 2023) (citing *Denton*, 949 N.W.2d at 347, for this principle). Even so, no law—common law or statutory—deprives the Nebraska Attorney General of the duty to exercise his judgment on the constitutionality of state statutes; indeed, his common law duty is limited to defending "duly adopted statutory enactments that are not unconstitutional," and does not extend to defending every statute, even ones that in the exercise of the Attorney General's judgment are not constitutional. *Id.* Proposed Intervenors have shown nothing more than their disagreement with the Attorney General's position, so they have

24

failed to overcome the presumption that the Nebraska Attorney General adequately represents the interests of the citizens of the state in this litigation. *Chase*, 165 F.4th at 1124.

Proposed Intervenors are not entitled to intervene of right under Federal Rule of Civil Procedure 24(a).

### 2. *Permissive Intervention*

#### a. The Pertinent Arguments

Proposed Intervenors argue that if they are not granted leave to intervene of right under Federal Rule of Civil Procedure 24(a)(2), they should be granted leave to intervene permissively under Rule 24(b)(1)(B). Filing 32 at 25. They argue that the defense they seek to offer goes to the central legal question in the case concerning whether the Nebraska statutes at issue conflict with federal law and violate the Supremacy Clause. Filing 32 at 25. They also assert intervention will not unduly delay or prejudice the adjudication of the Parties' rights. Filing 32 at 25–26. The Parties argue that permissive intervention should be denied because Proposed Intervenors lack standing, so their presence would only bog down this litigation with ancillary issues. Filing 41 at 11.

#### b. Standards for Permissive Intervention

Federal Rule of Civil Procedure 24(b) provides for permissive intervention as follows:

(b) Permissive Intervention.

> **(1) In General.** On timely motion, the court may permit anyone to intervene who:
>
> > **(A)** is given a conditional right to intervene by a federal statute; or
> >
> > **(B)** has a claim or defense that shares with the main action a common question of law or fact.

Fed. R. Civ. P. 24(a)–(b). Permissive intervention under Rule 24(b) is different from intervention of right:

25

> Rule 24(b) . . . provides that a "court may permit anyone to intervene" if they are either "given a conditional right to intervene by a federal statute" or if they have "a claim or defense that shares with the main action a common question of law or fact." *See Chase,* 686 F. Supp. 3d at 878-79. The decision to deny permissive intervention is "wholly discretionary," with the "principal consideration" being whether the proposed intervention would "unduly delay or prejudice the adjudication of the parties' rights." *S.D. ex rel. Barnett v. U.S. Dep't of Interior,* 317 F.3d 783, 787 (8th Cir. 2003) (*Barnett*). "Accordingly, we grant great deference to the district court's decision to deny a Rule 24(b) motion, reviewing it only for a clear abuse of discretion." *Id.* (citations omitted).

*Chase,* 165 F.4th at 1124. Indeed, "[r]eversal of a decision denying permissive intervention is extremely rare, bordering on nonexistent." *Id.* (quoting *Barnett,* 317 F.3d at 787). Legitimate considerations include whether the intervenor is already adequately represented and whether the intervenor lacks standing. *Id.* at 1124–25.

c.    The Court Finds Permissive Intervention Inappropriate

Here, the Court declines to exercise its discretion to allow Proposed Intervenors to intervene permissively. *Id.* at 1124 (whether to allow permissive intervention is "wholly discretionary" (citation omitted)). The first and greatest impediment to their permissive intervention is that they lack standing, as explained in § II.A.2. above. *See id.* at 1124–25 (identifying standing as a relevant consideration for permissive intervention). The second impediment is that—notwithstanding Proposed Intervenors' disagreement with the Nebraska Attorney General on the constitutionality of the state statutes at issue—Proposed Intervenors are already adequately represented in this action, as explained in § II.B.1.c. above. *See id.* at 1124 (identifying adequate representation by an existing party as a relevant consideration). Litigation of Proposed Intervenors standing and the adequacy of the representation of their interests by existing parties has already bogged down and delayed the resolution of this case. *See Id.* (identifying the "principal consideration" as whether the proposed intervention would "unduly delay or prejudice the adjudication of the parties' rights" (citation omitted). Further delay is not necessary because

26

the Court has already given Proposed Intervenors a full and fair opportunity to air their differences

with the Nebraska Attorney General on the validity of the challenged state statutes by permitting

them to submit their *Amici Curiae* Brief, which presumably includes the arguments that Proposed

Intervenors would have made, had they been allowed to intervene.

Thus, the Court also denies permissive intervention.

### III. THE MOTION FOR A STAY PENDING APPEAL

Proposed Intervenors were fully aware that their Motion to Intervene had been denied and

only a statement of the Court's rationale was wanting, so they filed a Motion for Stay of

Proceedings Pending Appeal prior to the entry of this decision explaining the Court's rationale for

denying leave to intervene. Filing 45. Proposed Intervenors stated that they "intend to appeal the

denial of intervention once the Court issues the memorandum supporting the order denying

intervention referenced in [the Order at Filing 43]," that is, once the Court issues this Memorandum

and Order. Filing 46 at 2.

### A. The Pertinent Arguments

Proposed Intervenors' argument for a stay is that judicial economy favors providing the

Circuit Court of Appeals with an opportunity to resolve the intervention question before this Court

is left to adjudicate the merits of a proposed consent decree without the benefit of the participation

of a party defending the challenged statutes. Filing 46 at 2. They contend that the challenged

statutes have been in force for two decades without objection from the United States. Filing 46 at

2. They also argue that there is precedent in the District of Minnesota finding similar statutes

constitutional. Filing 46 at 2 (citing *United States v. Walz*, No. 0:25-cv-02668 (D. Minn. June 25,

2025)). They argue that in these circumstances there is no compelling urgency that militates against

a limited stay that would facilitate more orderly and efficient proceedings. Filing 46 at 2. They

also argue that they have a substantial likelihood of success on appeal of the denial of intervention

Appellate Case: 26-2124   Page: 106   Date Filed: 06/12/2026 Entry ID: 5650825

because courts are particularly solicitous of intervenors who are "public interest group[s]" seeking to participate in a case involving a "public interest question." Filing 46 at 4. Proposed Intervenors argue further that they will suffer hardship without a stay because of the substantial harm that would be imposed by the Consent Judgment. Filing 46 at 4. They assert that these concerns outweigh the interests of the Parties in proceeding directly to a determination on the merits of the Consent Judgment. Filing 46 at 4–5.

The Parties respond that the request for a stay would accomplish nothing but further delay with no savings to the resources of the Parties or Proposed Intervenors. Filing 47 at 1. The Parties argue that Proposed Intervenors have already briefed the principal motion—albeit in the capacity of *amici curiae*—so all that remains is for the Court to render its decision on the merits of the Consent Judgment. Filing 47 at 1. More specifically, the Parties argue that Proposed Intervenors' "judicial economy" argument is backwards, because the most economical course is to decide the case. Filing 47 at 3. The Parties argue that Proposed Intervenors' argument is also predicated on the assumption that they would win an appeal of the denial of their intervention resulting in further litigation, but that possibility arises from any appeal. Filing 47 at 4. The Parties also assert that the case on which Proposed Intervenors rely to show that they have a substantial defense was wrongly decided for the reasons set forth in the Parties' brief on the merits. Filing 47 at 5.

