# In the United States Court of Appeals for the Eighth Circuit

---

**UNITED STATES OF AMERICA,**

*Plaintiff-Appellee,*

*v.*

**STATE OF NEBRASKA,**

*Defendant-Appellee,*

**OREL ALLIANCE** AND **TRUE POTENTIAL SCHOLARSHIPS,**

*Movants-Appellants.*

---

On Appeal from the United States District Court
for the District of Nebraska
The Honorable Brian C. Buescher

---

## DEFENDANT-APPELLEE STATE OF NEBRASKA'S OPPOSITION TO MOTION FOR STAY

---

MICHAEL T. HILGERS
Attorney General of Nebraska

Nebraska Department of Justice
1445 K Street, Room 2115
Lincoln, Nebraska 68508
Tel.: (402) 471-2683
Fax: (402) 471-3297

CODY S. BARNETT
Solicitor General
cody.barnett@nebraska.gov

Counsel for State of Nebraska

# TABLE OF CONTENTS

Page

Introduction ............................................................................................. 2

Argument ................................................................................................. 4

   I.   Putative Intervenors Are Not Likely to Succeed on the
Merits ............................................................................................. 4

       A.  Putative Intervenors lack standing. ...................................... 4

       B.  Putative Intervenors have not satisfied the
requirements for intervention. .............................................. 11

       C.  The Consent Judgment is valid. ........................................... 14

   II.  Putative Intervenors Will Not Suffer Irreparable Harm ........... 17

  III. Neither the Equities Nor the Public Interest Favor a
Stay ............................................................................................... 18

Conclusion ............................................................................................. 19

# INTRODUCTION

Twenty years ago, the State of Nebraska enacted laws that extended in-state tuition benefits to illegal immigrants. Then-Governor Dave Heineman "vetoed the bill because it violated federal law and was bad policy," but the unicameral Legislature overrode his veto. Kris Kobach, *The Senate Immigration Bill Rewards Lawbreaking: Why the DREAM Act Is a Nightmare*, The Heritage Foundation (Aug. 14, 2006).[1]

Fast forward to the present. Shortly after taking office in 2025, President Trump issued two executive orders that made clear the United States would no longer tolerate such violations. He ordered federal departments and agencies to "ensure … that no taxpayer-funded benefits go to unqualified aliens" and to "take appropriate action to stop the enforcement of State and local laws, regulations, policies, and practices favoring aliens over any groups of American citizens that are unlawful, preempted by Federal law, or otherwise unenforceable, including State laws that provide in-State higher education tuition to aliens but not to out-of-State American citizens." R. Doc. 1, at 4 (first quoting Executive

---

[1] Available at https://perma.cc/UY4E-BUZL.

Order 14218, then quoting Executive Order 14287). Accordingly, the United States sued Nebraska and alleged violations of the Supremacy Clause. *See id.* at ¶¶ 11–16. Nebraska agreed with the United States's position, and both parties asked the Court to "enter a permanent injunction" preventing the Nebraska laws from being enforced to "extend eligibility for in-state tuition benefits to aliens who are not lawfully present in the United States." R. Doc. 2, at 2.

Movants True Potential and Orel Alliance ("Putative Intervenors")—"two organizations that fund and assist immigrants pursuing higher education in Nebraska"—wanted "to intervene … to defend the validity of the challenged Nebraska statutes." R. Doc. 18, at 1. Yet Putative Intervenors did not have standing and otherwise failed to satisfy Rule 24's requirements for intervention, so the district court properly denied their motion. R. Doc. 49, at 10–27. After "an independent inquiry," the court also granted the Consent Judgment. *Id.* at 39, 54.

Putative Intervenors now seek a stay pending appeal. But nothing warrants that "extraordinary remedy." *Nken v. Holder*, 556 U.S. 418, 428 (2009). This Court should deny their request.

