No. 26-2124

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff - Appellee

v.

STATE OF NEBRASKA,
Defendant - Appellee

v.

OREL ALLIANCE and MATTERS ON TOMORROW, TRUE POTENTIAL
SCHOLARSHIP,
Intervenor Defendants – Appellants

On Appeal from the United States District Court for the District of
Nebraska, No. 8:26-cv-0172
The Hon. Brian C. Buescher, U.S. District Judge

## BRIEF FOR APPELLANTS

Nicholas K. Grandgenett
Robert E. McEwen
James A. Goddard
947 O Street, Suite 401
Lincoln, NE 68508
Phone: (402) 438-8853
ngrandgenett@neappleseed.org

Orlando C. Economos
Joshua M. Salzman
Paul R.Q. Wolfson
Brian D. Netter
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
oeconomos@democracyforward.org

*Counsel for Orel Alliance and True Potential Scholarship*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and 8th Cir. R. 26.1.A., Appellant Orel Alliance states that it is a Nebraska not-for-profit organization, that it is not a subsidiary of any corporation, and that it does not have any stock which can be owned by a publicly held corporation.

Appellant Matters on Tomorrow, acting through its program True Potential Scholarship, states that it is a Nebraska not-for-profit organization, that it is not a subsidiary of any corporation, and that it does not have any stock which can be owned by a publicly held corporation.

*/s/ Joshua Salzman*
Joshua Salzman

**SUMMARY OF CASE / STATEMENT REGARDING ORAL ARGUMENT**

The United States sued Nebraska, alleging that state laws governing in-state tuition eligibility at Nebraska's postsecondary schools are preempted by federal law. In "partnership" with the United States, Nebraska immediately joined a motion to have its own laws invalidated. Two organizations that provide services to affected students, and who would be adversely affected by the judgment, moved to intervene to defend the challenged laws. The district court denied intervention and entered a consent judgment invalidating Nebraska's longstanding tuition laws. This caused the tuition of many currently enrolled students, including those served by the putative intervenors, to skyrocket. Those organizations have appealed to challenge both the denial of their intervention motion and the entry of the consent judgment. Appellants have challenged the consent judgment on an array of independent grounds, including jurisdiction, statutory merits, constitutional validity, and remedial scope.

Given the importance of the case, which facially invalidated longstanding Nebraska statutes, and the number of issues, Appellants respectfully suggest that the Court allocate 30 minutes per side of oral argument time.

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................... 1

STATEMENT OF JURISDICTION ................................................................. 2

STATEMENT OF THE ISSUES ..................................................................... 3

STATEMENT OF THE CASE .......................................................................... 4

    A.    Nebraska Law Provides Pathways to In-state Tuition Regardless of Immigration Status or State Residence..... 4

    B.    The United States Sues and Nebraska Immediately Capitulates ....................................................................... 6

    C.    The District Court Rejects Intervenors' Attempt to Defend Nebraska Law ...................................................... 7

SUMMARY OF ARGUMENT ...................................................................... 10

STANDARD OF REVIEW ........................................................................... 12

ARGUMENT ............................................................................................... 12

    I.    The District Court Erred In Denying Intervention ................... 12

        A.    Intervenors Have Article III Standing. .......................... 12

            1.    Intervenors' core business is directly affected by the Consent Judgment. ........................................ 13

            2.    The district court erred by misconstruing precedent on standing and dismissing Intervenors' allegations............................................................. 15

        B.    Intervenors Were Entitled to Intervene of Right. .......... 22

            1.    Intervenors have substantial interests at stake..... 22

            2.    No party adequately represents Intervenors' interests................................................................. 24

    II.    The Consent Judgment Should Be Vacated............................ 26

        A.    The Erroneous Denial of Intervention Invalidates the Consent Judgment....................................................... 26

        B.    The District Court Lacked Subject Matter Jurisdiction. 28

        C.    The Consent Judgment Is Unfair and Unreasonable ..... 32

III. The Challenged Laws Are Not Preempted ............................. 35

    A. The Plain Text of Section 1623(a) Is Consistent With Nebraska Law ............................................................ 36

        1. U.S. citizens from other states are eligible for in-state tuition. ...................................................... 37

        2. In-state tuition is not a "post-secondary education benefit." ............................................................. 42

    B. Under the District Court's Construction, Section 1623 Violates the Tenth Amendment ...................................... 45

IV. In The Alternative, Section 85-502 Is Severable. ..................... 48

V. The Proposed Consent Decree Is Inequitable, Particularly As Applied To Current Students .................................................. 50

CONCLUSION ....................................................................... 53

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Angela R. v. Clinton*,
999 F.2d 320 (8th Cir. 1993) ........................................................................ 33

*Animal Legal Def. Fund v. Reynolds*,
89 F.4th 1071 (8th Cir. 2024) ...................................................................... 12

*Arizona v. United States*,
567 U.S. 387 (2012) ...................................................................................... 48

*Benisek v. Lamone*,
585 U.S. 155 (2018) ...................................................................................... 53

*Bennett v. Spear*,
520 U.S. 154 (1997) ...................................................................................... 20

*Brennan v. N.Y. City Bd. of Educ.*,
260 F.3d 123 (2d Cir. 2001) ........................................................................ 26

*Brictson Mfg. Co. v. Woodrough*,
284 F. 484 (8th Cir. 1922) ........................................................................... 30

*Brown v. Pfeiffer*,
No. 19-cv-3132, 2021 WL 4947785 (D. Minn 2021) ................................. 33

*Brumfield v. Dodd*,
749 F.3d 339 (5th Cir. 2014) ....................................................................... 23

*Carpenters Indus. Council v. Zinke*,
854 F.3d 1 (D.C. Cir. 2017) ......................................................................... 17

*Carson v. Simon*,
978 F.3d 1051 (8th Cir. 2020). .................................................................... 33

*Chicago & Grand Trunk Ry. Co. v. Wellman*,
143 U.S. 339 (1892). ........................................................ 3, 29

*Chiglo v. City of Preston*,
104 F.3d 185 (8th Cir. 1997) ...................................... 24, 25

*Common Cause R.I. v. Gorbea*,
970 F.3d 11 (1st Cir. 2020) ................................................ 33

*Ctr. for Biological Diversity v. Strommen*,
114 F.4th 939 (8th Cir. 2024) ...................................... 32, 33

*Dahle v. Kijakazi*,
62 F.4th 424 (8th Cir. 2023) ....................................... 32, 33

*Diamond Alternative Energy, LLC v. Env't Prot. Agency*,
606 U.S. 100 (2025) .......................................... 17, 20, 21

*Doe v. United States*,
58 F.4th 955 (8th Cir. 2023) ........................................... 12

*eBay Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006) ...................................................... 3, 50

*Epperson v. State of Ark.*,
393 U.S. 97 (1968) ............................................................ 47

*Ewing v. Scotts Bluff County Bd. of Equalization*,
227 Neb. 798 (1988) ....................................................... 49

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .................................................. 12, 21

*Finch v. Treto*,
82 F.4th 572, 579 (7th Cir. 2023) ................................. 51

*Fuller v. Volk*,
351 F.2d 323 (3d Cir. 1965) .......................................... 30

*Get Loud Arkansas v. Jester*,
  171 F.4th 1058 (8th Cir. 2026) ...................................................... 3, 12, 15, 16, 18

*Granville House, Inc. v. Dep't of Health & Hum. Servs.*,
  715 F.2d 1292 (8th Cir. 1983) ...................................................... 13, 14

*Grove City Coll. v. Bell*,
  465 U.S. 555 (1984) ...................................................... 44

*Grutter v. Bollinger*,
  188 F.3d 394 (6th Cir. 1999) ...................................................... 23

*Immigrant Defs. L. Ctr. v. Noem*,
  145 F.4th 972 (9th Cir. 2025) ...................................................... 15, 18

*INS v. Chadha*,
  462 U.S. 919 (1983). ...................................................... 31, 32

*Iowa v. Wright*,
  154 F.4th 918 (8th Cir. 2025) ...................................................... 16

*Kasper v. Bd. of Election Comm'rs of the City of Chicago*,
  814 F.2d 332 (7th Cir. 1987). ...................................................... 34

*Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*,
  478 U.S. 501 (1986) ...................................................... 3, 28

*Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
  70 F.4th 582 (D.C. Cir. 2023) ...................................................... 20

*Martinez v. Regents of Univ. of Cal.*,
  241 P.3d 855 (Cal. 2010) ...................................................... 30, 49, 50

*Mausolf v. Babbitt*,
  85 F.3d 1295 (8th Cir. 1996) ...................................................... 2, 12, 25

*Medical Liability Mut. Ins. Co. v. Alan Curtis LLC,*
  485 F.3d 1006 (8th Cir. 2007) ...................................................... 22

*Mille Lacs Band of Chippewa Indians v. Minnesota*,
989 F.2d 994 (8th Cir. 1993)................................................................... 22

*Moore v. Charlotte-Mecklenburg Bd. of Educ.*,
402 U.S. 47 (1971) ...................................................................... 3, 29

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453 (2018) .......................................................... 3, 45, 46, 48

*Muskrat v. United States*,
219 U.S. 346 (1911) ............................................................................ 29

*Nat'l Parks Conservation Ass'n v. U.S. Env't Prot. Agency*,
759 F.3d 969 (8th Cir. 2014)........................................................ 3, 20, 22

*Printz v. United States*,
521 U.S. 898 (1997). ........................................................................... 48

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*,
120 F.4th 390 (4th Cir. 2024)............................................................. 17

*Sanguine, Ltd. v. U.S. Dep't of Interior*,
736 F.2d 1416 (10th Cir. 1984)........................................................... 25

*Sanguine, Ltd. v. United States Dep't of Interior*,
798 F.2d 389 (10th Cir. 1986)............................................................. 26

*SEC v. Citigroup Glob. Mkts., Inc.*,
752 F.3d 285 (2d Cir. 2021) ............................................................... 33

*South Dakota ex rel. Barnett v. U.S. Dep't of Interior*,
317 F.3d 783 (8th Cir. 2003)............................................................... 25

*Spatt v. New York*,
361 F. Supp. 1048 (E.D.N.Y. 1973), *aff'd*, 414 U.S. 1058 (1973)..................... 44

*St. Charles Tower, Inc. v. Kurtz*,
643 F.3d 264 (8th Cir. 2011) .............................................................. 34

*Starns v. Malkerson*,
  326 F. Supp. 234 (D. Minn. 1970), *aff'd*, 401 U.S. 985 (1971) ......................... 45

*Styczinski v. Arnold*,
  141 F.4th 950 (8th Cir. 2025) ............................................................. 49

*Texaco Puerto Rico, Inc. v. Dep't of Consumer Affs.*,
  60 F.3d 867 (1st Cir. 1995) ............................................................... 53