As to the factors relevant to a stay pending appeal, the Parties argue that Proposed Intervenors have not made a strong showing of likelihood of success where they rely on the courts' supposed solicitousness to intervention by public interest groups. Filing 47 at 6. The Parties argue that Proposed Intervenors have also failed to show hardship absent a stay because they have suffered no cognizable injury. Filing 47 at 6. The Parties argue that the relevant question is whether Proposed Intervenors are injured by denial of leave to intervene, but any such injury could be

28

remedied by the Court's denial of entry of the Consent Judgment, whether or not Proposed

Intervenors are allowed to intervene. Filing 47 at 6–7. The Parties argue that the equities and public

interest weigh against a stay because further delay of the Consent Judgment continues the

sovereign harm to the interest of the United States and the public in the supremacy of federal law,

and the intervenors have already been given the opportunity to be heard as *amici curiae*. Filing 47

at 7.

## B. Applicable Standards

"The denial of a motion to intervene of right is immediately appealable as a final

judgment . . . and [the Eighth Circuit's] review is de novo." *F.T.C. v. Johnson*, 800 F.3d 448, 451

(8th Cir. 2015) (quoting *United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 833 (8th Cir.

2009)). The Eighth Circuit has explained,

> "A stay is not a matter of right, even if irreparable injury might otherwise
> result" but instead is "an exercise of judicial discretion." *[Nken v. Holder*, 556 U.S.
> 418,] 433, 129 S.Ct. 1749 [(2009)] (internal quotation marks omitted). "[T]he
> propriety of its issue is dependent upon the circumstances of the particular case."
> *Id.* (internal quotation marks omitted). The . . . party moving for the stay pending
> appeal, "bears the burden of showing that the circumstances justify an exercise of
> that discretion." *Id.* at 434, 129 S.Ct. 1749. "A motion to a court's discretion is a
> motion, not to its inclination, but to its judgment; and its judgment is to be guided
> by sound legal principles." *Id.* (internal quotation marks omitted). The Supreme
> Court has "distilled" "those legal principles" "into consideration of [the following]
> four factors":
>
> > (1) whether the stay applicant has made a strong showing that he is likely
> > to succeed on the merits; (2) whether the applicant will be irreparably
> > injured absent a stay; (3) whether issuance of the stay will substantially
> > injure the other parties interested in the proceeding; and (4) where the public
> > interest lies.
>
> *Id.* (internal quotation marks omitted); *see also Brady [v. Nat'l Football League]*,
> 640 F.3d [785,] 789 [(8th Cir. 2011)] (same).

*Kansas v. United States*, 124 F.4th 529, 532–33 (8th Cir. 2024).

### C.  A Stay Pending Appeal of the Denial of Leave to Intervene Is Not Warranted

In "the circumstances of th[is] particular case," the Court concludes that a stay pending appeal is not appropriate in the exercise of the Court's discretion "guided by sound legal principles." *See Kansas*, 124 F.4th at 533 (quoting *Nken*, 556 U.S. at 433–34). Contrary to Proposed Intervenors' contentions, the Court concludes that Proposed Intervenors have not made a strong showing that they are likely to succeed on the merits of their appeal of denial of leave to intervene. *Id.* (first factor). This is so because of the Court's conclusions above that Proposed Intervenors lack standing or an interest warranting intervention. For the same reasons that the Court concludes that Proposed Intervenors lack injuries required for standing or intervention, the Court also concludes that Proposed Intervenors will not be irreparably injured absent a stay. *Id.* (second factor). Any interest Proposed Intervenors have in being able to appeal as parties if the Consent Judgment is entered is no stronger than their interest in and injury from the Consent Judgment, and the Court has found both their interest and their injury insufficient. In addition, a stay would substantially injure other interested parties and the public interest, where there can be no significant interest on the part of the United States, the State of Nebraska, or the public in the continued operation of state statutes that are contrary to federal law. *Id.* (third and fourth factor).

Finally, the Court concludes that even if it is not Proposed Intervenors' actual intent, the effect of a stay pending appeal would be a delay that permits the challenged state statutes to remain valid at least into the next academic year. This too is contrary to the public interest. *Id.* (fourth factor). In the Court's view, the fact that potentially unconstitutional state statutes have remained unchallenged for several years does not warrant further delay in determining their validity in the face of federal law when those state statutes are challenged. Even if the Court concludes that Proposed Intervenors articulate a significant public interest in allowing the airing of a position

Appellate Case: 26-2124   Page: 109   Date Filed: 06/12/2026 Entry ID: 5650825

different from that espoused by the Parties, as the Court explained above, the Court has given

Proposed Intervenors a full and fair opportunity to air their differences with the Nebraska Attorney

General on the validity of the challenged state statutes by permitting them to submit their *Amici*

*Curiae* Brief. That *Amici Curiae* Brief presumably includes the arguments that Proposed

Intervenors would have made, had they been allowed to intervene. Thus, neither Proposed

Intervenors' interest nor the public interest is injured by denying a stay pending appeal of the denial

of their Motion to Intervene.

In short, Proposed Intervenors' Motion for Stay of Proceedings Pending Appeal is denied.

Therefore, the Court will proceed to consideration of the merits of the Parties' Joint Motion for

Entry of Consent Judgment.

## IV.  THE MOTION FOR ENTRY OF CONSENT JUDGMENT

In considering the Parties' Joint Motion for Entry of Consent Judgment, the Court will

consider the briefing that the Court required the Parties to submit. In its Order for Briefs on Joint

Motion for Entry of Consent Judgment, the Court first stated that a brief was required by NECivR

7.1(a)(1)(A) because "the Joint Motion raises a substantial issue of law." Filing 15 at 1. The Court

then stated,

> The Court also requests that the parties address the issue of subject-matter jurisdiction in this case, including how the Court has subject-matter jurisdiction under the "case or controversy requirement" of Article III of the U.S. Constitution given that the positions of both parties in this lawsuit appear to be aligned at this time. *See, e.g., 281 Care Comm. v. Arneson*, 638 F.3d 621, 626–27 (8th Cir. 2011); *United States v. Windsor*, 570 U.S. 744, 759–60 (2013). The Court requests that the parties provide authority as to how federal courts address cases such as the one presently in front of this Court, where a state's laws appear to be in clear violation of federal laws and the state's executive authorities do not defend the state's laws from federal legal challenge given such clear federal authority.
>
> The Court further directs the parties to address whether the Court should give any deference to the agreement of the parties as to the constitutionality of the

31

statutes referenced, or whether a federal court must conduct its own independent analysis of the legal issues involved in coming to any such conclusion.

Filing 15 at 1–2. The Court will also consider the briefs of all *Amici Curiae* to the extent that the Court finds that those briefs address relevant issues and offer persuasive reasoning.

### A.  Subject-Matter Jurisdiction

"[S]ubject matter jurisdiction is a threshold inquiry at any stage of a lawsuit brought in federal court." *Sorenson v. Sorenson*, 64 F.4th 969, 974 (8th Cir. 2023). Consequently, one of the issues on which the Court required briefing was its subject-matter jurisdiction in this case, including whether the case presents a "case or controversy." Filing 15 at 1. The Parties and *Amici* address that issue, with rather different views.