# ARGUMENT

## I. Putative Intervenors Are Not Likely to Succeed on the Merits

To obtain the "extraordinary remedy" of a stay pending appeal, *Nken*, 556 U.S. at 428, Putative Intervenors must make, among other things, "a strong showing that [they are] likely to succeed on the merits," *Kansas v. United States*, 124 F.4th 529, 533 (2024) (quoting *Nken*, 556 U.S. at 434). The likelihood of success is the "most important factor" and requires "more than a mere possibility of relief." *Id.* (internal quotation marks and citations omitted).

For three reasons, Putative Intervenors have failed to clear this high hurdle. *First*, Putative Intervenors have no concrete injury and thus lack standing to intervene in this matter. *Second*, Putative Intervenors have failed to show that the Nebraska Attorney General inadequately represents any interest they may have in this litigation. Fed. R. Civ. P. 24(a)(2). *Finally*, Putative Intervenors have not impugned the validity of the Consent Judgment.

This Court should deny Putative Intervenors' request for a stay pending appeal.

### A. Putative Intervenors lack standing.

Putative Intervenors cannot succeed on the merits because they "must" yet cannot "establish Article III standing." *United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 833 (8th Cir. 2009). "To demonstrate standing, [intervenors]" needed to "*clearly* allege facts showing an injury

in fact, which is an injury to a legally protected interest that is concrete, particularized, and either actual or imminent." *Id.* at 833–34 (emphasis added) (internal quotation marks and citation omitted). Because Putative Intervenors "challenge[] the government's [allegedly] unlawful regulation … of *someone else*"—namely, the State of Nebraska—they have a "substantially more difficult" task. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024) (internal quotation marks and citation omitted). Both True Potential and Orel Alliance fall far short.

Start with True Potential. It alleged that the Consent Judgment would result in insufficient "funds to pay the full tuition of the 27 students attending public community and state colleges in Nebraska during the 2026–2027 school year." R. Doc. 21, Ex. 1 at ¶ 16. For at least two reasons, that does not establish a cognizable injury.

*First*, it's too speculative. True Potential never averred that a single student purported to receive one of the 27 scholarships is unlawfully present in the United States and therefore at risk of needing more money under the Consent Judgment. That makes True Potential's claim that it will be unable to fully fund all 27 pledged scholarships pure speculation. *See* R. Doc. 32, at 7 ("*If* the students that True Potential has committed to support lose their eligibility for in-state tuition, True Potential simply would not have the funds to finance the education they pledged to pay for starting in 2026.") (emphasis added).

True Potential tried to say that it will "need to renegotiate its administrative agreements and increase fundraising efforts," and *that* will cause it to "renege on its commitment to the 27 students." R. Doc. 21, Ex. 1 at ¶ 18–19. But the Consent Judgment is too "far removed from [the] distant (even if predicable) ripple effects" of this ostensible injury. *All. for Hippocratic Med.*, 602 U.S. at 383. The Consent Judgment does not target a chain of which Putative Intervenors are an inevitable link. "Invalidation of the Nebraska statutes based on preemption only affects who may be eligible for in-state tuition." R. Doc. 49, at 18. The Consent Judgment is not the "direct[]" cause of these attenuated consequences (if they even come to pass), so True Potential cannot claim them as injuries that confer standing. *All. for Hippocratic Med.*, 602 U.S. at 379.

Not only that, but it's a patent attempt to "manufacture … standing" where none exists. *Id.* at 394. An "organization … cannot spend its way into standing simply by expending money to gather information and advocate." *Id.* Otherwise, "all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." *Id.* at 395. If True Potential decides it needs to engage in more fundraising in the wake of a Consent Judgment it dislikes, that does not mean True Potential can claim additional fundraising as a litigable injury.

*Second*, True Potential has not identified any legal obligations that the Consent Judgment would affect. Not only did True Potential fail to

demonstrate a single scholarship that the Consent Judgment would jeopardize, but it also failed to show that it even has a legal obligation to provide those scholarships in the first place. At most, True Potential says it will have to "renege" on its promise. But an allegation that an organization will have to "break its promise … is not the kind of concrete and particularized invasion of a legally protected interest necessary to demonstrate an injury in fact." *Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) (internal quotation marks and citation omitted).