*Tilton v. Richardson*,
  403 U.S. 672 (1971) ........................................................................ 49

*Trbovich v. United Mine Workers of America*,
  404 U.S. 528 (1972) ........................................................................ 24

*United States v. Hansen*,
  599 U.S. 762 (2023). ....................................................................... 36

*United States v. Illinois*,
  No. 3:25-cv-01691, 2025 WL 2524028 (S.D. Ill. Sept. 2, 2025) ...................... 30

*United States v. Johnson*,
  319 U.S. 302 (1943) ........................................................................ 29

*United States v. Lopez*,
  514 U.S. 549 (1995) ........................................................................ 47

*United States v. Massachusetts*,
  No. 1:26-cv-12952 (D. Mass. filed June 29, 2026) ................................... 30

*United States v. Newsom*,
  No. 2:25-cv-03375 (E.D. Cal.) .......................................................... 30

*United States v. Rhode Island*,
  No. 1:26-cv-419 (D.R.I. filed June 29, 2026). ...................................... 30

*United States v. Texas*,
  -- F.4th --, 2026 WL 1983151 (5th Cir. July 9, 2026) ...................... 27, 42, 46

*United States v. Union Elec. Co.*,
    64 F.3d 1152 (8th Cir. 1995) ...................................................................................... 23

*United States v. Virginia*,
    No. 3:25-cv-01067 (E.D.V.A.) ................................................................................ 30

*United States v. Walz*,
    No. 26-1886 (8th Cir. filed June 25, 2025) .......................................................... 30

*United States v. Walz*,
    No. 25-cv-2668, 2026 WL 851231 (D. Minn. Mar. 27, 2026) ................. 3, 30, 39

*United States v. Windsor*,
    570 U.S. 744 (2013) ......................................................................................... 31, 32

*Vlandis v. Kline*,
    412 U.S. 441 (1973) ................................................................................................ 47

*Walden v. Kosinski*,
    153 F.4th 118 (2d Cir. 2025) ................................................................................. 21

*Windsor v. United States*,
    699 F.3d 169 (2nd Cir. 2012) ................................................................................ 32

*Wineries of Old Mission Peninsula Ass'n v. Twp. of Peninsula, MI*,
    No. 22-1534, 2022 WL 22236853 (6th Cir. Aug. 23, 2022) .............................. 26

*WundaFormer, LLC v. Flex Studios, Inc.*,
    680 F. App'x 925 (Fed. Cir. 2017) ....................................................................... 39

*Wyeth v. Levine*,
    555 U.S. 555 (2009) ............................................................................................... 47

**Statutes**

**8. U.S.C.**

§ 1101 ...................................................................................... 37

§ 1601(1). ................................................................................ 45

§ 1621(c)(1)(B). ....................................................................... 43

§ 1623(a). ............................................................................. 3, 37


**20 U.S.C.**

§ 1015d ................................................................................... 44

§ 1015d(a) ............................................................................... 47

§ 1070 ..................................................................................... 43


**Neb. Rev. Stat.**

Neb. Rev. Stat. § 51-201.02. ...................................................... 45

Neb. Rev. Stat. § 84-205 (2025). ................................................ 29

Neb. Rev. Stat. § 85-1907(3) ...................................................... 43

Neb. Rev. Stat. § 85-2102(6) ...................................................... 43

Neb. Rev. Stat. § 85-3202(6) ...................................................... 43

Neb. Rev. Stat. § 85-502 ........................................................ 48, 50

Neb. Rev. Stat. § 85-502(6)-(8) .................................................. 38

Neb. Rev. Stat. § 85-502(9)(a)(ii) ............................................ 48, 50

Neb. Rev. Stat. § 85-502(9)..................................................................... 36, 50

Neb. Rev. Stat. § 85-502.01. ..................................................................... 38

**Other Statutes**

Minn. Stat. § 135A.043(a). ....................................................................... 50

# Other Authorities

Br. in Opp., *Day v. Bond*,
   No. 07-1193, 2008 WL 2151696 (U.S. May 19, 2008)..................................... 30

Nebraska Statewide Workforce & Educational Reporting System, *Postsecondary
   graduation provides important individual and societal benefits*, Nswers.org (last
   visited Aug. 3, 2026). ................................................................................ 52

Nebraska Statewide Workforce & Educational Reporting System, *Postsecondary
   Persistence,* Nswers.org ............................................................................ 52

# Rules

Federal Rule of Civil Procedure 24(a)................................................................ 22

## INTRODUCTION

Nebraska law has long enabled certain graduates of Nebraska high schools to pay in-state tuition at Nebraska public colleges and universities, without regard to their immigration status. After decades of inaction, the United States filed a suit alleging that Nebraska's longstanding laws governing tuition at its own state universities are preempted by a 30-year-old federal statute, 8 U.S.C. § 1623(a). The Nebraska Attorney General made no effort to defend the State's laws; instead, he immediately waived service and co-signed a Joint Motion for Entry of Consent Decree. Governor Jim Pillen publicly boasted about "the combined efforts of President Trump's Department of Justice and Attorney General Hilgers" to secure what he called the "overdue" invalidation of democratically enacted Nebraska laws. App.093-95; R. Doc. 21 at 44-46 (DOJ Press Release).

Given the Nebraska Attorney General's abdication of his duty to defend Nebraska law, two organizations that fund and assist immigrants pursuing higher education in Nebraska, and whose missions and operations would be adversely affected by invalidation of the challenged laws, sought to intervene. The district court, however, denied intervention based on a standing analysis that is contrary to Supreme Court and Eighth Circuit precedent. The court also concluded that the putative intervenors were adequately represented by the State, even as the State was affirmatively seeking the invalidation of the statutes Intervenors sought to defend.

The court then entered the proposed consent judgment, despite the fact the nominal adversaries before the court were active partners collaborating to obtain a shared policy goal. Moreover, the court reached the wrong result on the merits. The Nebraska legislature was cognizant of Section 1623 and specifically crafted the challenged statutes to comply with federal law. The district court's overly capacious reading of Section 1623 misreads the statute's plain language. It also raises grave constitutional concerns by infringing upon core state prerogatives. And, in a final error, the district court refused even to consider the reasonable reliance interests of students who have already invested considerable time and money in educations imperiled by the consent judgment. Each of these errors mandates reversal.

**STATEMENT OF JURISDICTION**

The United States invoked the district court's jurisdiction under 28 U.S.C. §§ 1331 and 1345. App.013; R. Doc. 1 at 2. The district court denied Intervenors' intervention motion on May 22, 2026. App.105; R. Doc. 43. It then entered final judgment in the underlying litigation on June 3, 2026. App.420-21; R. Doc. 50. On June 5, 2026, Intervenors filed a timely appeal of both orders. App.422-23; R. Doc. 54.[1] This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

---

[1] Intervenors are entitled to appeal the consent judgment, notwithstanding the denial of intervention. *See Mausolf v. Babbitt*, 125 F.3d 661, 666 (8th Cir. 1997).

## STATEMENT OF THE ISSUES

1.  Whether intervention should have been granted.

    - *Get Loud Arkansas v. Jester*, 171 F.4th 1058 (8th Cir. 2026)

    - *Nat'l Parks Conservation Ass'n v. E.P.A.*, 759 F.3d 969 (8th Cir. 2014)

2. Whether the consent judgment should be vacated because intervention was improperly denied, because there was never a genuine case or controversy, and because the judgment was neither fair nor reasonable.

    - *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501 (1986)

    - *Chicago & Grand Trunk Ry. Co. v. Wellman*, 143 U.S. 339 (1892)

    - *Moore v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 47 (1971)

3. Whether the challenged statutes are validly preempted by Section 1623(a).

    - 8 U.S.C. § 1623

    - *United States v. Walz*, No. 25-cv-2668, 2026 WL 851231 (D. Minn. Mar. 27, 2026)

    - *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018)

4. Whether the district court erred in refusing to consider the equities before entering injunctive relief.

    - *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 394 (2006)

**STATEMENT OF THE CASE**

### A. Nebraska Law Provides Pathways to In-state Tuition Regardless of Immigration Status or State Residence

Nebraska public post-secondary schools, like public universities and colleges in other states, charge substantially higher tuition to students who lack a connection to Nebraska than is charged to students who qualify for "in-state" tuition. Schools set the rates: at the University of Nebraska at Omaha, for example, in-state tuition costs $9,880 per year; out-of-state tuition costs $26,400. App.069-78 (Univ. of Neb. Omaha, *Estimated Cost of Attendance*). And Nebraska law determines who is eligible: Section 85-502 of the Nebraska Revised Statutes provides ten distinct pathways, half of which require physical presence in Nebraska and half of which do not, by which students may qualify for in-state tuition. These include habitual presence by an emancipated minor, Neb. Rev. Stat. § 85-502(1); marriage to a Nebraskan, *id.* § 85-502(4); relation to a University of Nebraska staff member, *id.* § 85-502(6); and military or National Guard service, *id.* §§ 85-502(7), (8).

As relevant here, one of these pathways, now codified as subsection (9), was added by the Nebraska legislature in 2006. *See* App.079-81; R. Doc. 21, Ex. 4 (L.B. 239 Slip Law). L.B. 239 was introduced so that "anybody" from "Mexico or Minnesota" could attend a Nebraska post-secondary school at the in-state rate so long as they meet certain criteria. *See* App.121; R. Doc. 44-2 at 16 (introductory statement of L.B. 239 sponsor). The bill provided that any student may qualify for

in-state tuition so long as they live in Nebraska for three years, graduate from a Nebraska high school while living with a parent or guardian, and aver that they will apply for "permanent residen[ce]" when "eligible to do so." Neb. Rev. Stat. § 85-502(9).

When crafting this provision, the Legislature was cognizant of 8 U.S.C. § 1623, which specifies that students not "lawfully present" cannot be eligible "on the basis of residence within a State" for a "postsecondary education benefit" unless "a citizen or national" is also entitled without regard to residence. L.B. 239 was specifically drafted to comply with federal law and to not provide any benefits to undocumented that are unavailable to U.S. citizens. *See* App.113-14; R. Doc. 44-2 at 8-9 (introductory statement of L.B. 239 sponsor). Thus, while an impetus for the bill was to promote Nebraska's interest in making educational and economic opportunities available to immigrants who could contribute to Nebraska's future workforce, the bill was designed so that "any citizen" who meets the bill's criteria would be eligible for in-state tuition "as required under [8 U.S.C. § 1623]." App.112, 129; R. Doc. 44-2 at 7, 24.

For two decades, L.B. 239 has ensured Nebraska's post-secondary schools remain affordable for Nebraska's high school graduates. And despite some opposition, the Legislature has repeatedly declined to repeal it, rejecting two repeal bills in the most recent legislative session. App.079-91; R. Doc. 21 at 30-42 (L.B.