*1.  The Pertinent Arguments*

The Parties argue that this case "undoubtedly" presents a case or controversy because the challenged Nebraska statutes are still in effect. Filing 27 at 2. They argue that nothing in their agreement has affected that fact, and the sovereign injury to the United States satisfies the case-or-controversy requirement of Article III and gives the United States standing. Filing 27 at 4; *see also* Filing 27 at 9–10 (concerning standing based on injury in the form of violation of federal law). The Parties argue that even if this is a "friendly, non-adversary proceeding" because the federal and state executives agree on the outcome, there is a controversy as long as the state does not give the Supremacy Clause its effect. Filing 27 at 5. Here, the United States argues that it continues to be injured by the challenged Nebraska statutes because those statutes remain in effect and Nebraska has taken no further steps to give the United States the relief it requests by ceasing to give effect to the challenged Nebraska statutes. Filing 27 at 5. The Parties argue that none of the cases cited by *Amicus* Guereca require a different result. Filing 27 at 7–8. The United States also argues that it has standing to sue as *parens patriae* to secure the federal rights of its citizens and to

Appellate Case: 26-2124    Page: 111    Date Filed: 06/12/2026 Entry ID: 5650825

vindicate the public interest in obedience to federal law. Filing 27 at 11. The Parties argue that the injury to the United States is fairly traceable to Nebraska because the challenged Nebraska statutes remain in effect, and Nebraska has made illegal aliens eligible for post-secondary education benefits based on residence where those benefits are denied to United States citizens from other states, and the Consent Judgment would resolve that injury. Filing 27 at 12.

Amicus Guereca argues that a case or controversy requires the parties to have adverse legal interests and to pursue an honest and actual antagonistic assertion of rights against each other. Filing 16 at 3. Here, however, he argues that the parties agree on the constitutional question and desire the same result, so there is no case or controversy. Filing 16 at 3. He argues,

> In 2006, these laws were validly enacted by the Legislature. Twenty years later, the Legislature refused to repeal them. Now, the executive branches of two separate sovereigns are leveraging their "tremendous partnership" to achieve a result rejected by the Legislature. Because the United States and the State of Nebraska are aligned, the Court has been deprived of "an honest and actual antagonistic assertion of rights," and the constitutionality of the challenged laws has not yet been tested in the crucible of adversarial litigation.

Filing 16 at 4. Amicus Guereca asserts that a "friendly" lawsuit cannot be used by a party beaten in the legislature to transfer to the courts an inquiry as to the constitutionality of the legislative act. Filing 16 at 4. He contends that the proper recourse is the introduction of bills in the Nebraska legislature to address the issue. Filing 16 at 5.

Amici True Potential and Orel likewise argue that there is no case or controversy to which judicial power may attach where the Parties are clearly cooperating. Filing 44 at 14. Amici point out, "The Parties here do not deny their collaboration—they flaunt it; indeed, the Parties envision the consent decree as a tool to advance their mutual policy goals." Filing 44 at 7 (citing Filing 21 at 44–47 (DOJ Press Release). They also argue that this case is distinguishable from ones on which the Parties rely because Nebraska has not taken any concrete action that is adverse to the United States or actively enforced the challenged statutes against non-compliant educational institutions.

33

Filing 44 at 15. They also point out that the cases on which the United States relies were vigorously litigated on the merits by intervenors, but adversely affected parties here are not given the opportunity to defend the Nebraska statutes where the Nebraska Attorney General has failed to do so. Filing 44 at 16.

2.      The "Case or Controversy" Requirement in "Friendly" Lawsuits

*Amici* are correct that the Supreme Court observed, "It never was the thought that, by means of a friendly suit, a party beaten in the legislature could transfer to the courts an inquiry as to the constitutionality of the legislative act." *Muskrat v. United States*, 219 U.S. 346, 359–60 (1911) (quoting *Chicago & G.T. Ry. Co. v. Wellman*, 143 U.S. 339, 345 (1892)); *see also Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 346 (1936) (Brandeis, J., concurring) (also quoting this statement from *Chicago & G.T. Ry. Co.*, 143 U.S. at 345)). That is hardly the end of the matter, however.

Much more recently, the Supreme Court addressed "friendly" lawsuits in *United States v. Windsor*, 570 U.S. 744, 759–60 (2013). In *Windsor*, two women were married in a lawful ceremony in Ontario, Canada, and when one of them died after they had returned and resided in New York, she left her entire estate to the other, who then claimed an estate tax exemption for a surviving spouse. *Windsor*, 570 U.S. at 749–50. The United States Congress had enacted the Defense of Marriage Act (DOMA), one provision of which defined "marriage" and "spouse" to exclude same-sex couples. *Id.* at 752. The district court found the provision of the DOMA at issue was unconstitutional and ordered the United States to refund the estate taxes. *Id.* at 754. The United States continued to deny refunds at the same time that it declined to defend the constitutionality of that provision of the DOMA. *Id.* at 756. The Supreme Court observed that this position of the United States "does introduce a complication" with whether a case or controversy existed. *Id.*

Notwithstanding the "complication," the Supreme Court concluded, "The Government's position—agreeing with Windsor's legal contention but refusing to give it effect—meant that there was a justiciable controversy between the parties, despite what the claimant would find to be an inconsistency in that stance." *Id.* at 756. The Supreme Court explained:

> In this case the United States retains a stake sufficient to support Article III jurisdiction on appeal and in proceedings before this Court. The judgment in question orders the United States to pay Windsor the refund she seeks. An order directing the Treasury to pay money is "a real and immediate economic injury," indeed as real and immediate as an order directing an individual to pay a tax. That the Executive may welcome this order to pay the refund if it is accompanied by the constitutional ruling it wants does not eliminate the injury to the national Treasury if payment is made, or to the taxpayer if it is not. The judgment orders the United States to pay money that it would not disburse but for the court's order. The Government of the United States has a valid legal argument that it is injured even if the Executive disagrees with § 3 of DOMA, which results in Windsor's liability for the tax. Windsor's ongoing claim for funds that the United States refuses to pay thus establishes a controversy sufficient for Article III jurisdiction. It would be a different case if the Executive had taken the further step of paying Windsor the refund to which she was entitled under the District Court's ruling.

*Windsor*, 570 U.S. at 757–58 (citation omitted).

The Supreme Court then addressed prudential concerns raised by the Executive's agreement with the opposing party's legal argument:

> The Executive's agreement with Windsor's legal argument raises the risk that instead of a "'real, earnest and vital controversy,'" the Court faces a "friendly, non-adversary, proceeding ... [in which] 'a party beaten in the legislature [seeks to] transfer to the courts an inquiry as to the constitutionality of the legislative act.'" *Ashwander v. TVA*, 297 U.S. 288, 346, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (quoting *Chicago & Grand Trunk R. Co. v. Wellman*, 143 U.S. 339, 345, 12 S.Ct. 400, 36 L.Ed. 176 (1892)). Even when Article III permits the exercise of federal jurisdiction, prudential considerations demand that the Court insist upon "that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

*Windsor,* 570 U.S. at 759–60. The Supreme Court then considered whether there were "countervailing considerations" warranting the hearing of a case even when one party is reluctant to prevail in its position:

35

One consideration is the extent to which adversarial presentation of the issues is assured by the participation of *amici curiae* prepared to defend with vigor the constitutionality of the legislative act. With respect to this prudential aspect of standing as well, the [Supreme Court in *INS v. Chadha*, 462 U.S. 919 (1983),] encountered a similar situation. It noted that "there may be prudential, as opposed to Art. III, concerns about sanctioning the adjudication of [this case] in the absence of any participant supporting the validity of [the statute]. The Court of Appeals properly dispelled any such concerns by inviting and accepting briefs from both Houses of Congress." 462 U.S., at 940, 103 S.Ct. 2764. *Chadha* was not an anomaly in this respect. The Court adopts the practice of entertaining arguments made by an *amicus* when the Solicitor General confesses error with respect to a judgment below, even if the confession is in effect an admission that an Act of Congress is unconstitutional. *See, e.g., Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

*Windsor*, 570 U.S. at 760.