Orel Alliance fares no better. It posits that it will "need to spend more money covering the filing fees for Ukrainian immigrants to apply for parole." R. Doc. 21, Ex. 2 at ¶ 24. Yet again, Orel Alliance does not identify a single Ukrainian immigrant that would be affected by the Consent Judgment. So its fears about increased costs are simply too speculative to count as a cognizable injury.

Similarly, Orel Alliance frets that "*if* these students become ineligible for in-state tuition … these same Ukrainian immigrants will turn to Orel Alliance for referrals to charitable financial services instead of education services," which will "undermine[] Orel Alliance's goal of supporting an independent and self-reliant Ukrainian immigration population in Nebraska." *Id.*, Ex. 2 at ¶ 25 (emphasis added). It further postulates that *if* these things come to pass, Orel Alliance will have to "hire a new full-time employee" "to develop new organizational resources." *Id.*, Ex. 2 at ¶ 26. Again, this is another blatant attempt to bootstrap standing

where none exists. "Undermining" a nongovernmental organization's goals is too ephemeral to serve as a concrete injury, lest every organization obtain "standing to challenge almost every federal policy that they dislike." *All. for Hippocratic Med.*, 602 U.S. at 395.

None of Putative Intervenors' counterarguments persuade otherwise. Putative Intervenors contend that they have standing as organizations because the Consent Judgment impairs their "core business activities." Intervenors' Motion at 10 (citing *Get Loud Arkansas v. Jester*, 171 F.4th 1058, 1064 (8th Cir. 2026)).

But organizational standing requires more than an impairment of business activities. Rather, organizations must show that the challenged actions "*directly* affected and interfered with the organization's core business activities." *Get Loud Arkansas*, 171 F.4th at 1064. As the Supreme Court made clear, "the standing doctrine serves to protect the 'autonomy' of those who are *most directly affected* so that they can decide whether and how to challenge the defendant's action." *All. for Hippocratic Med.*, 602 U.S. at 379–80 (emphasis added). Three times the Supreme Court highlighted the need for organizations to demonstrate a "direct" effect to have standing. *Id.* at 379, 385, 395.

Yet Putative Intervenors cannot show a direct effect. To start, the Consent Judgment doesn't stop them from doing anything. *All. for Hippocratic Medicine*, 602 U.S. at 374 ("But the plaintiffs do not prescribe or use mifepristone. And FDA is not requiring them to do or refrain from

doing anything."). All it does is bar Nebraska from enforcing unconstitutional statutes. *See* R. Doc. 49, at 18. Intervenors remain free to "fund[] 100% of the tuition costs" for "undocumented" students and to provide "education referral services for Ukrainian immigrants." Intervenors' Motion at 10–11. That's different from the organization in *Get Loud Arkansas*, who challenged a rule that "directly interfered with Get Loud's voter registration activities by prohibiting the use of its online registration tool[.]" 171 F.4th at 1064.

Instead of asserting a direct effect on their core activities, Putative Intervenors attempt a form of third-party standing. The Consent Judgment *directly* regulates Nebraska. R. Doc. 49, at 18. Some illegal immigrants within the State may feel "predictable" effects therefrom. *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025). And only then *might* Putative Intervenors feel downstream effects. But that's too remote to qualify as a "direct effect" to Putative Intervenors.

Because Putative Intervenors are so distant, whatever costs they incur are not fairly traceable to the Consent Judgment. Like the medical organizations in *Alliance for Hippocratic Medicine*, Putative Intervenors assert organizational based on financial costs associated with actions they will take in response to the Consent Judgment. The Supreme Court made clear that, without a "direct effect," organizations "cannot manufacture [their] own standing in that way." *All. for Hippocratic Med.*, 602 U.S. at 394.

*Get Loud Arkansas* further drives this point home. Because the organization there suffered a direct effect from the challenged regulation, it "*spent* additional time, labor, and resources to redesign its online tool and *hired* additional staff." 141 F.4th at 1064 (emphasis added). These increased costs weren't speculative or an attempt to spend the organization's way into court—they happened, and they happened in direct response to the regulation.