239, *supra* p. 4; L.B. 870, 109th Leg., 2d Sess. (Neb. 2026); L.B. 1061, 109th Leg. 2d Sess. (Neb. 2026)).

### B. The United States Sues and Nebraska Immediately Capitulates

In April 2026, the United States sued Nebraska alleging that Section 85-502, together with three related provisions that allow students who qualify for in-state tuition to access certain scholarship programs, violate the Supremacy Clause on the theory that they are preempted by Section 1623. App.013; R. Doc. 1 at 2.[2] Before a summons was even issued, Nebraska jointly moved with the United States for a consent judgment invalidating and enjoining the challenged statutes. App.012-33; R. Docs. 1, 2; R. Doc. 3.

The Parties trumpeted their use of the litigation to achieve a shared policy preference. The U.S. Attorney for the District of Nebraska praised "the quality of partnership between Nebraska state leaders and the Department of Justice." App.093-95; R. Doc. 21 at 44-46 (DOJ Press Release). Governor Pillen likewise celebrated "the combined efforts of President Trump's Department of Justice and Attorney General Hilgers" as "the latest example of the tremendous partnership between the State of Nebraska and the Trump Administration." *Id.* Governor Pillen added that he was "grateful for the combined efforts of President Trump's

---

[2] The three other statutes are Neb. Rev. Stat. §§ 85-1907(3), 85-3202(6), and 85-2102(6).

Department of Justice and Attorney General Hilgers to deliver this long overdue correction." *Id.*

## C. The District Court Rejects Intervenors' Attempt to Defend Nebraska Law

**1.** Following the Attorney General's capitulation, two organizations that fund and assist immigrants pursuing higher education in Nebraska, promptly moved to intervene to oppose entry of the consent judgment.

True Potential Scholarship operates as an independent subprogram within Matters on Tomorrow, a Nebraska-based non-profit organization. Add.058; App.054; R. Doc. 21 at 5. True Potential's core business is to operate a scholarship program that funds 100% of the tuition costs and fees for students who are ineligible for federal financial aid, live in Nebraska or Iowa, completed their senior year of high school in the United States, and plan to attend a community or state college in Nebraska or Iowa. Add.058-59; App.054-55; R. Doc. 21 at 5-6. Since True Potential was founded in 2013, it has provided more than 300 scholarships to students who are undocumented or living in Nebraska under immigration statuses such as Deferred Action for Childhood Arrivals ("DACA") or Temporary Protected Status ("TPS"). Add.059; App.055; R. Doc. 21 at 6. True Potential has committed to paying 100% of the tuition and fees for 26 students attending Nebraska public post-secondary colleges in the 2026-2027 academic year. Add.060; App.056; R. Doc. 21 at 4. True Potential lacks the resources to honor this commitment unless these 26

students retain their eligibility for in-state tuition. Add.059-60; App.055-56; R. Doc. 21 at 3-4. The consent decree would require True Potential to incur substantial additional fundraising costs and potentially renege on its commitments. Add.061; App.057; R. Doc. 21 at 5.

Orel Alliance is an Omaha-based nonprofit organization that ensures Ukrainian families can obtain the assistance necessary to rebuild and thrive in Nebraska. Add.063; App.060; R. Doc 21 at 11. One of Orel's primary services is assisting students with identifying schools and education programs, including connecting them with attorneys and resources for applying for the proper immigration status to apply to those programs. Add.064-65; App.061-62; R. Doc. 21 at 12-13. For the 2026-2027 school year, Orel will assist 23 Ukrainian immigrants with referrals to the University of Nebraska at Omaha and an additional 15 to public community colleges for credit-based ESL classes. Add.068; App.065; R. Doc. 21 at 16. But Orel's ability to refer those students to these schools is dependent on their eligibility for in-state tuition, without which education would be prohibitively expensive. *Id.* Orel Alliance has also provided tuition assistance to Ukrainian students in the past and anticipates doing so in the future if Ukrainian students are eligible for in-state tuition. *Id.* Orel's services also include paying immigration filing fees for certain USCIS applications. Add.066; App.063; R. Doc. 21 at 14. Orel explained that invalidation of the challenged Nebraska laws would require the

students Orel supports to make additional immigration filings costing $2,350 per student in order to help the students retain eligibility for in-state tuition (which would be available with an alternative, but otherwise unnecessary, immigration status). Add.069-70; App.066-67; R. Doc. 21 at 17-18. Like True Potential, their ability to continue these services is conditioned on the students' eligibility for in-state tuition. Add.068; App.065; R. Doc. 21 at 16.

**2.** The district court denied intervention, allowing Intervenors to participate only as amici curiae. Add.001; App.105; R. Doc. 43. The court concluded that Intervenors lack standing because they are not legally bound to provide their core services and because Intervenors' increased costs are attenuated from the consent judgment. Add.015-19; App.379-382; R. Doc. 49 at 14-18. The court also found that Intervenors lack a cognizable interest that would support intervention of right and that they are adequately represented by Nebraska. Add.024-26; App.388-390; R. Doc. 49 at 23-25.

The court then adopted the consent judgment. It concluded that it had jurisdiction over this "friendly" lawsuit, Add.037-39; App.401-403; R. Doc. 49 at 36-38; that enforcement of Section 1623 against the State raises no federalism concerns, Add.046; App.410; R. Doc. 49 at 45; and that the challenged statutes are preempted to the extent they allow unlawfully present immigrants to access in-state tuition, Add.051; App.415; R. Doc. 49 at 50. And though Intervenors had urged the

Court to tailor any injunction to protect the interests of currently enrolled students, the court entered an injunction that takes immediate effect, without any equitable analysis.

## SUMMARY OF ARGUMENT

The district court committed a series of errors in preventing Orel and True Potential from providing the defense of Nebraska's tuition laws that the Nebraska Attorney General refused to offer, and in then entering a consent judgment enjoining enforcement of those longstanding state laws.

First, the district court was wrong to deny intervention. Intervenors' core business activities are threatened by the invalidation of Nebraska law because it would strip the students they support of eligibility for in-state tuition and thus increase the cost of supporting those students through tuition hikes and immigration application fees. That gives Intervenors both standing to intervene and a substantial interest that will be impaired by the outcome of this case, and no other party will adequately represent that interest because the United States and the Nebraska Attorney General have agreed on every facet of this case from the start. To reach a contrary conclusion, the district court misread precedent from this Court and the Supreme Court and imposed its own, stricter standards for standing and intervention.

Second, the consent judgment should be vacated because Intervenors were not permitted to litigate its merits. The denial of intervention to a party with a right to

defend its interests is alone sufficient to invalidate the judgment. The district court also lacked jurisdiction because there has never been any adversity between the parties that could constitute a case or controversy. And the Parties' collusion produced a consent judgment that is both unreasonable and procedurally unfair.

Third, the consent judgment is wrong on the merits because Section 1623 does not preempt Nebraska law. The text of Section 85-502, read properly, does not conflict with Section 1623 because it does in fact allow United States citizens from other states to qualify for the same tuition rates extended to individuals without lawful presence, and because the rates offered are not a "postsecondary education benefit" as defined in federal law. Even if there were tension between the two, Section 1623 could not validly preempt Nebraska law because it would function as a command to the states in violation of the Tenth Amendment.

Fourth, should the Court find any portion of Nebraska law preempted, it should sever the offending portion and preserve the rest—for example, by stripping the residence requirement in Section 85-502(9)(a)(ii) so that it does not depend on "residence," while leaving the rest of the criteria—and the path to in-state tuition they create—intact.

Finally, the district court erred by failing to consider the equities when enjoining the relevant provisions of Nebraska law. In so doing, the court overlooked the students who have invested time and money in reasonable reliance on the

stability of the legal arrangements that allowed them to pursue their educations in the first place.

## STANDARD OF REVIEW

Denial of a motion to intervene as of right is reviewed *de novo*. *Mausolf v. Babbitt*, 85 F.3d 1295, 1302 (8th Cir. 1996). The district court's legal conclusions regarding the interpretation and constitutionality of a federal statute are reviewed de novo. *Doe v. United States*, 58 F.4th 955, 958 (8th Cir. 2023).

## ARGUMENT

## I. The District Court Erred In Denying Intervention

The district court held that the Intervenors had both failed to establish Article III standing and failed to satisfy the intervention criteria in Federal Rule of Civil Procedure 24(a)(2). Both conclusions are wrong.

### A. Intervenors Have Article III Standing.

A party has standing if it (1) is suffering or will suffer an injury-in-fact that is (2) fairly traceable to the challenged conduct and (3) redressable by the Court. *Animal Legal Def. Fund v. Reynolds*, 89 F.4th 1071, 1077 (8th Cir. 2024). As this Court recently reaffirmed, "[a]n organizational plaintiff satisfies the injury-in-fact requirement if a defendant's actions directly affected and interfered with the organization's core business activities." *Get Loud Arkansas v. Jester*, 171 F.4th 1058, 1064 (8th Cir. 2026), *reh'g denied*, 2026 WL 1459895 (8th Cir. May 22, 2026); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (non-

12

profit organization can demonstrate standing to challenge actions that interfere with its "core business activities"); *Granville House, Inc. v. Dep't of Health & Hum. Servs.*, 715 F.2d 1292, 1298 (8th Cir. 1983) (organization has standing to challenge actions that would "perceptibly impair[]" "ability to provide [its] services").

### 1. Intervenors' core business is directly affected by the Consent Judgment.

Both True Potential and Orel Alliance have core missions of providing services, including tuition assistance, to students, including undocumented students, who qualified for in-state tuition under the Nebraska law provisions enjoined in the consent judgment. Those services are now more expensive to provide—if they can be provided at all—and both organizations are being directly impeded from continuing to provide their core services.

True Potential faces a quintessential pocketbook injury as a result of the consent judgment. It committed to fund the full cost of tuition for 26 Nebraska students in the 2026-2027 academic year based on the expectation that those students would retain their eligibility for in-state tuition, as provided for under Nebraska law. The consent judgment will cause those tuitions to skyrocket, driving up the cost to True Potential of honoring its commitment and maintaining the program that is central to the program's mission. As True Potential's declarant explained, the organization's ability to finance those tuitions "is contingent on these students' retaining eligibility for in-state tuition." Add.060; App.056; R. Doc. 21 at 7. The

Consent Judgment thus places True Potential in the untenable position of needing to renege on its commitment to these students unless it can raise additional funds or renegotiate administrative arrangements for students' educations. Add.061; App.057; R. Doc. 21 at 8.