> 3.   This "Friendly" Lawsuit Satisfies "Case or Controversy" and "Standing" Requirements

Here, the Court concludes that the questions of subject-matter jurisdiction and standing are controlled by *Windsor* not by *Chicago & Grand Trunk Railway Company*. As in *Windsor*, the Nebraska Attorney General's position—agreeing with the legal contention of the United States but refusing to give it effect—means that there is a justiciable controversy between the parties, despite the apparent inconsistency in the Nebraska Attorney General's position. *Windsor*, 570 U.S. at 756. The injury to the United States is violation of the Supremacy Clause, and such a constitutional injury is as real and concrete as the economic injury to the United States of loss of estate taxes from the Treasury at issue in *Windsor*. *See, e.g., United States v. Missouri*, 114 F.4th 980, 984 (8th Cir. 2024) (Missouri's statute classifying various federal firearms laws as infringements of the Second Amendment was a "concrete and particularized" injury to the United States from violation of the Supremacy Clause), *cert. denied*, 146 S. Ct. 90, 223 L. Ed. 2d 7 (2025). The Court agrees with the Parties that the Constitution does not demand the absurd result that the United States has no means of judicial redress against unconstitutional state laws when the state's executive branch

36

happens to agree with the United States Attorney General about the merits of a preemption claim. Filing 27 at 6.

Even if Article III permits the exercise of federal jurisdiction, "prudential considerations demand that the Court insist upon 'that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" *Id.* at 760 (quoting *Baker*, 369 U.S. at 204). Thus, this Court like the Supreme Court in *Windsor* must consider whether there are "countervailing considerations" that warrant hearing this case, even when Nebraska is reluctant to prevail on the validity of its statutes—or flat out agrees that its statutes are invalid. *Id.* The concerns of the absence of any participant supporting the validity of the Nebraska statutes here as in *Windsor* is allayed by granting *Amici* the opportunity to brief the merits of the Consent Judgment. *Id.* (adopting the practice of entertaining arguments made by an *amicus* when the executive admits that an act of its legislature is unconstitutional).

The Court is not persuaded by the arguments of *Amici* that the Court should disregard the teachings of *Windsor* on the ground that Nebraska has not taken any concrete action that is adverse to the United States or actively enforced the challenged statutes against non-compliant educational institutions. All that was required to establish a case or controversy in *Windsor* was that despite the agreement of the United States with the taxpayer, the United States did not refund the taxes collected. *Windsor*, 570 U.S. at 757–58. Thus, the case or controversy issue turned on whether the opposing party, although in agreement on the legal question, took no action to grant the relief sought by the other party. Likewise in this case, the Court concludes that there is a case or controversy because while Nebraska agrees on the legal issue, it has taken no action to grant the United States the relief it seeks, which is invalidation of the challenged state statutes.

37

The Court also is not persuaded by *Amici's* argument that the cases on which the United States relies are distinguishable because they were vigorously litigated on the merits by intervenors, but adversely affected parties here are not given the opportunity to intervene and defend the Nebraska statutes where the Nebraska Attorney General has failed to do so. Filing 44 at 16. The Supreme Court in *Windsor* did not require an intervenor to satisfy prudential concerns; rather the Supreme Court "adopt[ed] the practice of entertaining arguments made by an *amicus*" when the executive admitted that the act of its legislature was unconstitutional. *Windsor*, 570 U.S. at 760 (citing *Dickerson*, 530 U.S. 428). As the Court has already pointed out twice above, the Court has given Sen. Guereca, True Potential, and Orel Alliance a full and fair opportunity to air their differences with the Nebraska Attorney General on the validity of the challenged state statutes by permitting them to submit their briefs as *amici*, which presumably include the arguments that they would have made, had they been allowed to intervene.

Thus, subject-matter jurisdiction in this case satisfies both Article III and prudential concerns.

### B. The Constitutionality Determination

In its Order for Briefs on Joint Motion for Entry of Consent Judgment, the Court directed the parties "to address whether the Court should give any deference to the agreement of the parties as to the constitutionality of the statutes referenced, or whether a federal court must conduct its own independent analysis of the legal issues involved in coming to any such conclusion." Filing 15 at 2.

The Parties' first response is the following:

> [T]he Court need not engage in a searching merits analysis but should defer to the parties' agreement by merely assuring itself that the consent judgment sought is fair, reasonable, adequate, and not contrary to law. *United States v. Metro. St. Louis Sewer Dist. (MSD)*, 952 F.2d 1040, 1044 (8th Cir. 1992).

Filing 27 at 2. The Parties add that "[i]n any event, the challenged Nebraska laws are expressly preempted and unconstitutional," Filing 27 at 2, and they offer supporting arguments.

The Court concludes both state and federal courts "have a constitutional obligation . . . to uphold federal law." *Hathorn v. Lovorn*, 457 U.S. 255, 269 (1982) (quoting *Stone v. Powell*, 428 U.S. 465, 494, n. 35 (1976), in turn citing *Martin v. Hunter's Lessee,* 1 Wheat. 304, 341–344, 4 L.Ed. 97 (1816)). Where the issue is a federal one, federal courts "have the duty to make [an] independent inquiry and determination," even if a state court has addressed the question. *Aftanase v. Econ. Baler Co.*, 343 F.2d 187, 192 (8th Cir. 1965). Where a federal court has a duty to make an independent inquiry and determination of constitutionality even where a state court has already made such a determination, a federal court plainly has a duty to make an independent inquiry and determination of constitutionality of a state statute even if all the parties before it agree that the state statute violates federal constitutional principles of the supremacy of federal law. The Court will not defer to the Parties' conclusion but will make an independent inquiry and determination.

### C. Preemption

The Court turns next to that independent inquiry into and determination of whether the federal statute, 8 U.S.C. § 1623(a), preempts the four challenged Nebraska statutes, Neb. Rev. Stat. §§ 85-502, 85-1907(3), 85-3202(6), and 85-2102(6). That inquiry begins with a survey of the statutes at issue to put in context the arguments of the Parties and *Amici* on the preemption issue.

*1.     The Statutes at Issue*

The federal statute at issue, 8 U.S.C. § 1623, states the following:

**§ 1623. Limitation on eligibility for preferential treatment of aliens not lawfully present on basis of residence for higher education benefits**

**(a) In general**

Notwithstanding any other provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a

39

political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident.

**(b) Effective date**

This section shall apply to benefits provided on or after July 1, 1998.

8 U.S.C. § 1623. In the view of the Fifth Circuit, at least, the "[n]othwithstanding any other provision of law" language means that "Section 1623(a) contains an express preemption clause."

*Young Conservatives of Texas Found. v. Smatresk*, 73 F.4th 304, 312 (5th Cir. 2023).