Intervenors ask the Court to fill any speculative gaps by drawing "all reasonable inferences" in their favor. Intervenors' Motion at 12. But inferences can only be drawn so far. They "must be based upon facts and not upon other inferences." *Brown v. Md. Cas. Co.*, 55 F.2d 159, 161 (8th Cir. 1932). While True Alliance pled that its ability to fund scholarships was "contingent on … students eligibility for in-state tuition without regard to immigration status" and also pled the "immigration statuses of the students [it] serve[s]," it takes more than a reasonable inference to bridge the gap between those two statements. Just because True Alliance serves some illegal immigrants does not mean that the 27 scholarship recipients are themselves illegal.

At bottom, Putative Intervenors failed to "*clearly* allege facts showing an injury in fact." *Metro. St. Louis Sewer Dist.*, 569 F.3d at 833–34 (emphasis added). Without standing, they cannot succeed.

## B. Putative Intervenors have not satisfied the requirements for intervention.

Not only did Putative Intervenors fail to demonstrate standing, but they also did not establish an "interest in the subject matter of the litigation" that would be impaired that "existing parties do not adequately protect[.]" *Entergy Ark., LLC v. Thomas*, 76 F.4th 1069, 1071 (8th Cir. 2023) (quoting Fed. R. Civ. P. 24).

To start, Putative Intervenors have no interest in this litigation that warrants intervention. As reviewed above, Putative Intervenors are at least three degrees removed from the Consent Judgment. For the same reasons that Putative Intervenors lack standing, they also do not have a necessary interest to intervene. R. Doc. 49, at 21–23.

Whatever interest Putative Intervenors have, the Nebraska Attorney General adequately represents it. When "a proposed intervenor's asserted interest is one that a governmental entity who is a party to the case is charged with protecting," this Court "presume[s] that the government's representation is adequate." *Entergy Ark., LLC*, 76 F.4th at 1071. To determine adequacy, this Court "focus[es] on what the case is about." *Id.* at 1072 (quotation marks omitted). And this case is binary: Do the Nebraska laws violate federal law (and thus the Supremacy Clause)?

Nebraska law entrusts the Nebraska Attorney General with the duty to "defend actions and claims against the state." Neb. Rev. Stat. § 84-205(1). The Attorney General routinely defends the constitutionality

of Nebraska statutes, and Nebraska's courts explicitly acknowledge that role. *See, e.g.*, Neb. Sup. Ct. R. § 2-109(E) (providing that appellate briefs asserting unconstitutionality of a Nebraska statute must be served on the Attorney General and the Attorney General shall be entitled to file a response and may be heard at oral argument); *State v. Catlin*, 953 N.W.2d 563, 566 (Neb. 2021) (recognizing that Rule 2-109 "ensures that the Attorney General has been notified of the challenge to the constitutionality of a statute, so that the Attorney General may carry out the common-law duty to defend all duly adopted statutory enactments that are not unconstitutional").

That duty, however, has discretionary components. For the Attorney General's duty to defend state laws extends only to those "duly adopted" and "not unconstitutional." *State v. Denton*, 949 N.W.2d 344, 347 (Neb. 2020) (acknowledging "the Attorney General has some duties which are not purely statutory and are sometimes referred to as the 'common-law duties of the office'" including that "he or she must defend duly adopted statutory enactments that are not unconstitutional"). Although sparingly, the Attorney General has conceded unconstitutionality before. *See, e.g.*, *Planned Parenthood of the Heartland v. Heineman*, 724 F. Supp. 2d 1025, 1042 (D. Neb. 2010) ("This Court appreciates the Defendants' integrity and candor in acknowledging that LB 594 violates the Commerce Clause of the United States Constitution.").

Here, the Attorney General has exercised his discretion and concluded that the challenged Nebraska laws cannot be legally defended and has agreed to the proposed Consent Judgment. This is consistent with his duty and adequately represents whatever interests Putative Intervenors have.