Orel likewise provides services, including tuition assistance and educational referral services, to Ukrainian students who depend on the enjoined statutes for their eligibility for in-state tuition. Add.067-68; App.064-65; R. Doc. 21 at 15-16. The consent judgment impedes Orel's achievement of its mission in several ways. Orel faces the financial burden of expensive filing fees for otherwise unnecessary immigration applications for impacted students. Add.069; App.066; R. Doc. 21 at 14. And because the consent decree will make education unaffordable for many of the students Orel serves, it will frustrate demand for Orel's educational services and force Orel to restructure its operations and hire a new staff member if it is to continue performing its preexisting mission of promoting the financial independence of Nebraska's Ukrainian community through educational attainment. Add.070; App.067; R. Doc. 21 at 18; *cf. Granville*, 715 F.2d at 1299 (non-profit chemical dependency treatment center had standing to challenge rule that made it harder to achieve its mission of serving indigent clients, even if the center could avoid financial harm by serving wealthier clientele instead). Like True Potential, Orel's

ability to continue these services is conditioned on the students' eligibility for in-state tuition. Add.068; App.065; R. Doc. 21 at 16.

Thus, Intervenors have far more at stake than a mere ideological objection to the consent judgment and have not sought to "manufacture an injury merely by diverting resources in response to a defendant's action." *Get Loud*, 171 F.4th at 1064. Rather, they persued intervention to oppose government action that burdens, financially and otherwise, their ability to perform the pre-existing core missions. *See Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 988 (9th Cir. 2025) (holding that organization had standing based on actions taken "to *continue* carrying out its core activities and longstanding mission"). Because True Potential and Orel face increased costs and reduced demand for their longstanding programs, they have each alleged a "concrete and particularized injury in fact." *Iowa v. Wright*, 154 F.4th 918, 939 (8th Cir. 2025) (quotation marks omitted); *see also Get Loud*, 171 F.4th at 1064 (finding standing where the plaintiff "spent additional time, labor, and resources . . . and hired additional staff" to continue performing its mission after adoption of the challenged rule).

### 2. The district court erred by misconstruing precedent on standing and dismissing Intervenors' allegations.

The district court accepted that the Consent Judgment would "increas[e] [Intervenors'] costs of providing their services." Add.016; App.380; R. Doc. 49 at 15. Yet, despite acknowledging this classic pocketbook injury, it nonetheless

concluded that Intervenors had failed to demonstrate either a cognizable injury or the traceability required to establish standing. This conclusion rested on a misreading of this Court's precedents and an overly restrictive reading of the Intervenors' declarations.

**a.** The district court first erred by imposing an unduly stringent test for determining whether the Intervenors had demonstrated a cognizable injury. Although this Court recently reaffirmed that an organization has standing to challenge actions that "directly affected and interfered with the organization[s'] core business activities," *Get Loud Arkansas*, 171 F.4th at 1064, the district court expressed doubt as to whether "interfering with an organization's 'core business activities'" is actually sufficient to "establish the requisite injury in fact" needed to confer standing. Add.014-15; App.378-79; R. Doc. 49 at 13-14. To address this purported issue, the district court added its own "clarifying" gloss to this Court's test, requiring organizational plaintiffs to demonstrate that the challenged action "require[s] or forbid[s]" some action by the plaintiff and that the challenged action would "reclassify the organization's business or impose requirements for the conduct of its business." Add.015; App.379; R. Doc. 49 at 14. The court also suggested that the Intervenors might be required to demonstrate that they were "legally bound" to provide their services. Add.017; App.381; R. Doc. 49 at 16.

These additional hurdles flout governing law. A party need not be the immediate object of a regulation to be injured by it. *See, e.g.*, *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 112 (2025); *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 2 (D.C. Cir. 2017) (Kavanaugh, J.) (holding that lumber industry group had standing to challenge a critical habitat designation that was likely to reduce the overall lumber supply). *Diamond Alternative* explains that the separate traceability and redressability requirements may be affected when the plaintiff is not directly regulated. 606 U.S. at 112. But injuries are not inherently less substantial or cognizable merely because the harm flows through the regulation of a third party. And, as discussed below, Intervenors here demonstrated that their injuries were traceable to the consent judgment and would be redressed if they were to prevail in defeating it.

Recent decisions from other circuits confirm that non-profit or advocacy organizations—no less than for-profit businesses—can establish cognizable injuries when government action impedes their missions even when the plaintiff is not directly targeted by that action. The Fourth Circuit held that the Republican National Committee could challenge actions by a state elections board that did not directly require or prohibit any action by the RNC but interfered with organizational and voter outreach efforts and required the expenditure of additional resources to combat voter fraud. *See Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th

390, 397 (4th Cir. 2024). Similarly, the Ninth Circuit held last year that an organization that provides legal assistance to noncitizens could challenge an asylum policy that frustrated the organization's ability to achieve its mission of providing those services. *See Immigrant Defs*, 145 F.4th at 987-88.

Nor is there any foundation for the district court's suggestion that Intervenors were required to show that they were "legally bound" to provide their tuition assistance or other services. Add.017; App.381; R. Doc. 49 at 16. An organization (or business) will almost always have the option of ceasing operations if the regulatory environment becomes unfriendly. In *Get Loud*, this Court did not ask whether the plaintiff organization was legally obligated to conduct its volunteer voter registration activities before concluding that the organization could challenge a regulation that made those activities "substantially less effective." 171 F.4th at 1064. The district court erred in imposing a higher burden on Intervenors here.

**b.** The district court also faulted Intervenors for not "identif[ying] any specific recipients" of their services who are "aliens unlawfully present." Add.016; App.380; R. Doc. 49 at 15. But both organizations described the immigration statuses of the students they serve, which include undocumented students and students with DACA, TPS, pending asylum claims, and similar statuses. Add.059; App.055; R. Doc. 21 at 6 ("True Potential provides scholarship funds to students who are undocumented or are authorized to live in Nebraska through deferred action . . . or Temporary

18

Protected Status[.]"); Add.068; App.065; R. Doc. 21 at 16 ("Of these 23 immigrants [Orel supports], 13 have TPS, a pending TPS application, or a pending asylum application."); *id.* (explaining Orel typically refers Ukrainians experiencing a gap in immigration status, or who may be enrolled in other immigration programs, to public community colleges for credit-based ESL classes and anticipates doing so for 15 Ukrainians in the upcoming school year). Intervenors also confirmed that those students receive their eligibility for in-state tuition from the challenged statutes and Intervenors' abilities to provide their services is contingent on those students' eligibility for in-state tuition without regard to lawful presence. *Id.*; Add.059-60; App.056-57; R. Doc. 21 at 7-8.

Any uncertainty about which of the students supported by Intervenors will be affected is attributable to the fact that the term "lawfully present" in Section 1623 is not specifically defined. It thus remains unclear precisely which non-citizens will be treated as ineligible for in-state tuition under the consent decree. *See* Add.052; App.416; R. Doc. 49 at 51 (approving the consent decree without clarifying which categories of noncitizens will be considered not lawfully present). But Intervenors specifically alleged why they credibly fear that Nebraska will take the view that the students they serve are unlawfully present and, thus, ineligible for in-state tuition. Add.061; App.057; R. Doc. 21 at 8; Add.066-67; App.063-64; R. Doc. 21 at 14-15.

There is thus nothing speculative about Intervenors' injuries. Students they serve are likely to lose eligibility, which in turn will directly affect both organizations. Nothing more is needed to allege injury in fact, particularly given that all reasonable inferences must be drawn in Intervenors' favor. *See Nat'l Parks Conservation Ass'n v. U.S. Env't Prot. Agency*, 759 F.3d 969, 973 (8th Cir. 2014).

**c.** Intervenors have also shown traceability and redressability. The district court thought Intervenors' injuries too attenuated because tuition is assessed to students, not charged to the Intervenors directly. R. Doc. 49. But as the Supreme Court recently explained, a party that is not regulated directly can establish traceability when it can show that its injuries from the challenged policy are "predictable" rather than "speculative." *Diamond Alternative Energy*, 606 U.S. at 112 (citation omitted); *see also, e.g.*, *Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 593 (D.C. Cir. 2023) ("[A]n injury may be 'fairly traceable' to an agency action that is not 'the very last step in the chain of causation.'") (quoting *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997)). Here, the effect of the Consent Judgment on Intervenors—who pay tuition and immigration filing fees on behalf of students—is not merely predictable, but virtually automatic. "Third parties," here the universities, will "likely react" to the district court's judgment by "predictabl[y]" raising tuition for affected students. *Diamond Alternative Energy*, 606 U.S. at 112 (cleaned up). Raising the costs for students

raises the costs for the organizations that support them. Correspondingly, a judgment upholding Nebraska's laws would preserve the preexisting tuition structure and avoid the injuries to True Potential and Orel.

The district court dismissed *Diamond Alternative Energy* on the ground that it involved "business" instead of "philanthropy." Add.019; App.383; R. Doc. 49 at 18. But Article III does not privilege for-profit businesses and nothing in *Diamond Alternative Energy* limits its application to the private sector or business regulations. On the contrary, the Supreme Court has suggested that in evaluating the standing of a non-profit organization, it is appropriate to consider whether a similarly situated for-profit entity would have standing under similar circumstances. *See Alliance for Hippocratic Med.*, 602 U.S. at 395 (analogizing a non-profit organization's harms to those of a retailer). Here, no less than in the business context, "commonsense economic principles" provide the requisite link between the Consent Judgment and Intervenors' injuries and the downstream effect of the judgment on Intervenors' is no less predictable merely because they do not charge for their services. *Diamond Alternative Energy*, 606 U.S. at 116. *See Walden v. Kosinski*, 153 F.4th 118, 131-132 (2d Cir. 2025) (applying *Diamond Alternative Energy* outside the context of a for-profit business). That is all that is necessary to establish traceability and redressability.

**B. Intervenors Were Entitled to Intervene of Right.**

Intervenors also satisfied the requirements for intervention of right under Federal Rule of Civil Procedure 24(a). They filed a "timely [motion]," and they demonstrated "a recognized interest in the subject matter of the litigation" "that might be impaired by the disposition of the litigation" that was not "adequately protected by the existing parties." *Mille Lacs Band of Chippewa Indians v. Minnesota*, 989 F.2d 994, 997 (8th Cir. 1993).

In concluding otherwise, the district court did not question Intervenors' timeliness, but believed that Intervenors lack a cognizable interest and that their interests are adequately protected by the Attorney General. Those conclusions are wrong and disregard this Court's instruction that the intervention standard be "construed liberally, with all 'doubts resolved in favor of the proposed intervenor.'" *Nat'l Parks Conservation Ass'n*, 759 F.3d at 975 (citation omitted).