Neb. Rev. Stat. § 85-501 provides as follows:

All state educational institutions shall charge nonresident fees to be paid by nonresidents of Nebraska who shall matriculate at any such institution, and the governing board of each institution may fix and collect such fees. Subject to the minimum standards provided by section 85-502, resident status shall be determined at the time of each registration according to rules and regulations which the governing board of each institution shall establish.

Neb. Rev. Stat. § 85-501. Thus, this statute requires non-residents to pay non-resident tuition at Nebraska post-secondary schools, subject to Neb. Rev. Stat. § 85-502.

Neb. Rev. Stat. § 85-502, the challenged Nebraska statute on which the challenges to the other state statutes depend, states the following concerning minimum standards for resident status (and hence in-state tuition) in its first pertinent part:

Rules and regulations established by the governing board of each state postsecondary educational institution shall require as a minimum that a person is not deemed to have established a residence in this state, for purposes of sections 85-501 to 85-504, unless:

(1) Such person is of legal age or is an emancipated minor and has established a home in Nebraska where he or she is habitually present for a minimum period of one hundred eighty days, with the bona fide intention of making this state his or her permanent residence, supported by documentary proof[.]

40

Neb. Rev. Stat. § 85-502(1). Thus, although this provision does not mention aliens, it expressly makes eligibility for in-state tuition depend on residence in the state rather than citizenship.

The statute then imposes specific requirements for aliens as follows:

> (5) Except as provided in subdivision (9) of this section, such student, if an alien, has applied to or has a petition pending with the United States Immigration and Naturalization Service to attain lawful status under federal immigration law and has established a home in Nebraska for a period of at least one hundred eighty days where he or she is habitually present with the bona fide intention to make this state his or her permanent residence, supported by documentary proof[.]

Neb. Rev. Stat. § 85-502(5). Thus, as to an alien's presence in the United States, an alien must have applied for lawful status, but the alien does not have to be lawfully present at the time.

The subdivision referenced in § 85-502(5) as an exception to its requirements provides as follows:

> (9)(a) Such student resided with his or her parent, guardian, or conservator while attending a public, private, denominational, or parochial high school in this state or a school in this state which elects pursuant to section 79-1601 not to meet accreditation or approval requirements and:
>
>> (i) Graduated from a public, private, denominational, or parochial high school in this state, completed the program of instruction offered by a school in this state which elects pursuant to section 79-1601 not to meet accreditation or approval requirements, or received a diploma of high school equivalency issued pursuant to section 79-730;
>>
>> (ii) Resided in this state for at least three years before the date the student graduated from the high school, completed the program of instruction, or received the diploma of high school equivalency;
>>
>> (iii) Registered as an entering student in a state postsecondary educational institution not earlier than the 2006 fall semester; and
>>
>> (iv) Provided to the state postsecondary educational institution an affidavit stating that he or she will file an application to become a permanent resident at the earliest opportunity he or she is eligible to do so.

Neb. Rev. Stat. § 85-502(9). Thus, instead of meeting the requirements of subdivision (5) of the statute, an alien may satisfy the requirements of subdivision (9). The requirements of subdivision

Appellate Case: 26-2124    Page: 120    Date Filed: 06/12/2026 Entry ID: 5650825

(9) are *inter alia* graduation from one of the schools listed or a high school equivalency diploma; residence in the state for at least three years; and an affidavit stating that the alien "will file an application to become a permanent resident at the earliest opportunity he or she is eligible to do so." *Id.* Thus, unlike subdivision (5), which requires an actual application for lawful status, subdivision (9) requires only an affidavit that the alien will apply for lawful permanent resident status at some point.

The other three Nebraska statutes at issue all incorporate the requirements of § 85-502. The first, Neb. Rev. Stat. § 85-1907, establishes eligibility for the Nebraska Opportunity Grant (NOG) program. It provides among other requirements that the student "[i]s a resident student who is domiciled in Nebraska as provided by section 85-502." Neb. Rev. Stat. § 85-1907(3). Thus, it includes the eligibility of aliens explained in § 85-502. Similarly, the Access College Early Scholarship Program Act (ACESPA) defines students eligible for the program as follows:

> (6) Student means a student attending a Nebraska high school with a reasonable expectation that such student will meet the residency requirements of section 85-502 upon graduation from a Nebraska high school.

Neb. Rev. Stat. § 85-2102(6). Thus, this provision imposes only a "reasonable expectation" that the student will meet the eligibility requirements of § 85-502, including the eligibility of aliens. The last Nebraska statute at issue concerns eligibility for the Door to College Scholarship Act (DTC) program. It provides in pertinent part that "eligible student means an undergraduate student who" *inter alia* "[i]s a resident student who is domiciled in Nebraska as provided by section 85-502." Neb. Rev. Stat. § 85-3202(6).

### 2. The Pertinent Arguments

The Parties argue that the challenged Nebraska statutes on their face are residency-based and make aliens unlawfully present in the United States eligible for post-secondary education benefits, while excluding United States citizens who have not resided in Nebraska, contrary to the

Appellate Case: 26-2124   Page: 121   Date Filed: 06/12/2026 Entry ID: 5650825

requirements of 8 U.S.C. § 1623(a). Filing 27 at 18. They point out that § 1623 contains an express

preemption clause. Filing 27 at 19. They argue further that the challenged Nebraska statutes

"unquestionably" conflict with § 1623 because they rely on residency of the aliens unlawfully

present in the United States, but United States citizens of other states cannot meet that residency

requirement. Filing 27 at 19. The Parties argue that post-secondary institutions need not admit

illegal aliens at all, but if they do, § 1623 requires that the aliens cannot receive in-state tuition

unless out-of-state United States citizens would receive the same benefits. Filing 27 at 21. The

Parties point to other federal court decisions that have found similar state laws expressly preempted

by § 1623(a). Filing 27 at 23. On the other hand, they describe the Minnesota District Court

decision on which *Amici* rely as an "outlier" and explain why they believe it is wrongly decided.

Filing 27 at 24–27.

Amicus Sen. Guereca does not address the merits of the Consent Judgment because he

instead focused his arguments on the alleged lack of jurisdiction over this "friendly" lawsuit. Filing

16 *passim*. *Amici* True Potential and Orel do address the merits. They assert that the challenged

Nebraska statutes do not conflict with federal law. Filing 44 at 21. They assert that "properly read"

§ 1623 and § 85-502 "are entirely consistent" and that principles of federalism and statutory

construction confirm that "harmonious" reading. Filing 44 at 21. As to the "proper reading" of the

statutes, *Amici* argue,

> The Nebraska laws do not provide in-state tuition "on the basis of residence" as that
> term is defined under federal law; in-state tuition is not a "postsecondary education
> benefit"; and "a citizen or national" can obtain in-state tuition in Nebraska without
> regard to residency.

Filing 44 at 22. The Court will address the details of these arguments to the extent that it finds

necessary in its analysis below. As to the "principles of federalism," *Amici* argue that traditional

state prerogatives in the administration of a state's educational system include the setting of tuition

Appellate Case: 26-2124   Page: 122   Date Filed: 06/12/2026 Entry ID: 5650825

prices for all students attending public universities. Filing 44 at 32. They argue that constitutional avoidance principles also come to bear, because § 1623(a) would violate the Tenth Amendment, which they argue prohibits Congress from limiting whom a state may treat as an in-state resident for purposes of tuition at public colleges and universities, and because it regulates the states directly, not the students unlawfully present in the United States. Filing 44 at 32–33.