That the Attorney General has exercised his discretion in a way that Putative Intervenors disagree with does not mean he inadequately represents their interest. "It is not sufficient that the party seeking intervention merely disagrees with the litigation strategy or objectives of the party representing its interests." *Little Rock Sch. Dist. v. N. Little Rock Sch Dist.*, 378 F.3d 774, 780 (8th Cir. 2004). To overcome the strong presumption that the State (through the Attorney General) adequately represents Putative Intervenors' interests, Putative Intervenors needed to show "that the *parens patriae* has committed misfeasance or nonfeasance in protecting the public." *North Dakota ex rel. Stenehjem v. United States*, 787 F.3d 918, 922 (8th Cir. 2015) (quoting *Chiglo v. City of Preston*, 104 F.3d 185, 188 (8th Cir. 1997)).

Putative Intervenors failed to meet this high bar. The Attorney General carefully considered the legal arguments and concluded that the United States's legal position was correct and, as a matter of legal strategy, it would be best to save the taxpayers money and agree to a Consent Judgment on a clear legal question. *See Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO CLC v. City of Cleveland*, 478 U.S. 501, 528

(1986) ("Consent decrees are an often-used avenue of resolution and "primarily a means by which parties settle their disputes without having to bear the financial and other costs of litigating."). He—the constitutional officer charged with making such decisions—considered and rejected the very arguments that Putative Intervenors want to make. *E.g.*, R. Doc. 20, at 8 (asserting the Tenth Amendment as an affirmative defense). That's not a "clear dereliction of duty," *Stenehjem*, 787 F.3d at 922—it's the exact opposite.

While Putative Intervenors might disagree with the Nebraska Attorney General, that disagreement does not warrant intervention. Putative Intervenors "failed to overcome the presumption that the Nebraska Attorney General adequately represents the interests of the citizens of the state in this litigation." R. Doc. 49, at 25.

### C.    The Consent Judgment is valid.

Finally, Putative Intervenors have not made the strong showing that the district court improperly entered the Consent Judgment. "When reviewing a proposed consent decree, the trial court is to review the settlement for fairness, reasonableness, and adequacy." *United States v. Met. St. Louis Sewer Dist.*, 952 F.2d 1040, 1044 (8th Cir. 1992). Here the district court did just that, making "an independent inquiry and determination" after a thorough review of the proposed Consent Judgment. R. Doc. 49, at 39, 51–53.

Putative Intervenors' counterarguments fail to persuade. First, Putative Intervenors argue that the district court did not weigh the equities, which they contend warrants reversal. Intervenors' Motion at 16. Not true. When the district court evaluated whether the Constitution preempts the challenged Nebraska laws, that itself weighed the equities. "The public has *no interest* in enforcing an unconstitutional" law. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) (emphasis added). Instead, the equity "is best served by preventing governmental intrusions into the rights protected under the Federal Constitution" and "preventing [States] from enforcing a law that is plainly unconstitutional[.]" *Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019).

Second, Putative Intervenors contend that the parties' agreement on the legal issues deprived the district court of jurisdiction to enter the Consent Judgment. While the parties ultimately agreed on the legal issues, a case or controversy nonetheless existed. Although a "friendly, non-adversary proceeding" in which a government does not defend its own laws "introduce[s] a complication," a controversy exists so long as that government, despite its agreement on the "legal contention," does not give it effect. *United States v. Windsor*, 570 U.S. 744, 756, 759 (2013); *see also INS v. Chadha*, 462 U.S. 919, 940 n.12 (1983) ("Even though the government largely agreed with the opposing party on the merits of the controversy, we found an adequate basis for jurisdiction in the fact that

the government intended to enforce the challenged law against that party.").

*Windsor* is instructive. There, the United States "retain[ed] a stake sufficient to support Article III jurisdiction" because it refused to give the plaintiff—whose legal positions the United States agreed with—the relief she sought. 570 U.S. at 757. The same is true here. Despite the parties' agreement, Nebraska did not "take[] the further step" of giving the United States the relief it sought—namely, to cease enforcing the challenged Nebraska laws. *Id.* at 758.