**1. Intervenors have substantial interests at stake**

For much the same reasons that Intervenors have standing, they also have cognizable organizational and financial interests in defending the challenged statutes. An interest is cognizable "where it is 'direct, substantial, and legally protectable.'" *See Medical Liability Mut. Ins. Co. v. Alan Curtis LLC,* 485 F.3d 1006, 1008 (8th Cir. 2007) (citation omitted). Even setting Intervenors' financial interests aside, interests analogous to those of Intervenors here have been repeatedly

recognized as cognizable. *See*, *e.g., Brumfield v. Dodd*, 749 F.3d 339, 343 (5th Cir. 2014) (permitting intervention of right by students' parents where a proposed consent decree could have eliminated educational opportunities stemming from educational vouchers and scholarships); *Grutter v. Bollinger*, 188 F.3d 394, 397-98 (6th Cir. 1999) (allowing intervention by, among others, a nonprofit organization whose stated mission is to preserve opportunities in higher education for African-American and Latino/a students in Michigan based on a substantial legal interest in the preservation of educational opportunities for Black and Latino students). Indeed, the district court here acknowledged that its conclusion that Intervenors lack a cognizable interest conflicts with *Grutter*. Add.024; App.388; R. Doc. 49 at 23.

It also cannot seriously be doubted that Intervenors' interest in maintaining in-state-tuition eligibility for the students they serve "might be impaired by the disposition of the litigation"—that is, "disposition of the action may as a practical matter impair or impede the applicant's ability to protect [its] interest." *Union Elec. Co.*, 64 F.3d at 1161 (alteration in original). The Consent Judgment is dispositive of the validity and enforceability of the statute that confers eligibility for in-state on the students Intervenors serve.

Intervenors face budgetary shortfalls from the consent judgment and an upending of their programs. As noted, their ability to provide services to the people they were established to assist—and whom they have assisted in the past—is

dependent on the eligibility of those Nebraska residents for in-state tuition. But because the Parties have succeeded in overturning the Nebraska laws that provided that eligibility, Intervenors will be forced either to cease assisting individuals as part of their core organizational mission or to expend additional resources trying to come up with stopgap remedies to fill sudden shortfalls.

### 2. No party adequately represents Intervenors' interests.

The district court also believed that Intervenors' interests were adequately represented by the Nebraska Attorney General, notwithstanding the fact that he has actively sought invalidation of the very laws Intervenors have sought to defend. Add.025-26; App.389-90; R. Doc. 49 at 24-25. Given this conflict in interests, Intervenors readily carried the "minimal" burden of demonstrating representation of their interests by the existing parties "may be inadequate." *Trbovich v. United Mine Workers of America*, 404 U.S. 528, 538 n.10 (1972); *see also Chiglo v. City of Preston*, 104 F.3d 185, 187-88 (8th Cir. 1997).

That conclusion is not altered by the fact that governments are often "presumed to represent the interests of its citizens as *parens patriae*," because no such presumption applies where a proposed intervenor "stands to gain or lose from the litigation in a way different from the public at large." *Chiglo*, 104 F.3d at 187-88. Here, Intervenors will be harmed, financially and otherwise, in ways that

distinguish them from other Nebraskans, who will not be similarly affected by the invalidation of the challenged pathways for qualifying for in-state tuition.

Moreover, this Court has found intervention to be proper when the putative intervenor had substantiated "concerns about the Government's enthusiasm for defending" the regulations that the intervenor sought to defend. *Mausolf*, 85 F.3d at 1303. Likewise, this Court has already indicated that an intervenor is not adequately represented by the state when the "[G]overnor failed to appeal from judgment invalidating [an] initiative measure" after having "previously expressed political opposition to the measure." *Chiglo*, 104 F.3d at 189. The present case involves an even starker conflict because the State did not even provide an initial or halfhearted defense of the challenged laws. Instead, Nebraska capitulated the same day that suit was filed as Governor Pillen cheered "the combined efforts of President Trump's Department of Justice and Attorney General Hilgers" to invalidate Nebraska's democratically enacted statute. App.094; R. Doc. 21 at 45. There could hardly be a clearer case where Intervenors' interests "actually differ from or conflict with the government's interests." *South Dakota ex rel. Barnett v. U.S. Dep't of Interior*, 317 F.3d 783, 785-86 (8th Cir. 2003); *Sanguine, Ltd. v. U.S. Dep't of Interior*, 736 F.2d 1416, 1419 (10th Cir. 1984) (finding representation inadequate where "the government in effect conceded the case at the outset").

## II. The Consent Judgment Should Be Vacated

After reversing the denial of intervention, this Court should vacate the judgment below. The improper denial of intervention alone invalidates the consent judgment because Intervenors were not afforded an opportunity to be heard in a matter implicating their rights. And the consent judgment itself is void both because the district court lacked subject-matter jurisdiction to enter it, and because it was procedurally unfair and unreasonable.

### A. The Erroneous Denial of Intervention Invalidates the Consent Judgment

At the outset, reversal of the denial of intervention alone is sufficient basis for vacating the consent decree before remanding for further proceedings. Because Intervenors' significant interests were not adequately represented in the proceedings below, that "prejudice to the intervenors can be avoided only by setting aside the prior [consent decree] and allowing the opportunity to litigate the merits of the case." *Sanguine, Ltd. v. United States Dep't of Interior*, 798 F.2d 389, 391 (10th Cir. 1986); *see Wineries of Old Mission Peninsula Ass'n v. Twp. of Peninsula, MI*, No. 22-1534, 2022 WL 22236853, at \*4 (6th Cir. Aug. 23, 2022) (relying on *Sanguine* to vacate summary judgment after reversing denial of intervention because "intervention changes the landscape and requires reconsideration"); *Brennan v. N.Y. City Bd. of Educ.*, 260 F.3d 123, 130 (2d Cir. 2001) (vacating an order that both approved a Title

26

VII settlement and denied intervention because the "merits can . . . be resolved only after appellants have an opportunity [to participate] as a party to the action").

The district court relegated Intervenors to amicus status, which was no substitute for the opportunity to participate in the litigation as parties. Intervenors were denied the opportunity to take jurisdictional discovery, which could have shed light on the extent of the coordination between Nebraska and the United States. Discovery might have yielded additional information regarding the absence of adversity between the parties and whether this suit was contrived to circumvent Nebraska's democratic process. Jurisdictional discovery could also have addressed the extent to which Nebraska is refusing to give effect to its agreement with the United States regarding the enforceability of the challenged statutes, which is a relevant consideration for determining whether the Parties are sufficiently adverse such that the case-or-controversy requirement was satisfied. *See United States v. Texas*, -- F.4th --, 2026 WL 1983151, at *14 (5th Cir. July 9, 2026) (Ramirez, J., dissenting) (explaining in the context of another suit under Section 1623 why this question can be both ambiguous and of critical jurisdictional significance).

Intervenors were likewise denied the opportunity to seek discovery concerning the policies that Nebraska has adopted for implementing the challenged provisions. This information could bear on the legal arguments—such as by

eluciating the extent to which non-resident citizens who attended high school in Nebraska have been able to access in-state tuition.

Finally, under the Parties' view, the denial of intervention threatens the ability of Intervenors to appeal an adverse judgment on the merits. The United States, at least, appears to dispute Intervenors' right to do so. *See United States v. Texas*, 25-10898, Appellee's Brief at 37 (5th Cir. Jan. 12, 2026) (arguing "this Court lacks appellate jurisdiction to vacate the consent judgment" because "'[i]t is well-settled that one who is not a party to a lawsuit, or has not properly become a party, has no right to appeal a judgment entered in that suit.'") (quoting *Edwards v. City of Houston*, 78 F.3d 983, 993 (5th Cir. 1996)).  But if Intervenors were granted party status, they would—like any party has suffered an adverse judgment—undoubtedly be entitled to appeal to the court of appeals for relief, and ultimately to the Supreme Court if necessary.

At bottom, Intervenors were denied the opportunity to litigate the merits of the case before judgment was entered—the basic due process protection inherent in adversarial proceedings. Because Intervenors were deprived of that opportunity, the consent judgment should be vacated.

## B.   The District Court Lacked Subject Matter Jurisdiction

1. Entry of the consent decree was also improper because there was no genuine case or controversy for the district court to resolve. *See Local No. 93, Int'l Ass'n of*

*Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 525 (1986) ("[A] consent decree must spring from and serve to resolve a dispute within the court's subject-matter jurisdiction."). A true case or controversy requires parties with adverse legal interests who pursue "an honest and actual antagonistic assertion of rights" against each other. *Muskrat v. United States*, 219 U.S. 346, 359 (1911); *Chicago & Grand Trunk Ry. Co. v. Wellman*, 143 U.S. 339, 345 (1892). This controversy must be "real, earnest, and vital." *Chicago & Grand Trunk Ry. Co.*, 143 U.S. at 345 "[B]y means of a friendly suit, a party beaten in the legislature [cannot] transfer to the courts an inquiry as to the constitutionality of the legislative act." *Id.* Correspondingly, when "both litigants desire precisely the same result," there is no case or controversy. *Moore v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 47, 48 (1971); *see also United States v. Johnson*, 319 U.S. 302, 305 (1943) (explaining that a suit is "collusive" when "it is not in any real sense adversary," and thereby lacks "a safeguard essential to the integrity of the judicial process, and . . . indispensable to adjudication of constitutional questions").

Here, the Nebraska Attorney General abdicated his duty to "defend actions and claims against the state." Neb. Rev. Stat. § 84-205 (2025). He instead chose to concede defeat and abandon the challenged laws before even being served with the complaint. Notably, the Attorney General capitulated despite the fact that analogous laws in other states have been upheld against challenges under Section 1623. *See*

*United States v. Walz*, No. 25-cv-2668, 2026 WL 851231 (D. Minn. Mar. 27, 2026), *appeal pending*, No. 26-1886 (8th Cir.); *Martinez v. Regents of Univ. of Cal.*, 241 P.3d 855, 863 (Cal. 2010). And many other states have actively defended their own in-state tuition statutes against similar preemption claims by the United States.[3]

The pace of the litigation also strongly indicates significant collaboration between the parties and that the proceeding was never adversarial. The joint motion for a consent judgment was filed contemporaneously with the complaint and before a request for summons was issued or the State of Nebraska even entered an appearance. *See* App.012-33; R. Doc. 1, 2. Moreover, the Parties' own statements confirm that they view the consent decree not as the proper mechanism for resolving a genuine legal dispute, but rather, as a tool to advance their mutual policy goals. *See* App.93-96; R. Doc. 21 at 44-46 (DOJ Press Release).[4]

---

[3] *See United States v. Illinois*, 3:25-cv-01691 (S.D. Ill.); *United States v. Newsom*, 2:25-cv-03375 (E.D. Cal.); *United States v. Virginia*, No. 3:25-cv-01067 (E.D.V.A.); *United States v. Massachusetts*, 1:26-cv-12952 (D. Mass.); *United States v. Rhode Island*, 1:26-cv-419 (D.R.I.). *Cf.* Br. in Opp., *Day v. Bond*, No. 07-1193, 2008 WL 2151696, at *35 (U.S. May 19, 2008) (argument by Kansas before the U.S. Supreme Court that its tuition law—which closely resembled Nebraska's—fully comports with Section 1623).