### 3.   *"Federalism" Issues*

The Court will consider first the "federalism" arguments raised by *Amici* True Potential and Orel because these issues were not raised by the Parties. Doing so will give due consideration to the arguments of *amici curiae* in this case in which the Parties are in agreement on the merits. *See Windsor,* 570 U.S. at 760 ("adopt[ing] the practice of entertaining arguments made by an *amicus*" when the executive admitted that the act of its legislature was unconstitutional). However, the Court's resolution of those arguments can be comparatively succinct.

First, the Court rejects *Amici'*s argument that traditional state prerogatives in the administration of a state's educational system include the setting of tuition prices for all students attending public universities. Filing 44 at 32. This argument misses the point, because § 1623(a) plainly does not set tuition prices for any students. Rather, it prohibits granting an alien who is not lawfully present in the United States eligibility for in-state tuition on the basis of residence within a State. 8 U.S.C. § 1623(a). The states remain entirely free to set tuition prices for all students at whatever amount the state may choose.

Next, the Court rejects *Amici*'s arguments based on the Tenth Amendment. What is at issue here is a matter of immigration policy. "The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012) (citing *Toll v. Moreno*, 458 U.S. 1, 10 (1982); *see also id.* at 395 ("The federal power to determine immigration policy is well settled."). The Supreme Court long ago said "that

44

the Tenth Amendment does not operate as a limitation upon the powers, express or implied, delegated to the national government." *Case v. Bowles*, 327 U.S. 92, 102 (1946) (internal quotation marks and citations omitted). Justice Scalia explained,

> As this Court has said, it is an "'accepted maxim of international law, that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions.'" *Fong Yue Ting v. United States*, 149 U.S. 698, 705, 13 S.Ct. 1016, 37 L.Ed. 905 (1893) (quoting *Ekiu v. United States*, 142 U.S. 651, 659, 12 S.Ct. 336, 35 L.Ed. 1146 (1892)). That is why there was no need to set forth control of immigration as one of the enumerated powers of Congress. . . .

*Arizona*, 567 U.S. at 422 (Scalia, J., concurring in part).

There is no federalism or Tenth Amendment impediment to § 1623(a), which is an exercise in federal authority over aliens and immigration policy.

> ### 4.    *Interpretation of the Statutes*

The next issue is whether § 1623(a) preempts the challenged state statutes, which the Parties and *Amici* dispute.

> #### a.    Preemption Standards

Federal law may "expressly" preempt state law or only impliedly do so if exercising state law would "unlawfully infringe" on federal law. *See, e.g.,* *HCI Distribution, Inc. v. Peterson*, 110 F.4th 1062, 1066 (8th Cir. 2024), *cert. denied sub nom. HCI Distribution, Inc. v. Hilgers*, 145 S. Ct. 1920, 221 L. Ed. 2d 663 (2025). Because the Parties have relied solely on "express" preemption, that is the only form of preemption that the Court will consider. The party asserting federal preemption of state law bears the burden of showing that the federal law preempts the state law. *R. J. Reynolds Tobacco Co. v. City of Edina*, 60 F.4th 1170, 1175 (8th Cir. 2023) (citing *Williams v. Nat'l Football League*, 582 F.3d 863, 880 (8th Cir. 2009)).

The Eighth Circuit has explained,

> "The Supreme Clause, U.S. Const., Art. VI, cl. 2, invalidates state laws that interfere with, or are contrary to, federal law." *Kinley Corp. v. Iowa Utilities Bd.*, 999 F.2d 354, 357 (8th Cir. 1993), quoting *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985), citing *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23 (1824) (Marshall, C.J.) (cleaned up). "Congress is empowered to pre-empt state law by so stating in express terms." *Id.*, *quoting Hillsborough Cnty.*, 471 U.S. at 713, 105 S.Ct. 2371. "Pre-emption fundamentally is a question of congressional intent ... and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one." *English v. General Elec. Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990), *citing Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 299, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988) (internal citation omitted).

*Couser v. Shelby Cnty., Iowa*, 139 F.4th 664, 669 (8th Cir. 2025), *cert. denied sub nom. Shelby Cnty. v. Couser*, 223 L. Ed. 2d 509 (Jan. 12, 2026). In other words, "'[S]tate law must yield' when Congress intends to preempt it." *WinRed, Inc. v. Ellison*, 59 F.4th 934, 941 (8th Cir. 2023) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)).

When "[i]nterpreting an express preemption provision, this court 'focus[es] on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'" *WinRed*, 59 F.4th at 942 (quoting *Watson v. Air Methods Corp.*, 870 F.3d 812, 817 (8th Cir. 2017)); *Ferrell v. Air EVAC EMS, Inc.*, 900 F.3d 602, 606 (8th Cir. 2018) (same) (quoting *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016)). "[W]hen the statute's language is plain, [the court's] inquiry into preemption both begins and ends with the language of the statute itself." *Ferrell*, 900 F.3d at 606–07 (quoting *EagleMed LLC v. Cox*, 868 F.3d 893, 903 (10th Cir. 2017)). More pointedly, the court "may not refuse to apply . . . preemption merely because [it] do[es] not believe it would be sound public policy to enforce the statute Congress enacted." *Id.* at 607.

b.  Section 1623(a) Plainly Preempts the Challenged State Laws

As mentioned above, in the view of the Fifth Circuit, at least, the "[n]otwithstanding any other provision of law" language of § 1623(a) means that "Section 1623(a) contains an express

Appellate Case: 26-2124    Page: 125    Date Filed: 06/12/2026 Entry ID: 5650825

preemption clause." *Young Conservatives of Texas Found. v. Smatresk*, 73 F.4th 304, 312 (5th Cir.

2023). The Fifth Circuit explained,

> [G]oing . . . with the proper reading of § 1623(a), the statute expressly preempts state rules that grant illegal aliens benefits when U.S. citizens haven't received the same. No matter what a state says, if a state did not make U.S. citizens eligible, illegal aliens cannot be eligible. But, to be clear, § 1623(a) doesn't impose *any* duty to grant the same benefits to U.S. citizens. *Cf. Day v. Bond*, 500 F.3d 1127, 1139 (10th Cir. 2007) ("Section 1623 does not provide that 'No nonresident citizen shall be denied a benefit' afforded to an illegal alien, but rather imposes a limit on the authority of postsecondary educational institutions."). Its sole focus is on improper benefits for illegal aliens.

*Smatresk*, 73 F.4th at 313. The Court agrees with this reading of the plain language of the statute.

*See Ferrell*, 900 F.3d at 606–07 (explaining that analysis of preemption begins and ends with the

plain language of the federal statute's language).

The Court concludes further that the provisions of § 85-502 applicable to aliens and the

provisions of the other three Nebraska statutes that depend upon § 85-502 plainly fall within the

preemptive force of § 1623. *Id.* (relying on the plain meaning of the federal statute) Section 85-

502 and the other challenged Nebraska statutes unquestionably conflict with § 1623(a) to the

extent that they permit aliens unlawfully present in the United States to qualify for in-state tuition

and state financial assistance "on the basis of residence" in Nebraska while at the same time

denying those postsecondary education benefits to United States citizens who do not meet the

residency-based requirements of those statutes. *See* 8 U.S.C. § 1623(a).