Similarly in *Chadha*, the parties agreed on the legal issues, and the Supreme Court still concluded that "[a] case or controversy is presented by this case." 462 U.S. at 939. The Court explained that "it would be a curious result if, in the administration of justice, a person could be denied access to the courts because the Attorney General of the United States agreed with the legal arguments asserted by the individual." *Id.* The same logic applies where the agreement is between two sovereigns rather than between a private individual and a sovereign. Just as the parties' agreement as to the legal issues did not affect the practical outcome in *Chadha* (*i.e.*, that Chadha would be deported), the parties' agreement here does not affect the practical outcome: The Nebraska Laws remain in effect. *Cf. id.* at 939–40. A contrary ruling would lead to the untenable result that the United States has no means of judicial redress against unconstitutional state laws when the State's

executive branch happens to agree with United States Attorney General about the merits of a preemption claim. *See* R. Doc. 2, at ¶ 2. The Constitution does not demand this absurdity.

## II.   Putative Intervenors Will Not Suffer Irreparable Harm

Putative Intervenors also failed to make a "strong showing" that they "will be irreparably injured absent a stay." *Kansas*, 124 F.4th at 533 (quoting *Nken*, 556 U.S. at 434). To obtain a stay pending appeal, irreparable harm is "most critical" and requires "more than some *possibility* of irreparable injury." *Id.* (emphasis added) (internal quotation marks and citation omitted). For the same reason that Putative Intervenors' claimed injuries were too speculative to give them standing, so also are they too ephemeral to constitute irreparable harm.

Moreover, Putative Intervenors' injuries are largely financial in nature, and economic losses are generally not irreparable. *Choreo, LLC v. Lors*, 164 F.4th 667, 671 (8th Cir. 2026). Putative Intervenors speculate that their financial losses *might* be unrecoverable, as it *could* be "unclear whether [they] would be able to recover those amounts even if the Consent Judgment is ultimately vacated." Intervenor Mot. at 21. But it's Putative Intervenors' burden to back up that contention, and they did not. *Kansas*, 124 F.4th at 533. "[N]othing in the record demonstrates irreparable harm will occur absent" a stay. *Choreo, LLC*, 164 F.4th at 671.

## III. Neither the Equities Nor the Public Interest Favor a Stay

Finally, Putative Intervenors have not shown that a stay pending appeal favors "the public interest[.]" *Kansas*, 124 F.4th at 533 (quoting *Nken*, 556 U.S. at 434). As reviewed above, the "public has *no interest* in enforcing an unconstitutional" law. *KH Outdoor, LLC*, 458 F.3d at 1272 (emphasis added). Instead, "it is always in the public interest to protect constitutional rights." *Rodgers*, 942 F.3d at 458. That's no less true when the Constitution protects the structure of our government. "[A] healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991). So the public simply has no interest in the enforcement of state statutes that upset that balance.

Putative Intervenors are wrong to contend that "the Nebraska Attorney General [cannot] claim any harm from a partial delay in an injunction against Nebraska's own democratically enacted statutes." Intervenors' Mot. at 22. The Nebraska Attorney General takes an oath to "support the Constitution of the United States[.]" Neb. Const. art. XV, § 1. Democratically enacted or not, statutes cannot offend the "supreme Law of the Land." U.S. Const. art. VI, cl. 2.

Appellate Case: 26-2124    Page: 19    Date Filed: 06/22/2026 Entry ID: 5653271

## CONCLUSION

The Court should deny Putative Intervenors' motion for a stay pending appeal.

Dated: June 22, 2026                    Respectfully submitted.

MICHAEL T. HILGERS                      /s/ Cody S. Barnett
Attorney General of Nebraska            CODY S. BARNETT
                                        Solicitor General
                                        cody.barnett@nebraska.gov

Nebraska Department of Justice          Counsel for State of Nebraska
1445 K Street, Room 2115
Lincoln, Nebraska 68508
Tel.: (402) 471-2683
Fax: (402) 471-3297

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 3,861 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word (the same program used to calculate the word count).

/s/ Cody S. Barnett
CODY S. BARNETT

# CERTIFICATE OF SERVICE

On June 22, 2026, this filing was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that the document has been scanned for viruses and is free of viruses.

/s/ Cody S. Barnett \_
CODY S. BARNETT

Appellate Case: 26-2124    Page: 22    Date Filed: 06/22/2026 Entry ID: 5653271