[4] Even if Intervenors had been permitted to intervene, their participation would not have cured this threshold defect because a court must have jurisdiction at the time the case is commenced. *See Fuller v. Volk*, 351 F.2d 323, 328 (3d Cir. 1965) (collecting cases) (citing *Brictson Mfg. Co. v. Woodrough*, 284 F. 484, 487 (8th Cir. 1922)).

2. The district court nonetheless determined that it had jurisdiction pursuant to *United States v. Windsor*, 570 U.S. 744 (2013), and *INS v. Chadha*, 462 U.S. 919 (1983). Add.037; App.401; R. Doc. 49 at 36. In those cases, a governmental entity "refus[ed] to give [] effect" to its agreement with the other side's legal position, as evidenced by a concrete adverse action against the opposing party in the litigation. *Windsor*, 570 U.S. at 756; *see also Chadha*, 462 U.S. at 939. In *Chadha* the Immigration and Naturalization Service was actively attempting to deport Mr. Chadha, despite its ultimate agreement with his constitutional challenge to the statutory scheme under which he was deported. *Chadha*, 462 U.S. at 923-925. And the United States withheld Edith Windsor's tax refund in the face of her suit to recover it, only later announcing that it would enforce, but not defend, the constitutionality of the act Windsor challenged. *Windsor*, 570 U.S. at 753-54.

Here, by contrast, the State of Nebraska has not taken any analogous concrete action adverse to the United States. Nor does the United States allege that the Nebraska Attorney General is actively enforcing the challenged statutes against non-compliant educational institutions. Given that *Windsor* and *Chadha* stand at the outer perimeter of Article III jurisprudence, the unusual exception recognized there should not be extended to the novel scenario here, which involves even less adversity between the Parties.

Moreover, the courts in *Windsor* and *Chadha* issued final judgment only after the cases were vigorously litigated with full adversarial presentations—in *Chadha*, by both houses of Congress, 462 U.S. at 928, 930 n.5, and in *Windsor* by the Bipartisan Legal Advisory Group ("BLAG") of the House of Representative, 570 U.S. at 754. That "sharp adversarial presentation of the issues" assuaged the *Windsor* Court that there were no prudential obstacles to the exercise of Article III jurisdiction. 570 U.S. at 761. Intervenors here were denied party status and, thus, could not provide a full defense of the challenged laws.

Finally, in both *Windsor* and *Chadha*, there was genuine adversity between the parties at the time the suits were filed. *Windsor* affirmed that Article III requirements "must be satisfied by the parties *before* judicial consideration is appropriate." 570 U.S. at 745 (emphasis added). In *Windsor*, the United States, actually defended DOMA for three months after suit was filed. *Windsor v. United States*, 699 F.3d 169, 176 (2nd Cir. 2012). And *Chadha* arose from an administrative proceeding in which the United States actively sought Mr. Chadha's deportation. 462 U.S. at 923. Neither case evinced pre-suit coordination between nominal adversaries pursuing a shared objective.

### C. The Consent Judgment Is Unfair and Unreasonable

The consent judgment should also be vacated because it was not "procedurally fair" or "reasonable." *Ctr. for Biological Diversity v. Strommen*, 114 F.4th 939, 942-

43 (8th Cir. 2024) (citation omitted). The consent judgment here fails those requirements because the Parties colluded and excluded Intervenors, the Nebraska legislature, and the people of Nebraska writ large from the process that produced it.

"Federal courts in adopting consent decrees are not mere recorders of contracts from whom parties can purchase injunctions." *Angela R. v. Clinton*, 999 F.2d 320, 324 (8th Cir. 1993) (cleaned up). Courts may only approve consent judgments that were produced "in good faith and at arm's length." *Ctr. for Biological Diversity*, 114 F.4th at 942 (citation omitted). The process must be free of "improper collusion [and] corruption." *Brown v. Pfeiffer*, No. 19-cv-3132, 2021 WL 4947785, at *3 (D. Minn 2021) (citing *SEC v. Citigroup Glob. Mkts., Inc.*, 752 F.3d 285, 294-95 (2d Cir. 2021)); *see also Carson v. Simon*, 978 F.3d 1051, 1066 (8th Cir. 2020). "A state official unhappy with the lawful decisions of the state legislature should not be able to round up an agreeable plaintiff who then uses collusive litigation to 'force' the state to do what the official wants." *Common Cause R.I. v. Gorbea*, 970 F.3d 11, 17 (1st Cir. 2020); *see also Ctr. For Biological Diversity*, 114 F.4th at 942-43 ("Although they oppose the decision, they do not allege collusion or any other type of misconduct.") (citing *Common Cause R.I.,* 970 F.3d at 17)).

Here, as noted, there appears to have been no arms' length negotiation. On the contrary, the Parties announced their collaboration in working towards a shared objective. *See* App.93-96; R. Doc. 21 at 44-46 (DOJ Press Release). The timing of

the lawsuit, the order of the filings, and statements of executive officers are unmistakable indications of impermissible collusion between the United States and Nebraska.

The absence of meaningful negotiation was particularly problematic because the resulting judgment enjoins a democratically enacted state law. This Court has recognized the need for rigorous review of consent decrees that risk "infring[ing] state sovereignty." *St. Charles Tower, Inc. v. Kurtz*, 643 F.3d 264, 271 (8th Cir. 2011) (citation omitted). There, the court declined to order a consent judgment because it would have required the issuance of a permit in violation of the procedures required by state statute and regulation. *Id.* The procedure required under state law to enact the consent judgment here is legislative repeal. That context amplifies the sovereignty concerns where, as here, politically aligned federal and state executive branch officials stipulate to the unconstitutionality of a state statute they mutually oppose on policy grounds. "[D]istrict judges should be on the lookout for attempts to use consent decrees to make end runs around the legislature." *Kasper v. Bd. of Election Comm'rs of the City of Chicago*, 814 F.2d 332, 340 (7th Cir. 1987). The consent judgment here reflects the policy preferences of executive branch officers who suffered legislative defeat and then circumvented the Legislature to extinguish Nebraska's sovereign law—not the arm's length resolution of an honest controversy.

Notably, the collusion between the parties affected not only Nebraska's decision to forgo a merits defense of democratically enacted state laws, but also the scope of the resulting remedy. As discussed in greater detail below in Part V, *infra*, the United States waited twenty years to bring suit, creating substantial reliance interests on the part of students who have invested in educations in Nebraska schools. Had Nebraska been attentive to the equitable considerations facing students in its universities, it could have pushed for a phased implementation of any judgment, which would have allowed the many currently enrolled students affected by the judgment to complete their educations. But instead, Nebraska joined in a motion seeking an injunction that disregards the important equitable interests of these students.

## III.   The Challenged Laws Are Not Preempted

The Court need not decide the ultimate question of preemption at this stage; the denial of intervention should be reversed, the consent judgment vacated, and the case remanded. Should this Court nonetheless choose to reach the preemption merits, it should reverse. Properly construed, Section 1623 does not preempt Section 85-502. This conclusion is supported by the plain text of the respective statutes. And it is confirmed by the fact that under the district court's overexpansive construction of Section 1623, which prohibits States from evenhandedly offering in-state tuition to graduates of their own high schools without regard to immigration status, Section

1623 violates the Tenth Amendment. Given the ways in which Section 1623 "and the Constitution brush up against each other," the Court's "task is to seek harmony, not to manufacture conflict" as would result from adopting the district court's needlessly aggressive and invasive interpretation of Section 1623. *United States v. Hansen*, 599 U.S. 762, 781 (2023).

## A. The Plain Text of Section 1623(a) Is Consistent With Nebraska Law

Nebraska's longstanding tuition laws are consistent with federal law. The district court nonetheless held that Neb. Rev. Stat. § 85-502(9) is preempted.[5] That subsection provides in-state tuition to students who (1) resided with a parent or guardian while attending a Nebraska high school; (2) graduated from that high school; (3) resided in the state for three years before high school graduation; and (4) provided the school with an affidavit he or she will file an application to become a permanent resident at the earliest opportunity he or she is eligible to do so. Neb. Rev. Stat. § 85-502(9).[6]

---

[5] The United States also has challenged § 85-502(5), which allows "an alien" to qualify for in-state tuition if he "has applied to or has a petition pending with the United States Immigration and Naturalization Service to attain lawful status under federal immigration law" and has established a home in Nebraska with the intent to remain. Because Intervenors serve students who derive their eligibility for in-state tuition from § 85-502(9), Intervenors have focused on defending that provision.

[6] The provision is also limited to those who registered with the post-secondary education institution no earlier than the fall 2006 semester.

On the district court's telling, this evenhanded provision—which does not privilege non-citizens over citizens—contravenes Section 1623(a). That statute specifies that a person not lawfully present in the United States is ineligible "on the basis of residence within a State" for "any postsecondary education benefit" unless "a citizen or national" of the United States is eligible without regard to whether that person is such a resident. 8 U.S.C. § 1623(a). But properly construed, there is no conflict both because Nebraska does allow "a citizen or national" to obtain in-state tuition in Nebraska without regard to residency, and because in-state tuition is not a "postsecondary education benefit."

### 1. U.S. citizens from other states are eligible for in-state tuition.

**a.** Section 1623 does not categorically bar States from providing post-secondary education benefits to unlawfully present individuals on account of state residency. Instead, Congress imposed a more modest condition, precluding the provision of such benefits only "unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident." 8 U.S.C. § 1623(a).

For the purposes of Section 1623, "residence" is defined as a person's "principal, actual dwelling place in fact." 8 U.S.C. § 1101(33); *see also* 8 U.S.C § 1641 (adopting that definition for purposes of the chapter containing Section 1623). And Nebraska law provides several pathways by which "a citizen or national"

can qualify for in-state tuition without regard to their dwelling place. For example, certain veterans and their spouses and dependents can qualify for in-state tuition without dwelling within Nebraska. *See* Neb. Rev. Stat. § 85-502.01. The same is true of certain state college staff members and their dependents, the spouses and dependents of certain active duty servicemembers, and members of the Nebraska National Guard. *Id.*§§ 85-502(6)-(8). Because Nebraska's tuition laws allow non-residents these pathways to qualify for in-state tuition, they do not trigger Section 1623's prohibition on the provision of post-secondary education benefits to non-citizens and are not preempted.