Nevertheless, *Amici* argue that as a matter of plain language, § 1623(a) and the challenged

state statutes are not in conflict. First, they argue that "residence" under § 1623(a) is "the place of

general abode," meaning the "principal, actual dwelling place in fact, without regard to intent."

Filing 44 at 22 (quoting 8 U.S.C. § 1101(a)(33)). They argue that, in contrast, Neb. Rev. Stat. § 85-

502 specifies that residence for post-secondary education requires either intent or documentary

proof that the student is a dependent of persons defined in § 85-502(1)–(5). In other words, they

47

argue that § 85-502 does not define "residence" like § 1101(a)(33) does for § 1623(a) purposes as "principal, actual" dwelling "in fact." Filing 44 at 22. This argument is a misdirection. Eligibility for in-state tuition under § 85-502 is plainly based on "residence," defined consistent with the federal statutory definition in § 1101(a)(3) as the first five subdivisions of § 85-502 all turn on where the student "has established a home . . . where he or she is habitually present." Neb. Rev. Stat. § 85-502(1)–(5). This language is not identical to § 1101(a)(33), but its meaning is essentially the same as the meaning of a "place of general abode" or "principal, actual dwelling place in fact" in § 1101(a)(3). The fact that § 85-502 adds a requirement that the student have "the bona fide intention of making this state his or her permanent residence," where § 1101(a)(33) makes intent irrelevant, does not mean that "residence" within the meaning of § 85-502 is not included within § 1101(a)(33)'s definition of "residence."[2] The provisions of § 85-502 applicable to aliens do not define "residence" in a way that puts it beyond the preemptive force of § 1623(a).

*Amici* next contend that in-state tuition under § 85-502 is not a "postsecondary education benefit" within the meaning of § 1623(a). Filing 44 at 28. They argue that a state's decision to offer in-state tuition to individuals with some connection to the state is not public largesse but is instead "a self-interested decision to invest in its own future workforce." Filing 44 at 28–29. They argue that in-state tuition is not a benefit because payment flows from the student to the state, not the other way around. Filing 44 at 29. *Amici* are correct that § 1623(a) is cast in terms of "any postsecondary education benefit." 8 U.S.C. § 1623(a). However, their extraordinarily limited definition of "benefit" is not persuasive, particularly in the context of the costs of post-secondary education. The primary definition of "benefit" is "something that produces good or helpful results

---

[2] In contrast, the Minnesota statute at issue in *United States v. Walz*, No. 25cv2668, 2026 WL 851231 (D. Minn. Mar. 27, 2026), did not turn on residence at all, but on where the student attended and graduated from high school. 2026 WL 851231, at *1 (quoting Minn. Stat. § 134A.043).

48

or effects or that promotes well-being: advantage." *Merriam Webster Online Dictionary* (https://www.merriam-webster.com/dictionary/benefit). As an example, *Merriam Webster* provides "discounted prices and other *benefits* of a museum membership." *Id.* (emphasis in the original). Thus, in-state tuition is plainly an education "benefit" as it is a "discount" from the "out-of-state" tuition that a student who does not fall under § 85-502 would have to pay. That conclusion is not changed by *Amici* pointing to the reference in § 1623(a) to "amount, duration, and scope" of the benefit, as these parameters would reasonably apply to the "benefit" of the "discount" of in-state tuition compared to out-of-state tuition. Thus, the meaning of "education benefit" under § 1623(a) does not except § 85-502 from its preemptive force.

The Court is also unpersuaded by *Amici*'s contention that United States citizens from other states are eligible for in-state tuition under § 85-502. Filing 44 at 25. They argue that § 1623(a) "says that 'a' citizen or national—not 'all' citizens and nationals—must be eligible for in-state tuition without regard to Nebraska residency." Filing 44 at 25. They argue that Nebraska law creates multiple avenues by which an out-of-state United States citizens can be entitled to pay the in-state rate, regardless of their residency. Filing 44 at 25. *Amici*'s suggestion that § 85-502(6) could provide an out-of-state United States citizen with in-state tuition is beside the point, because § 85-502(6) does not address aliens at all, let alone "an alien who is not lawfully present in the United States." Neb. Rev. Stat. § 85-502(6) (granting state residence to a student who "is a staff member or a dependent of a staff member of the University of Nebraska, one of the Nebraska state colleges, or one of the community college areas who joins the staff immediately prior to the beginning of a term from an out-of-state location").[3] *Amici*'s contention that an out-of-state United

---

[3] Indeed, an alien unlawfully present in the United States would not be able to obtain a work permit to be a staff member at the institutions listed in § 85-502(6) except under very specific circumstances, such a parole and work authorization authorized by the Immigration and Customs Enforcement.

49

States citizen could qualify as a resident under § 85-502(9) is simply wrong, when that provision is read in context with § 85-502(5), to which it is an express exception. *See* Neb. Rev. Stat. § 85-502(5) ("Except as provided in subdivision (9) of this statute. . . ."). Section 85-502(5) applies to "an alien." When § 85-502(9) is read as an exception to § 85-502(5), "Such student" in subdivision (9) must also be "an alien." This is made clear by § 85-502(9)(a)(iv), which states that the student "[p]rovided to the state postsecondary educational institution an affidavit stating that he or she will file an application to become a permanent resident at the earliest opportunity he or she is eligible to do so." A United States citizen of any state would have no need for (and would not be eligible at any time) to become a permanent resident. Thus, *Amici* have failed to show that the provisions of § 85-502 applicable to aliens would be applicable to any United States citizen resident in another state.

The state statutes are preempted to the extent that they allow aliens unlawfully present in the United States to qualify as "residents" of Nebraska for the purpose of post-secondary education benefits[4] but deny such benefits to United States citizens of other states.

### D. Appropriateness of the Consent Judgment

The penultimate question is whether the Consent Judgment is appropriate.

#### 1.    *The Pertinent Arguments*

The Parties argue that the Consent Judgment is fair, reasonable, adequate, and does not violate the law, so it should be entered. Filing 27 at 2. They argue that the Consent Judgment is fair because there is no evidence of bad faith or other misconduct, even where the two sovereigns have reached agreement on its terms. Filing 27 at 14. They contend that the Consent Judgment is

---

[4] It is this limitation on the scope of preemption that makes *Amici*'s argument that parts of § 85-502 are "severable" irrelevant. Only those parts of § 85-502 that allow aliens unlawfully present—not all the parts of § 85-502—are preempted.

Appellate Case: 26-2124    Page: 129    Date Filed: 06/12/2026 Entry ID: 5650825

also reasonable because it springs from and serves to resolve the dispute within the Court's subject-matter jurisdiction, comes within the general scope of the case, and furthers the objectives of the law on which it is based, that is, preemption of the state statutes at issue by § 1623(a). Filing 27 at 15–16. The Parties argue that the Consent Judgment also resolves the claims raised in their entirety. Filing 27 at 16. Lastly, they argue that the Consent Judgment vindicates rather than violates the law and is proposed by parties authorized by law to enter into the agreement. Filing 27 at 17.