**b.** In arguing otherwise, the Parties have asserted that it is not sufficient that "a citizen or national" be eligible for in-state without regard to their residency. They insist that Section 1623 should be understood to prohibit the provision of post-secondary education benefits to individuals not lawfully present unless every last citizen and national also qualifies. Therefore, on the Parties' telling, Nebraska's laws are preempted because not all non-resident citizens and nationals are eligible for in-state tuition in Nebraska.

There are multiple problems with this contention. First, that construction rewrites the statute, which says that "a" citizen or national—not "all" citizens and nationals—must be eligible for in-state tuition without regard to Nebraska residency. "[T]he indefinite article 'a' is" often "interpreted to carry the meaning of 'one or

38

more.'" *WundaFormer, LLC v. Flex Studios, Inc.*, 680 F. App'x 925, 931 (Fed. Cir. 2017) (collecting cases). Thus, it is sufficient that "a" (*i.e.*, one or more) U.S. citizen or national can qualify for in-state tuition in Nebraska without regard to residency—which is undoubtedly true here. Another court in this circuit recently read Section 1623 the same way in upholding Minnesota's analogous in-state statute. *See Walz*, 2026 WL 851231, at *10-11. As *Walz* also recognized, "[r]eading 'a' in context of the whole clause also supports a singular designation, as that 'citizen or national' mentioned in the statute is later referred to as '*the* citizen or national,' rather than 'these citizens or nationals.'" *Id.* The court thus properly rejected the Parties' effort to rewrite Section 1623.

The Parties' approach is not only inconsistent with the wording Congress chose, but also with the very structure of the provision. That approach would render the last clause of Section 1623 effectively meaningless. Congress expected that it would be possible under some circumstances for a non-citizen without lawful presence to be eligible for an education benefit "on the basis of residence within a State"—otherwise, the "unless" clause specifying the conditions when such eligibility would be allowed would be superfluous. Yet, on the Parties' telling, a person without lawful presence can only obtain a benefit based on state residence if the benefit is provided to all citizens and nationals without regard to state residence. However, a State that provides the same tuition to all citizens and nationals

regardless of state residency definitionally does not provide in-state tuition at all, thereby stripping the "unless" clause of applicability.

**c.** The district court here did not adopt the Parties' argument. It instead relied on different reasoning—never urged by the Parties—as its basis for concluding that Nebraska law does not allow "a citizen or national" to qualify for in-state tuition without regard to residency. That reasoning is equally flawed.

The court began by recognizing that under Nebraska law, "United States citizens from other states," like a professor's husband or a National Guardsman, "are eligible for in-state tuition under § 85-502." Add.050; App.414; R. Doc. 49 at 49. It nonetheless deemed those pathways "beside the point" on the theory that those provisions of Nebraska law "do not address aliens at all." *Id.* It appears the district court adopted the view that the relevant inquiry is only whether Section 85-502(9) itself—*i.e.*, the high school attendance provision—provides a pathway by which a United States citizen can qualify for in-state tuition. After concluding that the provision is only applicable to "aliens," the court found that provision invalid.

The court was wrong, however, to assume that Section 1623 requires that the very same subsection of Nebraska law provide eligibility for the post-secondary education benefit to both unlawfully present noncitizens and non-resident citizens. Nothing in the plain language of Section 1623 supports that conclusion, and the district court never explained the basis on which it reached that apparent

interpretation. Properly understood, Section 1623 is satisfied so long as the same benefit (as measured in "amount, duration, and scope") is available to "a" non-resident "citizen or national." The specific source of law is immaterial. And here, it is undisputed that there are pathways by which non-resident citizens can obtain in-state tuition at the same rate that is available to undocumented students. That is dispositive.

Although it is ultimately irrelevant, the district court was also likely wrong in concluding that subsection (9) is only available to non-citizens. Textually, the language of subsection (9) applies to all "students" broadly, which is particularly notable when contrasted with another of the statute's independent subsections, which is specific to "aliens." *See* Neb. Rev. Stat. § 85-502(5), (9). And while subsection (5) references subsection (9), that does not (contrary to the district court's supposition) reduce subsection (9) to a mere exception to subsection (5). *See Dahle v. Kijakazi,* 62 F.4th 424, 427 (8th Cir. 2023). The statute's legislative history also confirms that L.B. 239 "provid[es] the same opportunity for every Nebraska graduate" and clarified that only an "undocumented graduate" would need to fulfill the additional requirement of providing "an affidavit stating that he or she will file an application to become a permanent resident as soon as he or she is eligible." App.221; R. Doc. 44-2 at 116. Moreover, if this question truly were of critical importance, discovery could have shed light on how Nebraska schools have applied

subsection (9), which only underscores the prejudice that resulted from the district court's erroneous denial of intervention. *See* Part II.A, *supra*.

**2.      In-state tuition is not a "post-secondary education benefit."**

The challenged laws are also not preempted for the second, independent reason that in-state tuition is not a "postsecondary education benefit" within the meaning of Section 1623. Tuition is the rate a student pays to attend a college or university; it is money that flows from the student to the college. And a state's decision to offer in-state tuition to individuals with some connection to the state is not public largesse, but rather a self-interested decision to invest in its own future workforce. Indeed, the L.B. 239 Fiscal Note confirmed that the bill would not fiscally impact the state or require it to expend money. *See* App.307-08; R. Doc. 44-2 at 202-203 (L.B. 239 Fiscal Note finding a fiscal impact of $0.00).

The district court concluded that in-state tuition is a "benefit" because it provides "a 'discount' from 'out-of-state' tuition that a student who does not fall under § 85-502 would have to pay." Add.050; App.414; R. Doc. 49 at 49; *see also United States v. Texas*, 2026 WL 1983151, at *6 (reaching a similar conclusion based on the unsubstantiated assumption that in-state tuition is "discounted"). But qualifying students without lawful presence are given no discount; they are charged the same rate that is charged to all other students who (by whatever mechanism) qualify for in-state tuition. And the court offered no support for the implicit assertion

that out-of-state tuition is the baseline price as would be necessary to demonstrate that in-state tuition is discounted. The fact that the state chooses to surcharge other students who have less of a connection to Nebraska and are less likely to contribute to the state in the future does not transform access to the base in-state rate into an impermissible "benefit."

While "postsecondary education benefit" is not defined in Section 1623(a), a neighboring provision of the United States Code defines a "State or local public benefit" as including "postsecondary education . . . or any other similar benefit for which payments or assistance are provided to an individual . . . by an agency of a State." 8 U.S.C. § 1621(c)(1)(B). Properly construed, then, a "postsecondary education benefit" must involve "payments" or similar "assistance" by the State. *Cf.* 20 U.S.C. § 1070 (providing for "Student Assistance" in the form of grants and loans for postsecondary education).[7]

Under this understanding of the statute, eligibility for in-state tuition does not qualify as a postsecondary education benefit, which is nothing more than a status that enables an individual who satisfies all other requirements for admission to a Nebraska college or university to pay a particular tuition rate. This does not fit the

---

[7] This argument may apply differently with regard to the challenged scholarship programs in §§ 85-1907(3), 85-3202(6), and 85-2102(6) of the Nebraska Revised Statutes. But the scholarships are paid to the schools and thus also do not involve direct payments to students. R. Doc. 27 at 29.

mold of other government "payments" or "assistance" in education. And Congress does not use such language when it intends to legislate regarding in-state tuition rates. *See, e.g.*, 20 U.S.C. § 1015d (providing for certain individuals in federal service to qualify for in-state tuition rates based on their federal duty station).

The district court ignored the statutorily provided definitions of "postsecondary education benefit." It instead concluded that because one example of "benefit" from Merriam-Webster.com is "discounted prices and other benefits of a museum membership," that "in-state tuition is plainly an education 'benefit.'" Add.050; App.414; R. Doc. 49 at 49. But, as noted, in-state tuition is not "discounted" in the relevant sense because in-state tuition is the presumptive baseline tuition. Moreover, the district court erred in relying on a generic dictionary definition of "benefit," rather than the specific phrase "postsecondary education benefit," which is a narrower term of art.

Furthermore, in-state tuition is not a form of public assistance: the interests and goals at issue differ. *See Grove City Coll. v. Bell*, 465 U.S. 555, 565 n.13 (1984) (distinguishing "general assistance programs" such as "food stamps, Social Security benefits, [and] welfare payments" from higher education "student aid programs," in part because student aid programs "assist colleges and universities") (overruled by statute on other grounds); *Spatt v. New York*, 361 F. Supp. 1048, 1054 (E.D.N.Y. 1973), *aff'd*, 414 U.S. 1058 (1973) ("reduced tuition systems, repeatedly

withstanding equal protection attack by out-of-state students, have been upheld as contributing to the state's economy and as a means of reasonably attempting to achieve partial equalization of school financing costs between in-state students . . . and out-of-state students."); *Starns v. Malkerson*, 326 F. Supp. 234, 241 (D. Minn. 1970), *aff'd*, 401 U.S. 985 (1971) (explaining that in-state tuition rates are justified by a state interest in furthering the education of students with an "intention of remaining" in the state and who "by reason of that education, will be prepared to make a greater contribution to the state's economy and future"). After all, "an educated and culturally aware society is increasingly important in an economy in which Nebraskans must compete on a global scale." Neb. Rev. Stat. § 51-201.02.

Nebraska benefits economically and socially from having an educated populace. Indeed, education—and the economic independence it promotes—is entirely consistent with Congress's goal of having immigrant populations be "self-sufficien[t]" and not dependent on public resources. *See* 8 U.S.C. § 1601(1). Constricting the availability of in-state tuition would undermine, not further, the statute's stated purposes.

**B.    Under the District Court's Construction, Section 1623 Violates the Tenth Amendment**

The problems with the district court's construction of Section 1623 are underscored by the fact that the district court's approach renders the statute unconstitutional. "Congress cannot issue direct orders to state legislatures." *Murphy*

*v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 475 (2018); *see also id.* at 479 (recognizing that "every form of preemption is based on a federal law that regulates the conduct of private actors, not the States"). Yet the district court construed Section 1623 as inflexibly dictating to States which members of its populace can be eligible for in-state tuition at the State's own educational institutions, even when the State is providing benefits to citizens and non-citizens alike.

The Parties make clear that Section 1623 operates as a regulation of the State—not individuals—and thus violates the Tenth Amendment. Indeed, the Parties themselves told the district court that Section 1623(a) is a regulation of the State of Nebraska. *See* R. Doc. 41 at 4-5. Accordingly, as one Fifth Circuit Judge recently noted, "[l]ike the federal preemption provision the Supreme Court invalidated in *Murphy*, 'there is simply no way to understand [§ 1623(a)] . . . as anything other than a direct command to the States.'" *United States v. Texas*, 2026 WL 1983151, at *18 (Ramirez, J., dissenting) (second alteration in original).[8] It is thus precisely the sort of "direct order" to States that "Congress cannot issue." *Murphy*, 584 U.S. at 475.