Amici argue that the Consent Judgment is neither procedurally fair nor reasonable because it was not negotiated at arm's length and lacks the necessary clarity. Filing 44 at 8. They contend that the Parties' "collusion" makes the Consent Judgment unfair because interested individuals and organizations had no opportunity to be heard. Filing 44 at 17. They also assert that the Consent Judgment warrants particular scrutiny because it invalidates democratically enacted law thus infringing state sovereignty. Filing 44 at 18. Amici contend that the Consent Judgment is unreasonable for the further reason that it is of uncertain scope and the terms and mechanism under which it will be enforced are unspecified. Filing 44 at 19. For example, they contend that persons "not lawfully present" is not defined in the Consent Judgment or § 1623. Filing 44 at 19.

    2.    *The Consent Judgment Satisfies Applicable Standards*

The Eighth Circuit has recognized that "[t]here are multiple judge-made rules that have arisen around the approval of consent decrees." *Ctr. for Biological Diversity v. Strommen*, 114 F.4th 939, 942 (8th Cir. 2024). Those rules include that the consent decree "must be procedurally 'fair,'" *id.*; it must also be "reasonable," *id.* at 943; and it cannot be an agreement "to violate the law," *id.* at 945.

Taking these requirements in turn, the Court concludes that the Consent Judgment is "procedurally fair," notwithstanding that it is the result of agreement between the Parties. The Eighth Circuit has explained this "fairness" requirement as follows:

> By procedurally fair, we mean the negotiations must have been "in good faith and at arm's length." *United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1020 (8th Cir. 2002). The "candor, openness, and bargaining balance" of the negotiations are factors to consider, but what matters in the end is whether there was "fair play." *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86–87 (1st Cir. 1990).

*Strommen*, 114 F.4th at 942. Although there was agreement between the Parties promptly on the heels of the filing of the Complaint, that does not establish that the Consent Judgment is the product of "collusion" or other "misconduct." *Id.* at 942–43. As the Court has explained, this "friendly" litigation was not improper. Indeed, the complaints of the *Amici* are really that they believe they deserved more of an opportunity to "air [their] objections." *Id.* at 943 (explaining that the parties opposing the entry of the consent decree made this argument). However, the Court has given Sen. Guereca, True Potential, and Orel Alliance a full and fair opportunity to air their differences with the Nebraska Attorney General on the validity of the challenged state statutes by permitting them to submit their briefs as *amici*, which presumably include the arguments that they would have made, had they been allowed to intervene. The Court also required full briefing by the Parties before it was willing to accept the Consent Judgment. Although the Court does not address whether such procedural considerations were required under the present circumstances, the Court concludes that the Court's decision to consider the arguments made by *Amici* undermines the *Amici's* contention of procedural unfairness. *Id.* at 942.

The Court is also satisfied that the Consent Judgment is "reasonable." *Id.* at 943. As the Eighth Circuit has explained,

> The reasonableness inquiry is "multifaceted," *Cannons*, 899 F.2d at 89, although two considerations are especially important. The first is whether the consent decree "spring[s] from and serve[s] to resolve a dispute within the court's subject-matter jurisdiction." *Local No. 93*, 478 U.S. at 525, 106 S.Ct. 3063. Closely related is the second: whether the relief it provides "com[es] within the general scope of the case made by the pleadings" and "further[s] the objectives of the law upon which the complaint was based." *Id.* (first alteration in original) (citation omitted). Within these basic limits, the parties "enjoy wide latitude in terms of what they may agree

52

to" in a consent decree. *Conservation L. Found. of New England, Inc. v. Franklin,* 989 F.2d 54, 59 (1st Cir. 1993).

*Strommen*, 114 F.4th at 943. *Amici*'s objection to the Consent Judgment on the basis of lack of "reasonableness" does not address these considerations but is instead essentially another assertion that the Consent Judgment was not negotiated at arm's length. The Court concludes that the Consent Judgment "springs from and serves to resolve" a dispute within the Court's subject-matter jurisdiction. *Id.* The Court has explained its conclusions about why it has subject-matter jurisdiction in this case, and the relationship between the claims made and the Consent Judgment is clear from a comparison of the Complaint and the Consent Judgment. Based on the same comparison, it is clear that the Consent Judgment furthers the objections of the law upon which the Complaint is based, § 1623(a). *Id.* The Parties have not abused their "wide latitude" in terms of what they agreed to where the Consent Judgment closely follows the language of the claims. *Id.*

The Consent Judgment here also is not an agreement to "violate the law." *Id.* at 945. As the Court has explained, the Consent Judgment is based on clear preemption of the challenged parts of the state statutes by § 1623(a). For the reasons that the Court has explained, the Consent Judgment also does not violate federalism or Tenth Amendment concerns.

*Amici*'s last argument that the Consent Judgment lacks clarity on essential terms like "unlawfully present in the United States" is a red herring. Their assertion that there are multiple immigration statuses only serves to demonstrate that the meaning of "unlawfully present" is a matter to which a very substantial body of law—both statutory and caselaw—can be applied to determine the applicability of the Consent Judgment.

### E.  The Language of the Consent Judgment

Notwithstanding these conclusions, the Court has found it necessary to exercise some editorial authority over the Consent Judgment. Many of those editorial changes were to conform

Appellate Case: 26-2124   Page: 132   Date Filed: 06/12/2026 Entry ID: 5650825

the Consent Judgment to the Court's standard format and presentation of a decision. In some instances, the Court has also modified the proposed language in the interest of clarity without changing the substance of the Consent Judgment.

## V. CONCLUSION

Upon the foregoing,

1.    Proposed Intervenors' Motion to Intervene, Filing 18, is denied;

2.    Proposed Intervenors' Motion for Stay of Proceedings Pending Appeal, Filing 45, is denied; and

3.    The Parties' Joint Motion for Entry of Consent Judgment, Filing 2, is granted, albeit with some editorial amendments to the proposed Consent Judgment.

Dated this 3rd Day of June, 2026.

BY THE COURT:

Brian C. Buescher
United States District Judge

Appellate Case: 26-2124    Page: 133    Date Filed: 06/12/2026 Entry ID: 5650825

Add.107

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>STATE OF NEBRASKA,<br><br>Defendant. | **8:26CV172**<br><br>**CONSENT ORDER AND FINAL JUDGMENT** |

This case is before the Court on the parties' Joint Motion for Entry of Consent Judgment. Filing 2. The Court has considered the parties' Joint Motion and all papers in support of and opposition to the Joint Motion, and for good cause shown,

IT IS ORDERED AND ADJUDGED that the parties' Joint Motion, Filing 2, is granted.

IT IS FURTHER ORDERED AND ADJUDGED that those portions of the Neb. Rev. Stat. §§ 85-502, 85-1907(3), 85-3202(6), and 85-2102(6) that extend eligibility for in-state tuition benefits to aliens unlawfully present in the United States violate the Supremacy Clause and are invalid, and

IT IS FURTHER ORDERED AND ADJUDGED that the State of Nebraska, as well as its successors, agents, and employees, are forever restrained and enjoined from enforcing those portions of Neb. Rev. Stat. §§ 85-502, 85-1907(3), 85-3202(6), and 85-2102(6) that extend eligibility for in-state tuition benefits to aliens unlawfully present in the United States.

1

This final judgment is issued pursuant to Federal Rule of Civil Procedure 58(a).

Dated this 3rd Day of June, 2026.

BY THE COURT:

Brian C. Buescher
United States District Judge

2