Any doubt is on this score is resolved by examining how the "provision operates." *Id.* at 478. Here, although Section 1623 forbids "an alien who is not

---

[8] The *Texas* majority (wrongly) believed that Fifth Circuit precedent had already established that Section 1623 is constitutional and merely targets state laws, rather than States themselves. *See* 2026 WL 1983151, at *8. Judge Ramirez's dissent explains the flaws in this conclusion.

lawfully present" from being "eligible," it neither grants any rights nor imposes any restrictions on private actors. Rather, it regulates only eligibility for state benefits—benefits created and administered by the states themselves.

This is particularly troubling because Section 1623 encroaches on Nebraska's authority to administer its educational system—a domain in which States have always been sovereign. *See United States v. Lopez*, 514 U.S. 549, 564 (1995); *Epperson v. State of Ark.*, 393 U.S. 97, 104 (1968) (recognizing "public education in our Nation is committed to the control of state and local authorities"). Traditional state prerogatives in this area include the authority to set the criteria and level of in-state tuition. *Vlandis v. Kline*, 412 U.S. 441, 452-53 (1973) ("[A] state has a legitimate interest in protecting and preserving the quality of its colleges and universities and the right of its own bona fide residents to attend such institutions on a preferential tuition basis."). Preemption is thus particularly disfavored in this area because it encroaches "in a field which the States have traditionally occupied." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (cleaned up). Indeed, federal statutes regarding public education typically have relied on Congress's spending powers. *See, e.g.*, 20 U.S.C. § 1015d(a). But Section 1623(a) lacks any nexus to federal education spending.

The district court dismissed the Tenth Amendment concerns in a single page, reasoning that the federal government "has broad, undoubted power over the subject

of immigration and the status of aliens." Add.045; App.409; R. Doc. 49 at 44 (quoting *Arizona v. United States*, 567 U.S. 387, 394 (2012)). True. But Section 1623 regulates state tuition policies, not immigrants themselves. Because education policy is associated with the State, it is Nebraska officials "who will be blamed" when, contrary to the will of Nebraska voters, students who have the potential to be contributing members of the Nebraska economy are denied educational opportunities. *Printz v. United States*, 521 U.S. 898, 930 (1997). And it is Nebraska officials who will be required to verify the immigration statuses of students and, thus, be unconstitutionally commandeered into enforcing federal immigration policy. *Id.* at 933. This imposition of duties on Nebraska officials exceeds Congress's immigration power, which authorizes regulation only of immigrants themselves. *See Murphy*, 584 U.S. at 479. Thus, if the Court has to reach the question, it should find Section 1623 unconstitutional.

## IV.    In The Alternative, Section 85-502 Is Severable.

If the Court nonetheless finds some portion of Neb. Rev. Stat. § 85-502 preempted by valid federal law, it should excise the unconstitutional language, not strike down more of the statutory scheme than necessary. For example, if the Court concludes that Neb. Rev. Stat. § 85-502(9)(a)(ii), which requires three years of Nebraska residence prior to high school graduation, is preempted by 8 U.S.C. § 1623, then it should strike only subsection (9)(a)(ii), and leave the remainder of

subsection (9) intact, allowing a pathway to remain that turns exclusively on attendance at and graduation from a Nebraska high school. This would avoid any conflict with Section 1623, which regulates the availability of only those post-secondary education benefits that are offered on account of residency within a state. *See, e.g.*, *Martinez*, 50 Cal. 4th at 1291 (concluding that Section 1623 does not apply to a provision that provided eligibility for in-state tuition based on attendance at a state high school, rather than residency within a state).

"The cardinal principle of statutory construction is to save and not to destroy." *Ewing v. Scotts Bluff County Bd. of Equalization*, 227 Neb. 798, 808 (1988) (citing *Tilton v. Richardson*, 403 U.S. 672, 684 (1971)). "Severability is a question of state law. [A federal court's] task is to predict how the [state supreme court] would rule if confronted with this issue." *See Styczinski v. Arnold*, 141 F.4th 950, 957 (8th Cir. 2025) (citation omitted) (applying Minnesota severability law to a state statute found to violate the Dormant Commerce Clause). The Nebraska Supreme Court uses a four-factor test to determine whether a statute is severable. The Court should consider:

> (1) Whether, when absent the invalid portions, a workable plan remains. (2) Whether the valid portions of an act can be enforced independently, and where the invalid portions do not constitute such an inducement to the valid parts that the valid parts would not have passed without the invalid parts. (3) Whether the severance will do violence to the intent of the Legislature. (4) Whether a declaration of separability is included in the act, indicating that the Legislature would have enacted the bill absent the invalid portion.

*Ewing*, 227 Neb. at 806 (citation omitted).

Here, the reference to residence in Neb. Rev. Stat. § 85-502(9)(a)(ii) can be excised and still leave a workable statute. Indeed, other states have adopted analogous tuition laws that focus only on in-state high school attendance and graduation without regard to residence. *See, e.g., Martinez*, 50 Cal. 4th at 1284 (2010); Minn. Stat. § 135A.043(a).

Nothing in the relevant legislative history indicates the three-year period was even discussed during debate, much less that it was essential to the bill's passage. Maintaining the core structure of Neb. Rev. Stat. § 85-502(9), rather than invalidating all of its applications to undocumented students, is more consistent with the Legislature's choices to enact L.B. 239 over a gubernatorial veto and to reject opportunities to repeal its provisions this past year. *See supra* pp. 5-6. Thus, to the extent there is anything unconstitutional in Section 85-502, the Court should enjoin only the unconstitutional provisions and leave the remainder of the statute intact.

## V. The Proposed Consent Decree Is Inequitable, Particularly As Applied To Current Students

The district court also erred in entering a permanent injunction without conducting an equitable analysis or considering the balance of equities or the public

interest.[9] This failure is, standing alone, reversible error. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 394 (2006) (holding "the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity"). The need for courts to consider the equities when issuing injunctive relief applies in constitutional cases, particularly when the reliance interests of third parties are implicated. *See Finch v. Treto*, 82 F.4th 572, 579 (7th Cir. 2023) (denying preliminary injunction in dormant commerce clause challenge where "the harm to the plaintiffs was vastly outweighed by the severe harm to the reliance interests of" third parties).

This error was also highly prejudicial because had the district court performed the required equitable analysis, it would have been compelled to conclude that the balance of equities and public interest weigh decisively against any injunctive relief that would threaten the ability of currently enrolled students, including students served by both True Potential and Orel Alliance, to complete their educations. These students have made substantial investments of time and money based on the

---

[9] The district court briefly addressed the public interest in the context of concluding that the Intervenors had not satisfied the requirements for a stay pending appeal. Add.031; App.395; R. Doc. 49 at 30. But that analysis nowhere suggests that the court considered the separate question of whether the underlying injunction is itself equitable.

reasonable expectation that they would remain eligible for in-state tuition based on 20-year-old state statutes that the United States had never previously questioned.

For example, the average graduating college student in Nebraska takes on $32,206 of debt (Ex. 13, EducationData.org, *Student Loan Debt by State: Nebraska* (June 26, 2025), https://perma.cc/XGE8-CDYV). They assumed that debt in reliance on the expectation that educational attainment will enable them to secure better employment prospects: in Nebraska, people with a bachelor's degree have an employment rate of 83 percent, compared to 69 percent for those with a high school diploma. App.350-53; R. Doc. 44-2 at 245-48; Nebraska Statewide Workforce & Educational Reporting System, *Postsecondary graduation provides important individual and societal benefits*, Nswers.org, https://perma.cc/GE8V-XFE3. Those graduates make 74 percent more than their high school diploma-wielding counterparts. App. 354-62; R. Doc. 44-2 at 249-57; Nebraska Statewide Workforce & Educational Reporting System, *Postsecondary Persistence,* Nswers.org, https://perma.cc/8J9B-FG6M.

These substantial and legitimate reliance interests easily dwarf any countervailing interest that could have been asserted in support of an injunction that would take immediate effect. Plaintiff United States has alleged only an abstract sovereign interest and waited 20 years to raise any objection to the challenged statutes. And after decades of inaction, during which it induced reasonable reliance

by students on the challenged laws, the United States cannot plausibly claim that there was any exigency that required immediate preemption of the challenged laws even as applied to enrolled students. *Cf. Benisek v. Lamone*, 585 U.S. 155, 160 (2018) (weighing "years-long" delay in seeking injunctive relief in the balance of the equities); *Texaco Puerto Rico, Inc. v. Dep't of Consumer Affs.*, 60 F.3d 867, 878 (1st Cir. 1995) (noting that "the sovereign's dilatoriness in seeking an equitable remedy" is a relevant consideration in determining the scope and availability of relief).

Nebraska, the nominal defendant, likewise cannot identify any prejudice from a more narrowly tailored injunction that preserves some applications of the challenged laws. While Nebraska's current Governor and Attorney General have made clear their disapproval of those statutes, they remain democratically enacted state laws. The State's interest is in having those laws remain in force to the greatest extent possible.

Accordingly, the injunction should be vacated for consideration of the equities, at least as to students already enrolled in Nebraska post-secondary schools at the time the consent judgment was entered.

## CONCLUSION

For the forgoing reasons, both the denial of intervention and the district court's consent judgment should be reversed, and the district court directed to

dismiss the case for lack of jurisdiction. Should the Court not dismiss the case, the

consent judgment should nevertheless be vacated and the case remanded for further

proceedings.


Dated: August 4, 2026                                    Respectfully submitted,

*/s/ Nicholas Grandgenett*
Nicholas K. Grandgenett
Robert E. McEwen
James A. Goddard
947 O. St, Ste, 401
Lincoln, NE 68508
Phone: (402) 438-8853
Fax: (402) 438-0263

ngrandgenett@neappleseed.org
rmcewen@neappleseed.org
jgoddard@neappleseed.org

*/s/   Joshua M. Salzman*
Orlando C. Economos
Joshua M. Salzman
Paul R.Q. Wolfson
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 921-4875

oeconomos@democracyforward.org
jsalzman@democracyforward.org
pwolfson@democracyforward.org


*Counsel for Intervenors*

# CERTIFICATE OF COMPLIANCE

This brief complies with the typeface and type-volume limitations in Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 12,477 words, excluding the accompanying documents authorized by Federal Rule of Appellate Procedure 27(a)(2)(B) and the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

This brief and the accompanying addendum have been scanned for viruses and are virus free.


Dated: August 4, 2026                              */s/ Joshua Salzman*
                                                   Joshua Salzman

**CERTIFICATE OF SERVICE**

I hereby certify that on August 4, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Joshua Salzman*
Joshua Salzman